Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARC S. KIRSCHNER,
as Trustee of the Refco Litigation Trust,

            Plaintiff,

      - against -

THOMAS H. LEE PARTNERS, L.P.;
THOMAS H. LEE ADVISORS, LLC; THL
MANAGERS V, LLC; THL EQUITY
ADVISORS V, L.P.; THOMAS H. LEE
EQUITY FUND V, L.P.; THOMAS H. LEE
PARALLEL FUND V, L.P.; THOMAS H.
LEE EQUITY (CAYMAN) FUND V, L.P.;
THOMAS H. LEE INVESTORS LIMITED
PARTNERSHIP; 1997 THOMAS H. LEE
NOMINEE TRUST; THOMAS H. LEE;
DAVID V. HARKINS; SCOTT L. JAECKEL;
and SCOTT A. SCHOEN,

            Defendants.

No. 07 CIV. _____

**07 CIV 7074**

**COMPLAINT**

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee" or "Plaintiff"), as Court-approved Trustee for the Refco Litigation Trust (the "Trust"),[1] brings this action based on information and belief against the following defendants:

- Defendants Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors, LLC, THL Managers V, LLC, THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust; and

- Thomas H. Lee ("Lee"), David Harkins ("Harkins"), Scott Jaeckel ("Jaeckel"), and Scott Schoen ("Schoen") (collectively, the "THL Directors").

These defendants collectively are referred to herein as "THL" or the "THL Defendants."

Such information and belief is based on the investigation of the Trustee and his counsel and the review of, among other things, (a) filings of Refco Inc. (collectively, with its direct and indirect subsidiaries, "Refco" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) filings, documents, and testimony obtained in connection with Refco's chapter 11 case, including but not limited to documents and testimony obtained in connection with investigations conducted pursuant to Bankruptcy Rule 2004; (c) interviews with current and former employees of Refco; (d) the final report of the Court-appointed Independent Examiner in the bankruptcy cases, and interviews of persons conducted in connection with the preparation of that report; (e) indictments filed in a criminal case against several former Refco executives; and (f) other relevant public documents. Plaintiff believes that

---

[1] The Trust is the duly authorized representative to commence all claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, as approved by the United States Bankruptcy Court for the Southern District of New York on December 15, 2006 (the "Plan").

substantial evidentiary support exists for the allegations set forth herein and that after a reasonable opportunity for discovery in this action significant additional evidence will be uncovered.

### STATEMENT OF THE CASE

1.      Refco's collapse and resulting bankruptcy in October 2005 was one of the worst financial disasters ever to befall the securities industry, leaving Refco's creditors and customers owed billions of dollars.  Only two months earlier, in August 2005, under the majority ownership and control of the THL Defendants, Refco had completed a seemingly successful initial public offering (the "IPO").  Through that offering, the THL Defendants pocketed over $162.5 million through their own sales of Refco stock to the public, while at the same time exposing Refco to hundreds of millions of dollars in liabilities to the purchasers of Refco shares who bought shares in reliance on fraudulent financial statements and other misleading representations.

2.      From outward appearances, the THL Defendants were the toast of the financial community, having made a huge score by buying control of Refco in August 2004, purportedly using their much-touted financial acumen and experience to ready Refco for a successful IPO, and then reaping substantial profits from that IPO only twelve months later.

3.      As the THL Defendants knew, but Refco's customers and creditors did not, appearances were deceiving.  Through their control and ownership of Refco, the THL Defendants had become aware of severe problems with Refco, its management, and its accounting.  By the time of the IPO, the THL Defendants knew that certain top executives and managers at Refco were dishonest, and that Refco had unreliable financial statements and a disturbing lack of internal and external accounting controls.

2

4.      As Refco's majority shareholder, with responsibilities pursuant to a lucrative Management Agreement between a THL entity and Refco (the "Management Agreement"), as well as the power to control Refco through board dominance and other means discussed below, THL owed fiduciary duties to Refco.  Likewise, while they served on Refco's board, the THL Directors owed similar fiduciary duties to the company.  Those fiduciary duties required the THL Defendants to act in Refco's best interest and not just their own interests.

5.      The story of THL's misconduct is one of greed and a failure of integrity.  To date, THL has sought to portray itself as a victim that was deceived and defrauded by certain members of Refco's management.  However, the THL Defendants have hidden from public view their extensive knowledge of the serious problems at Refco during the period that the THL Defendants were in control.

6.      By the time of the IPO, the THL Defendants were well aware that Refco's existing management was dishonest and had lied to THL and others at the time of the THL Defendants' investment in Refco.  They learned that certain members of Refco's management had deceived the THL Defendants about management's own historical compensation.  And even more significantly, they learned that certain members of Refco's management had withheld from the THL Defendants a highly critical "management letter" that Refco's outside auditor, Grant Thornton LLP ("Grant Thornton"), had provided to Refco management.

7.      After assuming control of Refco, through the receipt of that letter and other means, the THL Defendants learned that Refco's financial function was in shambles, that its internal accounting and external auditing functions were ineffective, and that Refco was in no condition to be a public company.  In private emails, a number of the THL Defendants openly discussed that Refco would be better off hiring a Big Four accounting firm to replace Grant

3

Thornton, which the THL Defendants recognized was not providing the type of auditing services that could be provided by a Big Four firm.

8.    One of the THL Defendants acknowledged in an email that, were Refco to fix its systems and switch to a Big Four firm, Refco might well require a restatement of its financial statements as part of a re-audit. In other words, prior to taking Refco public the THL Defendants openly discussed the fact that Refco's financial statements could well be materially false and in need of correction, but they forged ahead anyway.

9.    Rather than fix the problems at Refco, the THL Defendants made a conscious choice to bury those problems. Instead of doing things correctly and in accordance with Refco's best interests, the THL Defendants operated Refco with the singular goal of getting a payday for themselves as quickly as possible. Notwithstanding the THL Defendants' fiduciary duties to Refco, the THL Defendants focused all of their energies and resources on accomplishing an IPO to benefit themselves, and in the process, did nothing to fix the many problems that should have been apparent to the THL Defendants based on their control of Refco.

10.    To date, THL has been able to obtain the $162.5 million in proceeds from its Refco stock sales, along with another approximately $113 million that the THL Defendants siphoned out of Refco. THL obtained those $275 million in proceeds even though THL's own breaches of fiduciary duties to Refco resulted in Refco's incurrence of hundreds of millions of dollars in additional liabilities.

11.    The motive for the THL Defendants' actions was entirely selfish. Aside from the pursuit of cash, the THL Defendants were readying themselves to raise a new multi-billion dollar private equity fund with which to grow their business. The THL Defendants' ability to mark their Refco investment to market at a significant profit through a seemingly

4

successful IPO was a critical ingredient in the THL Defendants' plan to create a favorable track record for marketing purposes.

12.    As fiduciaries, the THL Defendants had a duty to put Refco's interests ahead of their own. Faced with their need for a substantial payday, however, the THL Defendants chose to pursue their own interests and line their own pockets.

13.    In this action, Plaintiff seeks to recover the damages the THL Defendants caused Plaintiff to suffer as a result of their multiple breaches of fiduciary duties. In addition to compensatory damages, Plaintiff also seeks disgorgement by the THL Defendants of the $162.5 million in proceeds that they received by causing Refco to go public in August 2005. And Plaintiff seeks to recover fraudulent transfers totaling approximately $113 million in payments made by Refco entities to the THL Defendants.

## JURISDICTION AND VENUE

14.    On October 17, 2005, the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"). The Debtors' Plan was confirmed on December 15, 2006 by the United States Bankruptcy Court for the Southern District of New York.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. Many of the acts and transactions alleged herein occurred in substantial part in this District. Additionally, Thomas H. Lee Partners, L.P., as well as many of its subsidiaries, and each of the THL Directors, filed proofs of claim in this District related to their involvement with Refco.[2] By doing so, THL submitted itself to the jurisdiction of this Court.

---

[2]    The entities and persons filing proofs of claim include Thomas H. Lee Partners, L.P., THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership,

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, among other things, Plaintiff was appointed as Trustee in this District; Refco is, and was, headquartered in this District; and many of the acts and transactions alleged herein occurred in substantial part in this District.

## PARTIES

### A.    Plaintiff

17.    <u>Trustee</u>.  Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Trust, which was established in connection with the Plan.  The Trustee is the duly authorized representative to commence all claims and causes of action formerly owned by the Debtors. Plaintiff brings this action on behalf of, among other Refco entities, Refco Group Ltd., LLC; New Refco Group Ltd., LLC; and Refco Inc.

### B.    Certain Refco Entities

18.    <u>Refco Group Ltd., LLC</u>.  Refco Group Ltd., LLC ("<u>RGL</u>") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

19.    <u>New Refco Group Ltd., LLC</u>.  New Refco Group Ltd., LLC ("<u>New Refco</u>") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  New Refco filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

20.    <u>Refco Inc.</u>  Refco Inc., the corporate parent of both RGL and Refco Capital Markets Ltd., was organized under the laws of Delaware, with its principal place of

---

the 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. Refco Inc. filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding

company that, through its subsidiaries, provided securities brokerage, execution and clearing

services for exchange-trade derivatives, and prime brokerage services in the fixed income and

foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005

Initial Public Offering ("IPO"), and was the issuer of the stock sold pursuant to the IPO.

      21.    Refco Capital LLC. Refco Capital LLC ("RCC"), a wholly owned

subsidiary of RGL, was organized under the law of Delaware, with its principal place of business

at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.

RCC filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17,

2005.

      22.    Refco Global Finance Ltd. Refco Global Finance Ltd. ("RGF"), a wholly

owned subsidiary of RGL, was organized under the law of Delaware, with its principal place of

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. RGF filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005.

      23.    Refco Capital Markets Ltd. Refco Capital Markets Ltd. ("RCM") was a

company organized and existed under the laws of Bermuda. At all relevant times, RCM had its

principal place of business at 200 Liberty Street, Tower A, New York, New York, 10281. RCM

filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

RCM was a securities broker and foreign exchange broker and one of the three principal

operating subsidiaries of Refco.

24.     <u>Refco Securities, LLC</u>.  Refco Securities, LLC ("<u>RSL</u>"), a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.

25.     <u>Refco LLC</u>.  Refco LLC, a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281. Refco LLC was a registered Futures Commission Merchant.

26.     Set out below is an organizational chart of Refco demonstrating the relationships of the relevant Refco entities:



## C.    Defendants

27.     <u>Thomas H. Lee Partners, L.P.</u>  Thomas H. Lee Partners, L.P. ("<u>THLP</u>"), a Delaware limited partnership, is a private equity investment firm headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management.  THLP's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

28.    THLP describes itself as "one of the oldest and most successful private equity investment firms in the United States." Since its founding in 1974, THLP has represented itself as a preeminent and highly sophisticated growth buyout firm. THLP has invested approximately $12 billion of equity capital in more than 100 businesses with an aggregate purchase price of more than $100 billion. THLP holds itself out to the financial community as extraordinarily sophisticated in business and financial matters. The firm currently manages approximately $20 billion of committed capital. Notable transactions sponsored by THLP include Dunkin Brands, Nielsen, Michael Foods, Houghton Mifflin Company, Fisher Scientific, Experian, TransWestern, Snapple Beverage, and ProSiebenSat1 Media.

29.    In June 2004, THLP and its affiliates purchased a controlling 57% equity stake in Refco for approximately $507 million. As a result, THLP held a majority stake in Refco and had de facto control over its operations. As detailed below, in addition to having voting control over Refco, THLP and related THL entities had a variety of contractual rights that provided them with additional control over, and access to information about, Refco's affairs. The THL entities involved with Refco include:

- Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THLP with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts of which at all times THLP was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts owned and controlled by Equity Advisors V and Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee

9

Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THLP;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

30.     THLP, THL Advisors, Managers V, Equity Advisors V, Fund V Entities, Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are collectively referred to herein as the "THL Entities." As discussed in more detail below, the THL Entities always acted in concert. They owned a majority stake in Refco from the date of THL's leveraged buyout of Refco (the "LBO") until Refco's IPO. Additionally, from the date of the LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and exercised discretion over its affairs.

31.     THL held their interests in Refco through the Fund V Entities.

32.     Thomas H. Lee. Thomas H. Lee ("Lee") was at all relevant times subsequent to the LBO a director of Refco. Lee founded the Thomas H. Lee Company, the predecessor of THLP, in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that entity after October 2005. As a director of Refco and as Chairman and CEO of THLP, Lee was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.

33.     David V. Harkins. David V. Harkins ("Harkins") was at all relevant times subsequent to the LBO a director of Refco. Harkins also served on Refco's nominating and governance committee. Harkins is Vice Chairman and Managing Director of Private Equity

Funds of THLP, and has also served as President of THLP. As a director of Refco and as Chairman and a top executive at THLP, Harkins was actively involved in the decision to invest in Refco and THLP's subsequent monitoring of its investment.

34.    Scott L. Jaeckel. Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the LBO a director of Refco. Jaeckel also served as treasurer of New Refco, treasurer of Refco Finance Holdings, LLC, and treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of May 2004. Jaeckel is a Managing Director of THLP. Jaeckel previously served as Vice President of THLP from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A from Harvard University and his extensive experience in corporate finance includes previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THLP, Jaeckel was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

35.    Scott A. Schoen. Scott A. Schoen ("Schoen") was at all relevant times after the LBO a director of Refco. Schoen served as president of New Refco; president of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of May 2004; and sole director of Refco Finance, Inc. Schoen also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THLP in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THLP from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and, prior to joining THL, was in the private finance department of Goldman, Sachs & Co. As a director and officer of Refco and a top executive at THLP, Schoen was actively

11

involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.

### D.     The THL Entities' Control Over Refco

36.     As noted, from the date of the LBO in August 2004 until Refco's IPO in August 2005, the THL Entities and their affiliates owned a majority stake (approximately 57%) of Refco and exercised control over Refco. From the date of the IPO until Refco's bankruptcy filing, the THL Entities and their affiliates owned approximately 42.7% of Refco and continued to exercise control over the company. The THL Entities controlled RGL and New Refco as of the LBO and through the date of their bankruptcy filings, and they controlled Refco Inc. as of the date of Refco's reincorporation (discussed below) at the latest and through the date of its bankruptcy filing.

37.     The THL Directors owed fiduciary duties to RGL and New Refco at least as of August 5, 2004, the date of the LBO, when they were made directors of New Refco and when RGL's corporate documents were amended so as to give New Refco (and the THL Directors) complete control over all of RGL's actions. The THL Directors owed fiduciary duties to Refco Inc. as of August 1, 2005, at the latest, when they were installed on its board.

38.     The basis for and evidence of the THL Entities' control over RGL, New Refco, and Refco Inc., at the times set forth above includes the following:

- The THL Entities owned a majority or a controlling interest in Refco during these periods, and the THL Entities at all times acted as one with respect to their interests;

- In addition to voting control, the THL Entities had various contractual rights providing them with additional control over, and access to information about, Refco's affairs — including, but not limited to, the Management Agreement;

- The THL Entities had the right to appoint 4 of 8 directors of New Refco, as well as a joint right with another shareholder to appoint a fifth director;

- The THL Entities had the right to appoint 3 of 8 directors of Refco Inc., as well as a joint right with another shareholder to appoint a fourth director;

- The THL Entities exercised these rights by installing their own executives on New Refco's and Refco Inc.'s boards and by ensuring that the THL Directors would and did vote as one block in the THL Entities' interests;

- The THL Entities had the right to "reasonable representation" on the key committees of New Refco's boards, including its audit committee, nominating and governance committee, and compensation committee, and it designated certain of the THL Directors to sit on these committees and take part in their review of information and decision making on behalf of the THL Entities;

- Members of the THL Entities had entered into a Management Agreement with New Refco in August 2004, which agreement specifically obligated Managers V to know and understand Refco's business so that it and the THL Entities could provide management and advisory services to Refco in connection with Refco's business operations and the execution of its "strategic plan";

- The Offering Memorandum for Refco's bonds, issued as part of the LBO, indicated that the THL Entities would "have the ability to control all aspects of [Refco's] business" as a result of the LBO;

- Refco characterized itself as a "controlled company" under New York Stock Exchange Rules following Refco's IPO due to the substantial stock holdings of the THL Entities and Refco's other major shareholder;

- In addition to the involvement of the THL Directors in Refco's management, THL also made other employees of THL Entities who were not directors available to work on Refco's oversight, and certain THL executives became officers of New Refco: Schoen, Jaeckel, and George Taylor became President, Treasurer, and Secretary, respectively;

- The Securityholders Agreement entered into between certain THL Entities and New Refco effectively conferred on the THL Entities veto power over a wide range of corporate activities, including the right to merge or sell any of Refco's assets or to effect a public offering — both through a requirement of gaining the vote of 65% of New Refco's outstanding shares to take a number of important actions, and through a requirement of board approval for a wide range of corporate activities; and

- The THL Entities had and exercised the authority on behalf of Refco to sign material documents and SEC filings.

39.    As a result of the foregoing, the THL Entities were able to and did exercise control over the business affairs of RGL, New Refco, and Refco Inc. In recognition of this fact, Federal District Court Judge Gerard Lynch recently denied the THL Entities' motion to dismiss claims alleging control person liability under section 15 of the Securities Act and section 20 of the Securities and Exchange Act.[3]

## FACTUAL BACKGROUND

### A.    Refco

#### 1.    Refco's Business

40.    RGL was a holding company whose direct and indirect subsidiaries were, among other things, providers of execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets. In 2004, the Refco businesses were the largest provider of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States. Refco serviced more than 200,000 accounts from over twenty locations in over ten countries.

41.    On or around August 5, 2004, when THL consummated its Refco LBO, New Refco became the successor parent holding company of the Refco business.

42.    Refco Inc. was formed in connection with Refco's August 2005 IPO, after which 42.7% of Refco Inc.'s stock was owned by the THL Entities and its affiliates; 33.8% was owned directly and indirectly by Phillip Bennett ("Bennett"), then Refco's President and CEO; 2.7% was owned by Refco's management and other related persons; and 20.8% was owned by public investors.

---

[3]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 41, 82, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

43.    Bennett was President, CEO, and Chairman of RGL from 1998 and later also served in those roles for New Refco and Refco Inc. Bennett was forced to take a leave of absence from Refco on October 10, 2005, the day that Refco announced the existence of a previously undisclosed multi-hundred-million-dollar related-party receivable on Refco's books.

44.    Tone Grant ("Grant") was CEO of RGL until 1998, when Bennett succeeded him. Grant also co-owned a majority of RGL together with Bennett until August 2004.

45.    Robert Trosten ("Trosten") was Executive Vice President and CFO of RGL from 2001 until his resignation in October 2004.

46.    On October 17, 2005, Refco and a number of its wholly owned subsidiaries were forced into bankruptcy and eventual dissolution as a direct and foreseeable result of a massive, financial fraud perpetrated over the course of at least eight years by Bennett with the aid and assistance of various co-conspirators, including former Refco owners (Grant and Thomas Dittmer), former Refco executives (Santo Maggio and Trosten), and others (collectively, the "Bennett Co-Conspirators"). Bennett, Grant, and Trosten have been indicted and currently await trial on related criminal charges.

**B.    Leveraged Buyout**

**1.    THL Undertakes Due Diligence**

47.    THL was contacted by Credit Suisse First Boston ("CSFB") in October 2003 regarding an investment opportunity in Refco. At this early stage, THL already viewed Refco as a candidate for a THL-led IPO. THL analyzed Refco to determine whether it could make a substantial investment in Refco and then quickly turn around and sell Refco or its equity to a third party or the public.

48.     THL expressed its interest in purchasing Refco, and received a detailed "Confidential Information Memorandum" prepared by CSFB.  By mid-November 2003, THL was in talks with CSFB regarding THL's intent to submit an indication of its interest to acquire Refco.

49.     In connection with its leveraged buyout of Refco, THL undertook due diligence.  THL was tantalized by the prospect of a successful IPO of Refco that would result in significant profits to THL and its affiliates.  Although THL's diligence put it on notice of a number of issues requiring additional investigation prior to any IPO, THL did not conduct the type of follow-up that in many cases would have revealed significant problems at Refco.

50.     THL hired outside professionals to assist in its due diligence as it prepared to acquire Refco.  These professionals included Weil, Gotshal & Manges LLP ("Weil"), THL's main outside legal counsel, to conduct legal due diligence; KPMG, to review Refco's financial statements; and McKinsey & Co., which analyzed financial market structures and trends.

51.     After the consummation of the LBO, Refco (not THL) paid the $9.6 million in professional fees generated by these due diligence efforts.  Had THL determined not to go forward with the LBO, it would have been required to pay those professional fees with its own funds.

### 2.     Due Diligence Put THL On Notice That Refco Had Management Problems

52.     If THL had undertaken a thorough and complete review of Refco's operations, it would, undoubtedly, have been on notice of the true state of Refco's problematic financial situation.  As Federal District Court Judge Gerard Lynch recently stated in a related

proceeding, the problems at Refco were "glaringly suggestive of fraud . . . . [T]here was certainly a monster under the bed . . . ."[4]

### a.  Management Thwarts THL's Knowledge Of Management's Misconduct

53.    Throughout its diligence, THL knew that its professionals repeatedly were stonewalled when they tried to obtain key information from the Bennett Co-Conspirators.

54.    In March 2004, KPMG reported to THL on at least three separate occasions regarding roadblocks in KPMG's diligence effort thrown up by the Bennett Co-Conspirators.  KPMG reported the following to THL:

- The Bennett Co-Conspirators had not provided KPMG with key financial information, including information regarding the nature of receivables owed to Refco;

- Rob Trosten, RGL's CFO, was unwilling to provide data underlying certain of Refco's financial figures; and

- KPMG attempted to engage some of the Bennett Co-Conspirators in an in-depth discussion regarding the company's financial information, but those persons restricted the conversation to anecdotal, high-level information.

55.    Initially, THL grew so frustrated with the Bennett Co-Conspirators that it called off its due diligence.  A THL memo dated March 29, 2004 made the point clearly: "we have been disappointed by management's ability to answer diligence questions and respond to data requests."  On March 24, 2004,  THL's Jaeckel emailed KPMG: "please do not spend time & $ on Refco until further notice – we are struggling on diligence."

56.    Nevertheless, THL determined to move ahead with its acquisition, with full knowledge that it could not expect cooperation or candor from the Bennett Co-Conspirators.

---

[4]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 57, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

**b.**    **THL's Ignorance Of Related-Party Receivables**

57.    THL also failed to insist upon competent documentation of related-party

receivable balances at Refco during its due diligence.

58.    On April 16, 2004 — barely three weeks after it called off its due

diligence before restarting — THL sent a letter confirming its proposal to purchase Refco and

discussing the structure for a "Potential Future Initial Public Offering" for Refco, (the "Proposal

Letter").

59.    The Proposal Letter shows THL's knowledge of related-party receivables

held by Refco Group Holdings, Inc. ("RGHI") and BAWAG[5] at Refco and the significance of

those receivables to Refco's future.  The following were given as preconditions to THL's

purchase of Refco:

> [A]ny existing shareholder loans will be terminated prior to Closing and funded
> with cash otherwise payable to the Sellers [RGHI and BAWAG Overseas], and all
> existing agreements, contracts or arrangements between the Company and the
> Sellers or their affiliates will be terminated . . . . [T]he Company may distribute
> the $120 million amount that was accrued for distribution as of February 29,
> 2004, provided, however, that no more than $12 million of such distribution will
> be in cash and the remainder will be made solely through the reduction of
> amounts payable to the Company from Sellers [i.e., related-party receivables held
> by RGHI].

60.    On May 17, 2004, KPMG issued a draft report to THL summarizing its

due diligence findings.  In the section titled "Receivables: risk concentration," the report stated

as follows: "Loans at February 28, 2003 included $105 million of receivables from members,

affiliated companies and related parties."  Reflecting KPMG's limited access to information, its

---

[5]    BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse AG
("BAWAG") was at this time the owner of a reported 10% stake in Refco through its subsidiary
BAWAG Overseas Inc.

report provided no analysis of the makeup of this $105 million or any explanation of how the receivable grew so large.

61.    Had THL followed up regarding related-party receivables, it would have uncovered the fraud within Refco and would not have allowed Refco to incur hundreds of millions of dollars in additional liabilities it could not afford.

### c.    THL's Knowledge Of Regulatory And Legal Problems

62.    Refco had a highly publicized history of serious regulatory and legal problems, including repeated fines imposed by the Commodity Futures Trading Commission ("CFTC"), among other regulators.  Refco paid millions of dollars to the CFTC as penalties for Refco's improper pooling of and misuse of customer funds.

63.    This checkered past was well known within THL prior to the LBO.  In a March 12, 2004 email, Jaeckel informed THL executives that Refco was a company that played "fast and loose [with] compliance issues."  Likewise, in a May 31, 2004 email, THL's Schoen commented on Refco's history in an email to THL colleagues and a Weil attorney by saying "the old operation [Refco] was in fact fined heavily for activities such as *mixing with client funds* and parceling winnings out selectively between Refco and clients . . . ."

64.    Another internal THL email in March 2004 informed Schoen that Lee had spoken to Arthur Levitt, former head of the SEC, regarding THL's impending acquisition of Refco.  The email stated:  "Arthur [Levitt] said it (Refco) had been known as a 'pump and dump' operation."

65.    THL knew that disciplinary actions brought by Refco's regulators ensnared even the most senior Refco executives, including one of the Bennett Co-Conspirators. For example, the SEC investigated Refco and Santo Maggio ("Maggio"), President and CEO of

RSL, in connection with an investigation into inappropriate short selling of stock in the Sedona Corporation.

66.     In July 2005, RGL publicly announced that one of Refco's top executives, Maggio, was near a settlement with the SEC which would result in his 1-year suspension from any supervisory duties as a result of his role in the Sedona manipulation.  RGL also noted the likelihood of a "substantial civil penalty," for which it had set aside $5 million.

67.     THL also knew that Refco had a history of nondisclosure of uncollectible losses incurred by its customers.  One such instance came to light in litigation related to Eastern Trading Company ("Eastern"), a client of what was then Refco Inc. (and later Refco LLC).  In the late 1990s, Eastern experienced large trading losses that resulted in a shortfall of $28 million in its account at Refco.  During Refco's lawsuit to recover this sum, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit said: "for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco [Inc.] did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate [RCC] . . . ."[6]

68.     THL did little or nothing to investigate the circumstances relating to Refco's concealment of the debit in its customers' account or the affiliate loan that was used to effect the concealment.  As discussed below, the Bennett Co-Conspirators' concealment of customer losses continued during THL's period of majority ownership of Refco and it was the public disclosure of such concealment that precipitated Refco's bankruptcy.

---

[6]     *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000).

69.     These and other well known legal and regulatory problems put THL on notice of Refco's checkered past.  Once it owned Refco, however, THL failed to ensure that Refco had remedied the deficiencies that caused its serious and widespread previous violations.

### d.    THL Ignores Professionals' Requests For Key Information

70.     THL's due diligence professionals repeatedly warned THL that they were not receiving the information necessary to conduct competent due diligence.  THL repeatedly ignored many of those requests.

71.     On May 10, 2004, Ram Menon of KPMG emailed Jaeckel, George Taylor ("Taylor"), a Vice President at THLP, and Max Strasburg ("Strasburg"), an analyst at THLP, alerting them to additional due diligence difficulties.  Menon's email attached a document summarizing KPMG's discussion with Mark Ramler of Grant Thornton, Refco's outside auditor. This document indicated that Grant Thornton had not provided KPMG with working papers regarding "credit risk loss reserves," among other things.

72.     KPMG also informed THL of the Bennett Co-Conspirators' questionable tax treatment of the liquidation of the former Refco, Inc. into its successor Refco LLC.  KPMG stated: "We have requested the [relevant documents] in case they describe the basis for management's opinion that no gain was recognized as a result of the conversion. . . .  We have not received this information."

73.     KPMG further informed THL that Grant Thornton "did not provide us with access to their audit planning memoranda, work programs, test work papers, schedule of audit adjustments and audit conclusion memoranda. . . .  [Grant Thornton's] audit conclusions on the fair value or [sic] [Refco's] proprietary investments were not also made available."

21

### e.    THL Never Obtains Documentation Regarding RGHI

74.    THL knew that the Bennett Co-Conspirators refused to provide key corporate documents regarding the relationship between Refco and Bennett's holding company, RGHI. THL's due diligence professionals repeatedly stressed the need for such documents.

75.    A document titled "Open Diligence Issues" dated February 26, 2004 and prepared by Weil listed RGHI's organizational documents as an "open item." The document also listed this troubling "Open Question": "Relationship of P. Bennett and T. Grant to entities owning Refco Group Ltd., LLC."

76.    Similarly, a May 13, 2004 Weil memo titled "Outstanding Legal Due Diligence Items" stated that Weil still needed to obtain "Voting agreements, stockholders agreements or any other material agreements relating to the relationships between RGHI, Refco Group Holdings LLC, BAWAG Overseas, Inc. and Refco Group Ltd., LLC."

77.    Notwithstanding these open issues, and the myriad unanswered questions, THL pushed forward without ever receiving these key materials regarding the relationship between Refco and its owners.

### f.    THL Learns Of Facts Hidden By Certain Members Of Refco's Management

78.    As noted, THL was fully aware that it could not expect candor from the Bennett Co-Conspirators. This proved especially true late in THL's due diligence process, when it learned that the Bennett Co-Conspirators had repeatedly failed to be forthright with THL.

79.    Shortly before the LBO, THL learned that a Refco executive had attempted to hide from THL a significant legal obligation that Refco may have owed to Edward McElwreath, who demanded a commission for introducing Refco to THL. By letters dated May 6, 2004, McElwreath's attorney made his demand known to Bennett and to THL's Schoen. The

letter to THL stated that Peter McCarthy, Executive Vice President of RSL, had suggested that McElwreath wait until the close of the THL LBO to make his demand, in order to "keep the contract's existence from [Thomas H. Lee Partners]." This surprising and worrisome disclosure did not deter THL from going forward.

80.    THL also was aware that the Bennett Co-Conspirators had failed to share key information regarding a litigation between Tradewinds Financial and RSL. On or around June 17, 2004, just six weeks before the LBO, a jury in New York returned a verdict in favor of Tradewinds and against Refco. Tradewinds had sued Refco for $45 million. Although THL had been generally aware of a litigation involving Tradewinds and Refco, THL was not told by the Bennett Co-Conspirators that the matter either was on the verge of trial or that the trial had been lost.

81.    After THL and/or Weil raised their concern about the Bennett Co-Conspirators' failure to voluntarily disclose the current status of the Tradewinds litigation, Schoen discussed this topic with Bennett. On June 19, 2004, Schoen sent an email to THL executives and Jay Tabor, an attorney at Weil, stating:

> Phil [Bennett] and I spoke for about an hour. He obviously went to great lengths to try to reassure me that there was no deliberate attempt on Dennis [Klejna's (Refco's General Counsel)] part to mislead us. I focused on the need to have the kind of open communication and transparency that we need as partners, and that he and we need as Directors on an ongoing basis. I referred to the discussion on the SEC matter [Sedona] as a similar experience, and he understood exactly what I was talking about. While I do not have satisfaction as to how this miscommunication/misunderstanding occurred, we have at least raised the bar on disclosure. Phil also understands that this cuts at our credibility with the lenders . . . .

82.    Although Schoen recognized that the THL Directors required "open communication and transparency" in order to fulfill their duties, the THL Directors knew they were not receiving this from the Bennett Co-Conspirators — and yet they went forward with the

LBO and thereafter took action as directors based on insufficient information, as discussed

below. Likewise, the THL Entities knew of this lack of transparency and yet directed certain of

Refco's acts as controlling shareholder without receiving necessary information.

**g.**    **THL Learns Of "Deep Throat" And Allegations Of Internal Fraud**

83.    Toward the end of its diligence process, THL learned of a Refco insider

(called "Deep Throat" by KPMG) who reported that in the 1990s Refco was "sloughing off"

trading losses into a Refco subsidiary.

84.    KPMG compiled a list of additional diligence items for THL to investigate

Deep Throat's report. KPMG's John Berndsen sent this list to Schoen at THL on May 28, 2004.

The highest-priority diligence item was to obtain RGHI's financial statements and recent tax

returns, tie them to Refco's books, and "[i]solate and investigate all items not flowing through

from [Refco]." As discussed below, had THL accepted KPMG's advice and obtained and

analyzed the relevant RGHI documents, THL likely would have uncovered the fraud being

perpetrated by the Bennett Co-Conspirators. THL did not do so.

85.    Another high-priority item identified by KPMG was to "[o]btain details

and understand the nature of inter-company financing arrangements, both on- and off-balance

sheet." These intercompany financing arrangements were crucial to understand the workings of

the Bennett Co-Conspirators' receivables scheme. Again, THL rejected KPMG's advice.

86.    Instead of conducting the recommended due diligence, THL merely

discussed the "Deep Throat" issues with Bennett. On the question of "application of proceeds in

the Sub S [RGHI], historical distributions, and handling of taxes," Schoen wrote in an email: "I

would not say that [Bennett] has yet committed to actually show us tax returns or Sub S [RGHI]

underlying organizational and ownership documents, but the issue is on the table and we will

24

have the opportunity to press on until we develop comfort." In connection with THL's request

for a meeting with THL and Ernst & Young, LLP — which had served as tax advisor to the

Refco entities, but resigned from handling Refco's tax returns in 2003 after (among other things)

Refco refused to make what Ernst & Young deemed to be appropriate disclosures regarding the

amount of RGHI's receivable balances — Bennett refused to permit THL's request for a

meeting. THL chose not to press the issue.

       87.     On June 2, 2004, Jaeckel sent an email to other THL executives to

summarize his meeting with Bennett regarding "Deep Throat." According to Jaeckel, Bennett

stated that in the 1990s, customers of Refco had incurred losses, and these losses were run

through certain unconsolidated overseas affiliates of Refco in order to offset their foreign tax

charges. Specifically, Bennett represented to THL that "both historically and going forward

[RGHI] has had and will have no brokerage accounts with any [Refco] entities;" these words,

wholly false, were accepted by THL, without any corroboration, as adequate assurance that there

were no trading losses being hidden by the Bennett Co-Conspirators. Even minimal follow-up

on this representation would have exposed evidence of the fraud at Refco. THL never obtained

appropriate documentation or other evidence from anyone at Refco other than Bennett.

       88.     On June 2, 2004, Schoen sent an email to other THL executives

summarizing this same meeting with Bennett. Schoen stated:

> Phil [Bennett] met with me and Scott Jaeckel to discuss tax liabilities and
> payments by the S Corp [RGHI]. I also pressed him that we really needed at least
> the Readers'[ ]Digest version of who is getting the proceeds from the deal, in
> particular how much is he putting in his pocket versus his rollover. He agreed
> that we need to be taken through all of it, but deferred the entire discussion until
> tomorrow morning. He says he needs to close the loop with Tone Grant before
> opening up these details. We will have to see where this discussion goes
> tomorrow.

89.    On June 3, 2004, David Harkins of THL responded to Schoen's email regarding Bennett's refusal to disclose who was getting the proceeds of the deal. Harkins wrote: "Good luck. *He just will not come clean easily on this one.*"

### 3.    THL Buys 57% Stake In Refco For $507 Million

90.    Had THL pressed for information with respect to any of the leads provided by Deep Throat, rather then failing to do so as set forth above, THL almost certainly would have uncovered the fraud.

91.    However, despite the unanswered questions and risks associated with an acquisition of Refco, THL, one of the world's most sophisticated leveraged buyout firms, forged ahead. As a result, the THL Entities entered into an agreement with various Refco entities, by which the THL Entities and their affiliates agreed to purchase 57% of RGL, a company purportedly valued at $2.25 billion.

92.    To facilitate and fund the LBO, THL created new entities including New Refco and Refco Finance Holdings LLC ("Refco Finance Holdings"). As part of the transactions, THL arranged for $1.4 billion in debt financing at Refco Finance Holdings. Refco Finance borrowed $800 million pursuant to a senior secured credit facility, and $600 million from the issuance by Refco Finance Holdings of unsecured subordinated notes. As part of the same series of transactions, Refco Finance Holdings merged with and into RGL with RGL as the surviving entity.

93.    RGL then purportedly distributed $500 million, supposedly representing excess cash held on RGL's books, to New Refco, which in turn purportedly distributed those funds to RGHI. As Refco and THL agreed, RGL also distributed certain businesses valued at over $237 million, referred to as the Asset Management Entities, to New Refco, which in turn

distributed those businesses to RGHI. These distributions to RGHI, and its sole owner, Bennett, had been endorsed by THL prior to the LBO.

94.     Subsequently, RGHI, and the THL Entities contributed their ownership interests in RGL to New Refco in exchange for the following consideration:

- Bennett, sole owner of RGHI, monetized a portion of his ownership in RGL in the amount of $875 million, and exchanged the remainder of his interest in RGL, with a stated value of $382.5 million, for an approximate 43% interest in New Refco.

- The THL Entities and their affiliates received an aggregate of 280.8 Class A Common Units of New Refco, which amounted to approximately 57% ownership interest.

95.     As a result of these transactions, New Refco owned 100% of RGL and became its sole member.

### 4.     THL Directors Join Refco's Board

96.     As part of the LBO, the THL Entities gained significant control over Refco, notably including the power to appoint board members. The THL Entities designated four THL executives to New Refco's board. In addition, certain THL executives became officers of New Refco: Schoen, Jaeckel, and Taylor became President, Treasurer, and Secretary, respectively.

97.     As a result of their positions as Board members and officers of New Refco, the THL Directors formally assumed fiduciary duties to New Refco.

98.     The THL Directors derived their control from their ownership position in Refco, as well as the Amended and Restated Limited Liability Company Agreement (the "New Refco LLC Agreement"). The New Refco LLC Agreement stated that "The business and affairs of the Company shall be managed and controlled by or under the direction of a Board of Managers . . . . The initial Board of Managers shall be comprised of the individuals set forth on

27

Schedule D." Schedule D listed the following Managers: David V. Harkins (THL); Scott L.

Jaeckel (THL); Thomas H. Lee (THL); Scott A. Schoen (THL); Phillip R. Bennett; Robert C.

Trosten; and Phillip Silverman.

      99.    The New Refco LLC Agreement included a section titled "Duties" that

stated: "The Managers, in the performance of their duties, shall owe to the Company and the

Members duties of loyalty and due care of the type owed by the directors of a corporation to such

corporation and its stockholders under the laws of the State of Delaware."

      100.    The THL Directors also owed fiduciary duties to RGL.  A Fifth Amended

and Restated Limited Liability Company Agreement of RGL (the "RGL LLC Agreement") was

entered into by New Refco (the sole member of RGL) on August 5, 2004.  The RGL LLC

Agreement included a section titled "Management" that stated:

> The business and affairs of the Company [RGL] shall be managed by the Member
> [New Refco]. . . .  Member shall have complete and absolute control of the affairs
> and business of the Company, and shall possess all powers necessary, convenient
> or appropriate to carrying out the purposes and business of the Company,
> including, without limitation, doing all things and taking all actions necessary to
> carrying out the terms and provisions of this Agreement.

**5.**    **THL's Lucrative Management Agreement**

      101.    As part of the LBO, Managers V agreed that it would serve in an oversight

and managerial capacity for Refco in return for tens of millions of dollars in fees.  This

Management Agreement was entered into on August 5, 2004 by New Refco (the "Company" for

purposes of the Management Agreement), RGL, and Managers V (the "Sponsor").

      102.    The Management Agreement was entered into *after* the THL Entities and

their affiliates had made their $507 million investment in the LBO, for which they received a

controlling 57% ownership share of New Refco.

      103.    The preamble to the Management Agreement reads in part as follows:

WHEREAS, the Sponsor has staff specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services.

WHEREAS, the Company will require the Sponsor's special skills and management advisory services in connection with its business operations and execution of its strategic plan.

WHEREAS, the Sponsor is willing to provide such skills and services to the Company.

104.    The Management Agreement provided that Managers V would provide advisory services to Refco under the following circumstances:

The Sponsor hereby agrees that if . . . [New Refco or RGL] reasonably and specifically requests that the Sponsor provide the services set forth below and the Sponsor agrees to provide such services, the Sponsor or one of its affiliates will provide the following services to the Company and its subsidiaries:

(a)    advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to the Company's or any of its subsidiaries' finances or relationships with banks or other financial institutions; or

(b)    advice with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of the Company and , and [sic] other senior management matters related to the business, administration and policies of the Company and its subsidiaries.

105.    New Refco and RGL agreed to pay Managers V's fees "[i]n exchange for the Sponsor's arrangement of the equity financing and agreement to provide the services set forth" in the Management Agreement.

106.    The first fee to be paid by New Refco and RGL to Managers V was a lump sum payment of $30 million (the "Initial Management Fee"). The second fee was a recurring management fee (the "Annual Management Fee") payable semi-annually and was to be

the **greater** of (a) $2.5 million per year or (b) 1% of Refco's EBITDA.[7] (Indeed, on August 5, 2004 — on the same day as the Management Agreement was signed — Refco paid approximately $31.627 million to Managers V for the Initial Management Fee and a semi-annual installment of the Annual Management Fee.)

107.    The Management Agreement was to continue in effect until one of three events took place:

- termination by Managers V;

- automatic termination on the date that Managers V and its affiliates no longer owned at least 25% of the equity of New Refco; or

- termination by Managers V upon the consummation of an initial public offering by New Refco or any successor entity.

108.    If the Management Agreement were terminated upon an IPO (as was foreseen all along), New Refco and RGL were to pay Managers V a buyout fee (the "Management Agreement Buyout Fee"). The Management Agreement Buyout Fee was to be equal to the net present value of the fees payable for **five years** from the termination of the Management Agreement.

109.    The Management Agreement was signed by Bennett on behalf of New Refco and RGL. Signing on behalf of Managers V were other members of the THL Entities — THLP (as its Managing Member) and Equity Advisors V (as its General Partner) — and Schoen (as Managing Director of Managers V).

110.    As controlling shareholders, the THL Entities were each an interested party in the Management Agreement transaction. The THL Entities entered into the

---

[7]    "EBITDA" was defined in the Securityholders Agreement between the parties to the Management Agreement as consolidated earnings for a given fiscal year of New Refco and its subsidiaries before interest, taxes, depreciation, and amortization.

Management Agreement with Refco, whose Board of Directors consisted of senior THL executives. At the same time, these senior THL executives exercised control over THL, Equity Advisors V, and Managers V. As a result, the THL Directors were conflicted with respect to each party's different obligations. In fact, the THL Directors' motive was to minimize the requests that Refco made of Managers V, so that that entity could get its money without providing any services in return.

111.    Had they fulfilled their duties to Refco, the THL Directors would not have permitted funds to be paid to the THL Entities pursuant to the Management Agreement. Alternately, they would have caused Refco to make a request to the THL Entities for services under the Management Agreement, so that Refco's processes, controls, and overall financial situation could have been better understood and improved. If nothing else, the deficiencies, resistance, and concealment they encountered in the due diligence process should have caused the THL Directors to liberally utilize the services of a sophisticated entity such as Managers V. They did not do so, and, upon information and belief, THL Managers V never performed any services in return for its lucrative Management Agreement.

**D.    THL's Awareness Of And Failure To Remedy Deficiencies At Refco Post-LBO**

112.    After the leveraged buyout, the THL Entities became Refco's majority owner and the THL Entities and THL Directors assumed direct oversight and management of Refco. Moreover, after the leveraged buyout, the THL Entities and THL Directors had unfettered access to all of Refco's information. The THL Defendants could obtain, and indeed had fiduciary obligations to obtain, answers to questions that had been raised but not answered in the course of their due diligence. Moreover, the THL Defendants had the ability, power, and

obligation, to remedy the problems at Refco caused by the Bennett Co-Conspirators.  They did
not do so.

113.    After THL was on Refco's board and at the helm, THL learned that
Refco's accounting and auditing function, both internal and external, was a disaster.  THL
executives knew and discussed the fact that Refco's accounting function was inadequate for a
company seeking to go public, and that Refco would be better off hiring a "Big Four" accounting
firm.

114.    As fiduciaries, directors, and officers, the THL Entities and THL Directors
had a duty to put Refco's interests ahead of their own.  Moreover, to justify the tens of millions
of dollars they reaped in the Management Agreement, the THL Entities and THL Directors
should have, at a minimum, insisted on correcting the problems that they knew to be afflicting
Refco.  Rather, for the THL Defendants, the choice was simple and had nothing to do with
fiduciary duties.  Taking Refco public would greatly benefit THL.  So THL pushed ahead,
without regard for the adverse consequences to Refco.  On October 19, 2004, just ten weeks after
the LBO, THL held a key IPO planning meeting with its professionals, and set the gears in
motion for the IPO.

115.    Aside from the financial gain to be made from a sale of Refco stock, the
THL Entities and the THL Directors knew that a successful IPO was critical to the THL Entities
and the THL Directors because they were making preparations to market a new private equity
fund, for which THL hoped to raise approximately $7.5 billion from institutional investors.  In an
email exchange with an investor in March 2005, even as a THL executive was discussing THL's
current investments such as Refco, the executive was soliciting interest in "our new fund – Fund
VI and hopefully Q1 2006."

32

116.    Indeed, after the fact, THL's chief executive acknowledged that Refco's bankruptcy had made it more difficult to raise money for THL's Fund VI. Scott Sperling of THL called Refco a "disappointment" and said the publicity was "very unpleasant," causing a delay in fund-raising of six months.

117.    By pushing what they knew was an unprepared company into an IPO, the THL Entities and THL Directors breached their duties by causing Refco to incur hundreds of millions of dollars in obligations so that THL could enjoy a quick profit and favorable publicity.

### 1.    THL's Failure To Ensure A Proper Accounting Function

118.    Not long after the LBO, THL realized that Refco should replace Grant Thornton. The THL Entities and THL Directors were well aware that Grant Thornton had done a substandard job auditing Refco. Based on, among other things, Grant Thornton's handling of management's opposition to the Management Letter, the THL Defendants knew that Grant Thornton was not sufficiently independent of the Bennett Co-Conspirators to discharge its responsibilities to audit the various financial statements for Refco. In email exchanges, THL executives noted that in order to clean up Refco's accounting and financial statements, Grant Thornton should be replaced with one of the "Big Four" accounting firms.

119.    THL knew, however, that a new auditor would need time to conduct a proper audit, and therefore would require THL to delay Refco's IPO. THL was unwilling to accept such a delay.

120.    THL executives also knew and discussed the fact that, besides the question of delay, there was a "restatement risk" that came with hiring competent outside auditors. This frank admission by THL executives that Refco's audited financials had a significant likelihood of being materially inaccurate, coupled with the decision not to hire competent auditors so as not

to interfere with THL's self-serving drive to the IPO, constituted a breach of the THL Entities'
and THL Defendants' fiduciary duties to Refco.

121.    THL's conflict was clear.  In an October 6, 2004 email to persons at THL
and KPMG, Jaeckel highlighted two possible courses of action with respect to Refco's outside
auditors.  Jaeckel expressed concern about the "restatement risk" as well as a possible delay in
THL's planned sale of its equity stake in Refco:

> Auditors.  I think we narrowed this down to 2 main options.  Option A – file [the
> IPO] as soon as possible so we are on the road in January.  *We will have to stay
> with GT under option A*. . . .  Frank [Casal of KPMG] cautions that *we run
> 'restatement risk' by switching auditors* (we run this risk in either option but it is
> magnified when you have public equity).  He said the big four take a very hard
> and long look at the books of companies audited by second tier firms.  Option B –
> replace current auditors for fiscal 2005 audit.  Big four are currently swamped
> with year end and SOX work. . . .  Likely to mean that *we wouldn't be selling
> equity until summer*.

122.    THL faced a stark choice:  improve the dysfunctional audit situation and
remedy the misstated and fraudulent financial statements but delay the IPO, or push ahead with
the IPO notwithstanding serious audit shortcomings.  THL and the THL Directors, to the
detriment of Refco, chose the latter.  They decided to retain Grant Thornton as outside auditor
even though it took ten months from Jaeckel's email to consummate the IPO — more than
enough time to change auditors and long enough for existing problems to fester and worsen
while Refco was without the safeguard of a capable auditor.  The real reason for THL's decision
was its recognition that bringing in a new, objective auditor might reveal problems lurking in
Refco's financial statements with disastrous financial and reputational consequences to the THL
Defendants, including the postponement or cancellation of the IPO on which the THL
Defendants were counting.

123.    In addition, THL executives repeatedly (and justifiably) expressed concern
over Refco's internal accounting staff:

34

- On March 28, 2005, Jaeckel wrote an internal THL email in which he said that "[t]he staff departures [of two senior Refco accounting personnel] are troubling – *[I]'m getting increasingly worried about our audit.*"

- On March 30, 2005, Strasburg sent an internal THL email regarding an "Auditor call" with Mark Ramler from Grant Thornton. Strasburg said: "Ramler pulled no punches — essentially calling [Refco's] finance staff ex[cept] Gerry [Sherer] 'lazy.'"

- On April 1, 2005, Taylor sent an internal THL email in which he concurred that "Gerry [Sherer] is clearly a one man band in the short run."

124. Notwithstanding their well grounded concerns, the THL Entities and THL Directors did not remedy these internal accounting deficiencies. To fix the problems at Refco would again have placed THL's much-desired IPO at risk. This was another breach of the THL Entities' and THL Directors' fiduciary duties to Refco.

## 2. THL Learns Of Grant Thornton's Management Letter

125. Subsequent events only added to THL's concerns about the deficiencies in Refco's accounting systems.

126. During the push toward an IPO, THL learned that Refco executives had lied to THL about the existence of a "horrendous" letter to Refco's management from Refco's outside auditors (the "Management Letter"). This letter, which came to light in March 2005, discussed significant accounting deficiencies at Refco. The Management Letter had been prepared by Grant Thornton in connection with its audit of Refco's financial statements for the fiscal year ending February 29, 2004, but was not provided to THL by the Bennett Co-Conspirators.

127. THL's Jaeckel learned of the Management Letter on or about March 31, 2005, at which point he forwarded a copy of the Management Letter internally within THL, and asked: "What does this letter say? I don't recall ever hearing about this letter. you guys?"

35

128.    THL's Taylor responded with another internal THL email: "I have never seen the [Management] letter before the email and *it is as horrendous as it sounds*."

129.    On April 1, 2005, Jaeckel wrote an internal THL email expressing his anger that the Bennett Co-Conspirators, with the assistance of Refco's outside auditors, had not provided the Management Letter to THL:

> when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. *if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both*[.]

130.    On April 1, 2005, Strasburg sent an internal THL email explaining that at or about the time that Grant Thornton had provided the Management Letter to Refco management, that management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's then Chief Financial Officer] received it when he first got there [date] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

131.    On April 6, 2005, Jaeckel sent an internal THL email discussing how the Management Letter had not been provided to THL:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

132.    The Management Letter listed nine broad and important "Internal Control Deficiencies" at Refco, each of which put THL on further notice of irregularities within Refco:

36

(1)     IT Environment;

(2)     Consolidation Process;

(3)     Formalized Reporting and Closing Process;

(4)     Internal Audit Function;

(5)     Fixed Asset Subsidiary Ledger;

(6)     Accounting Procedures and Policies;

(7)     Accounting Function;

(8)     Refco Capital Markets Ltd. Custody Reconciliations; and

(9)     Audit Coordination.

133.    Grant Thornton's comment regarding a "Refco Capital Markets Ltd. Custody Reconciliations" deficiency read: "The Company could not produce any custody reconciliations at or around year end for EQ." As discussed below, only through the fraudulent "upstreaming" by the Bennett Co-Conspirators of customer funds in accounts held at RCM was Refco able to fund its operations. Had the THL Defendants asked for RCM's custody reconciliations (which were essential to understand how Refco functioned), they would have seen that Refco's business model, as directed by the Bennett Co-Conspirators, was rooted in fraud and unsustainable.

134.    Grant Thornton's comment regarding Refco's "Internal Audit Function" deficiency stated that "it has become essential to establish an internal audit function [at Refco]."

135.    Had the THL Defendants acted appropriately in light of this information, they would have ensured that the internal audit function was staffed and operating properly. A proper internal audit function would have revealed, before the IPO, to the THL Entities and THL

Directors, the various accounting improprieties and frauds conducted by the Bennett Co-Conspirators within Refco (discussed below).

136.    Grant Thornton's comment regarding Refco's "Accounting Function" deficiency read in relevant part:

> **At present, the accounting function does not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer.** Although the Company has taken stop gap measures in engaging PWC to fill these gaps, it is not a solution. The Company needs to hire qualified people with the necessary skills and expertise . . . .

137.    Once again, THL was made fully aware that Refco was unprepared for an IPO. The THL Entities and THL Directors breached their fiduciary duties by nevertheless pushing Refco into going public too quickly and without sufficient care — all to meet THL's own timetable.

138.    Despite learning that it was lied to about Refco's accounting function, and then learning that the function was a mess, the THL Entities and THL Directors failed to ensure the appropriate remedies were taken, and in so doing breached their fiduciary duties to Refco. Indeed, the Prospectus disclosed deficiencies within Refco's accounting function — proof that the THL Entities and THL Directors had failed to ensure that Refco was prepared to go public.

### 3.    THL Becomes Aware of the Profit-Sharing Agreement

139.    Subsequent to the LBO, THL confirmed the dishonesty of the Bennett Co-Conspirators. One stark example is THL's discovery that before and after the LBO multiple Refco executives withheld information from the THL Defendants and others regarding an important and lucrative compensation scheme.

140.    In or around 2001, eight Refco executives purportedly entered into an arrangement with RGL, pursuant to which they would receive substantial payments from RGL in the event that RGL was sold to a third party for more than $900 million (the "Equity-Like

Arrangement"). By January 1, 2002, the Equity-Like Arrangement had been restructured in an effort to provide favorable tax treatment to the participants. Under the revised scheme, the participants purportedly obtained profit participation interests in RGL pursuant to which they would share in RGL's net annual income equal to their respective equity-like interest in RGL (the "Profit-Sharing Agreement" or "PSA").

141.    This arrangement purportedly was implemented by amending the RGL partnership agreement on January 1, 2002 to allow for profits-only members, who were entitled to share in the annual net profits of RGL but were not entitled to vote.

142.    In June 2004, on the brink of the consummation of the LBO, Refco agreed to redeem the purported equity-like interests by paying the executives a portion of the proceeds derived from a sale of Refco in amounts ranging from $2 to $25 million. The participants did not disclose to THL their purported equity-like interest in RGL, nor that they were to receive substantial redemption payments upon the LBO.

143.    In the pre-LBO due diligence period, Weil, at THL's behest, had asked Refco to provide its "employment arrangements or arrangements with key employees." Weil sent questionnaires to Refco executives asking them to disclose information concerning their respective backgrounds and regarding Refco's executive compensation structure. The questionnaires specifically asked the Refco executives whether they had any personal financial interest in the LBO. None of the eight participating directors or officers disclosed their participation in the PSA. Thus, none of the eight participating directors or officers disclosed that they would gain substantially from a high-priced sale of Refco.

144.    The failure of these directors and officers to make such disclosure was a deliberate effort on their part to deceive THL and others about the financial benefits that those directors and officers would receive upon a sale of Refco.

145.    Immediately after the closing of the LBO, THL began preparing for the IPO. Weil, again at THL's behest, sent identical questionnaires to Refco executives again asking whether they had any personal financial interest in the contemplated transaction.

146.    This time around, two of the members of the management team determined to come clean with THL. Having already been paid millions of dollars, these executives had less to lose by telling the truth. In March 2005, Refco executive Joseph Murphy learned that William Sexton, another Refco executive, planned to disclose his participation in the PSA. Accordingly, Murphy contacted Weil to determine whether he too had to reveal his participation in the PSA. Murphy then revealed that his profit participation interest had been acquired at the LBO for $13.7 million, $9.5 million of which had been paid to him at the time of the LBO, with the remaining $4.2 million to be paid to him at the IPO. Consistent with Murphy's understanding that Sexton was going to disclose his PSA interest, Sexton in fact disclosed on his questionnaire that Refco had agreed to acquire his "outstanding profits participation interest" for a total of $9 million, $6 million of which had been paid to him at the time of the LBO, with the remaining $3 million to be paid to him at the IPO.

147.    Following this partial and belated airing of the truth, Refco subsequently informed Weil that two other executives also participated in the PSA. THL therefore had knowledge that on August 5, 2004, upon consummation of the LBO, the PSA interests held by these four individuals had been partially redeemed for a total of approximately $26 million, using RGL funds routed through RGHI. THL also knew that the remaining redemption

payments for the PSA interests were to be accelerated upon consummation of the IPO. As a result, THL knew that certain of Refco's directors and officers — particularly Bennett, the 100% owner of RGHI — had yet another reason to take Refco public at a high price.

148.    THL and Weil knew that certain of Refco's executives had taken affirmative steps to conceal their equity-like interests in Refco. Nevertheless, THL did not inquire further about the PSA or its concealment. Neither THL nor Weil obtained a copy of the underlying documentation of the PSA even after they learned of this key agreement. Had they done so, instead of turning a blind eye, THL would have learned that four additional Refco executives participated in the PSA. Bennett was one of them. He made over $25 million on the LBO solely from the redemption of his PSA interest.

149.    Faced with blatant evidence that certain of the Bennett Co-Conspirators had conspired to engage in fraudulent conduct by failing to disclose the existence of their Profit-Sharing Agreements, the THL Defendants were on plain notice that at least a substantial part of Refco's management was not fit to be leading a public company. Rather than take steps to deal with that issue, the THL Defendants chose to ignore it and move forward with the IPO that was vital to THL's future financial and reputational success. Moreover, the THL Defendants opted to keep hidden from Refco's various constituencies the fraudulent conduct and character of these Refco executives in order to ensure that the THL Defendants were able to follow through on their plan to go forward with the IPO.

### 4.    THL's Knowledge Of Acquisitions Without Proper Diligence

150.    On June 14, 2005, a Refco employee emailed the Refco board of directors to request a conference call to discuss Project Key, the code name for Refco's acquisition of Cargill Investor Services.

151.    In response to the request for a board conference call, Jaeckel sent an internal THL email:

> Phil [Bennett] has not called me back. I hope the analysis is sufficiently deep/detailed for a discussion. Since they have never accepted our/Max [Strasburg]'s help I'm not sure who is modeling the deal and pro forma company.

152.    The same day, Taylor sent another internal THL email discussing his concerns with Project Key:

> Jake [Jaeckel] and I caught up with Gerry [Sherer] regarding his request for a Board meeting Thursday (now confirmed for 4:00pm) to discuss Project Key (Cargill). Phil and Gerry plan to present the financials for Key and discuss with the Board whether it is an interesting acquisition candidate. When pressed, **Gerry did not sound as if he had a presentation prepared that laid out the pros and cons of the deal** . . . . As it stands, **what will be presented to the Board will be a relatively rudimentary set of financials that are not integrated into Refco's financial results.** We offered to help model the combination by sending Max down to assist in pulling the necessary data together (an offer we've made several times in the past), but did not get much of a response.

153.    On June 15, 2005, Schoen responded to this email with another internal THL email expressing similar concerns:

> I had a 30 minute conversation with Phil [Bennett] on the same subject. . . . I gave him a pretty good push on the value we could offer in diligence and modeling, the importance of doing thorough due diligence and building a financial plan in a levered, soon to be public company as compared to their intuitive historical style, and my desire to see them present a 10-20 slide deck to the board that walks through summary financials, pro formas, accretion/dilution, lays out the key executional plan including individual responsibilities, deliverables and measurement metrics, and balances key opportunities and risks. **He fully acknowledged the need to engage with us in such a process, and then explained that these were unusual circumstances and basically blew me off.** He did it with respect, but nonetheless seemed to just be giving lip service to this approach.

154.    On June 16, 2005, Strasburg sent an internal THL email about Refco's strategy for Project Key.  He expressed concern over how this acquisition would be funded: "No consideration is given to debt costs and **Scott Love [from Refco] thinks they are funding this without borrowing.  Not sure how.**"

155.    Jaeckel replied with an internal THL email: "They r [*sic*] paying 300mm for this? *I wouldn't do that* – we have to trade at 10x ebitda for this to be accretive?"

156.    Strasburg replied with another internal THL email: "$215 upfront. Earnout is additional $67 to $192. *Love could not explain to me how it works.*"

157.    On June 16, 2005, Jaeckel sent an internal THL email expressing concern over how much Refco intended to pay for Project Key:

> I have not been able to view the Refco package [regarding Project Key] but have traded a couple quick emails w/ Max [Strasburg]. If I'm reading them correctly Refco would ultimately pay about 300mm for Key, which is over 9x ebitda. *If I'm correct in those assumptions I would not do this deal.* There is not enough upside in this deal to justify the capital and risk in my view. We only paid 8–8.5x ebitda for all of Refco. In our wildest dreams Refco would trade publicly in the 10-12x ebitda range (which at this point is at least as much hope as reality). In addition the company needs to do a very careful net income comparison to see if this [is] accretive after intangible amort[ization]. . . . *Hopefully I've got my facts wrong and this deal is more exciting.*

158.    Schoen replied with an internal THL email:

> We have a big task and desperately need our whole team on this, plus Weil and Grant Thornton. Phil says he must sign a definitive agreement by Tuesday or it is gone forever. I am really upset that with two months of begging to be involved, we are now at this point, but we have to get organized ASAP.

159.    On June 18, 2005, after receiving copies of documents for the Project Key purchase, Jaeckel sent an internal THL email referencing these documents: "Since the biz [business] is unfamiliar to us I'm not sure if we get a lot out of a page flip."

160.    On June 20, 2005, the THL Directors all approved a board resolution granting Refco executives the authority to finish the Cargill transaction — notwithstanding their strong misgivings (expressed as recently as two days earlier) about the procedure used for the deal and their knowledge that the acquisition was being rushed. In so doing, the THL Entities and the THL Directors breached their fiduciary duties to the company. Their top priority was

to complete the IPO, and, indeed, the IPO occurred just prior to the closing of the Cargill acquisition. The THL Defendants abdicated their responsibilities as controlling stockholder and directors because their sole interest was to move forward with the IPO. In their singleminded effort to accomplish an IPO payday for themselves as rapidly as possible, which would require the cooperation of Refco's management, the THL Defendants opted not to make waves with that management team, or otherwise take steps to protect Refco from going forward with an acquisition that the THL Defendants recognized was based on flawed and insufficient analysis.

161.    On June 20, 2005, after receiving an email from Sherer at Refco regarding yet another potential acquisition, Jaeckel sent Sherer an email recommending a number of due diligence steps that he considered appropriate. These included the use of outside professionals, which had not been part of the Project Key acquisition.

162.    Jaeckel then forwarded the email he had written to Sherer to Schoen, Taylor, and Strasburg at THL, making clear that he sought to avoid a repeat of Project Key: "Fyi – I didn't want lack of response to be seen as approval of *another disorganized effort*." This and other emails made clear that the THL Defendants were aware that they had approved the Cargill acquisition based on inadequate due diligence.

163.    Schoen responded to this internal THL email:

> A good plan. *Let's discuss this morning how we can try to force the same result in process re Cargill, albeit after the fact since we will be signing a binding agreement first!* We can at least lay out our specific requirements and give them a sample from [redacted] to show the level of work, planning and information that we require, and that absolutely must be done as a public equity filer.

164.    On June 22, 2005, Schoen sent Bennett a letter reading in part as follows:

> As promised, enclosed is a presentation one of our portfolio companies, [redacted], presented to its Board of Directors prior to obtaining a Board resolution to complete an approximately $400 million acquisition of [redacted]. This is an excellent example of the level of disclosure and diligence work we would normally expect for a substantial acquisition. *I recognize that the Cargill*

*process had real limitations we had to live with to be successful.* Hopefully, we can now do the work and prepare materials of comparable breadth and depth for our Board meeting.

165.    The decision to go forward with the Cargill transaction resulted in injuries to Refco because it overpaid for the assets that it acquired.  The Cargill acquisition was not the only major transaction approved by the THL Entities and the THL Directors in violation of their fiduciary duties.  Another example is a series of transactions with the Suffolk entities.

166.    In March 2005, RGL, through its subsidiary, RCC, issued a series of loans totaling $204.2 million (the "Suffolk Loans") to Suffolk, LLC, the controlling shareholder of PlusFunds Group, Inc., and related entities.

167.    The first loan, a line of credit of $154.2 million, was issued to Suffolk to be used to purchase the minority shares of PlusFunds.  The second loan, a total loan of $50 million, was issued to certain principals of PlusFunds.  These loans were secured by shares of PlusFunds.

168.    The Suffolk Loans were nothing more than a sham.  In actuality, Bennett and certain other Bennett Co-Conspirators had intended that Suffolk would default on the Suffolk Loans and Refco would thereby foreclose on and acquire the majority interest in PlusFunds — at a price far higher than market rate.

169.    The Bennett Co-Conspirators overpaid for PlusFunds.  At the time of the loan, PlusFunds' total net revenue was approximately $26 million.  Nevertheless, the Bennett Co-Conspirators valued PlusFunds at $250 million, an amount well in excess than its total net revenues.  In any event, there was insufficient justification for a $204.2 million loan against illiquid, privately-held stock.

170.    At the time of the Suffolk Loans, the THL Entities and THL Directors exercised control over the Refco parent entities.  The THL Entities and THL Directors knew that

45

Refco entered into the Suffolk Loans. Despite this knowledge, THL failed to ensure adequate controls over acquisitions, and did not attempt to reverse or remedy this loan of $204 million to a company with little or no collateral. The THL Entities' and THL Directors' lack of diligence caused Refco to spend over $200 million, which Refco did not have, to acquire a company that had been wildly overvalued.

### E.    IPO

171.    After conducting continuous due diligence pre- and post-LBO, the THL Entities and THL Directors knew of myriad problems at Refco which were reasons not to go through with the IPO. These problems included the following:

- Various indicia of fraud, including repeated dishonesty by the Bennett Co-Conspirators;

- Disastrous internal and external auditing which had received only "stop gap measures";

- The fact that the IPO would expose Refco to SEC and other reporting requirements for which the company plainly was unprepared;

- Financial statements that could well be in need of restatement;

- Refco was in the middle of a multi-hundred-million-dollar acquisition of Cargill which the Company could not afford, and which required the integration of business components on multiple continents; and

- Refco was highly leveraged, and only a portion of the IPO proceeds would be used to pay down debt.

172.    The THL Entities, THL Directors, and THL executives serving as officers of Refco — each a fiduciary of Refco — each had a duty to fix those deficiencies. Instead, as they had done prior to their acquisition of Refco, the THL Defendants made a conscious choice to disregard the problems and to proceed with its singular goal of getting a lucrative payday as quickly as possible.

### 1.    The Reincorporation

173.    In preparation for the impending IPO, Refco underwent a reincorporation (the "Reincorporation"), whereby Refco Inc. became the new holding company through which ownership in RGL was held.  As a result, Refco Inc. became the ultimate parent of the Refco entities; New Refco became inoperative except as a subsidiary of Refco Inc. and parent of RGL; and RGL continued to be the main holding company for the Refco businesses.

174.    As part of the Reincorporation, the THL Entities and their affiliates exchanged their 283.24 Class A Common Units of New Refco for 63,122,588 shares of common stock of Refco Inc and thus became majority owner of Refco Inc.

175.    As of August 1, 2005, the following people were directors of Refco Inc.:

- THL Directors:  David V. Harkins; Scott L. Jaeckel; Thomas H. Lee; and Scott A. Schoen;

- Refco Insider:  Phillip R. Bennett; and

- Independents:  Leo R. Breitman; Nathan Gantcher; Ronald L. O'Kelley.

THL therefore had significant control over the board of Refco Inc.

### 2.    The Prospectus

176.    Prior to the IPO, Refco Inc., as Refco's new parent company, filed a final prospectus (the "Prospectus") with the SEC.  The Prospectus described the stock sale as follows:

| | |
|---|---|
| Common stock offered by [Refco] | 12,500,000 shares. |
| Common stock offered by the selling stockholders | 14,000,000 shares. |
| Total offering | 26,500,000 shares. |
| Common stock to be outstanding after this offering | 127,500,000 shares. |

The offering amount of 26,500,000 shares did not include the overallotment of 3,975,000 shares available for purchase by the underwriters (the proceeds of which constituted the greenshoe dividend, discussed below).

177.    The Prospectus also included a "Report of Independent Registered Public Accounting Firm" from Grant Thornton, Refco's outside auditors, as well as the audited financials of New Refco, which were audited by Grant Thornton.

178.    As discussed above, THL knew that it would have been prudent to replace Grant Thornton, but — in its haste to cash out in the IPO — it consummated the IPO using Grant Thornton's audit opinion, notwithstanding that THL recognized that a re-audit by a Big Four firm could have required a restatement of Refco's financial statements.

### 3.    Roadshow

179.    THL embarked on a two-week IPO roadshow to market Refco to public investors.  A roadshow is a presentation by an issuer of securities to potential buyers that is intended to create interest in the securities and hence raise the price of the stock sold by the issuer.

180.    During its roadshow, THL touted the financial viability of Refco — despite its knowledge of Refco's troubled state.  In its roadshow presentation, THL claimed that Refco had "strong financial performance" and that it had solid risk management with "no proprietary trading" in order to ensure that Refco would not suffer sustained losses in the future. This was false.  In truth, Refco had suffered grave losses in the past that it had fraudulently masked and its financial model was beset with significant problems.

181.    Moreover, THL misleadingly touted its own involvement at Refco in an effort to overcome the public's poor perception of Refco's business practices.  The roadshow presentation stated that the "[Refco] [m]anagement team, in partnership with THL is poised to deliver the next stage of growth."  Investors were led to believe that THL was ensuring that many of the problems that plagued Refco were being fixed.  This too was false.  THL never informed the investors of the truth — that THL had failed to remedy Refco's troubled state.

### 4.    Stock Sales in the IPO

182.    After the roadshow, on August 11, 2005, just one year after the LBO, THL led Refco though an initial public offering of its stock. At that time, THL and its affiliates sold approximately 8.625 million shares of Refco common stock, with a total sale price of approximately $178.4 million. After selling this portion of their collective ownership, THL and its affiliates retained approximately 42.7% of ownership of Refco.

183.    Bennett sold 5.375 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $118.25 million.

184.    Refco's proceeds from the IPO totaled approximately $254 million, most of which was used to retire $210 million of the debt taken out to facilitate the LBO, plus a debt prepayment penalty of $18.9 million.

185.    THL and Bennett agreed among themselves to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt with which THL and Bennett had saddled Refco in connection with the LBO. Again, the THL Defendants put their own interests ahead of Refco's.

186.    When the fraud was disclosed, Refco was saddled with hundreds of millions of dollars in liabilities to all of the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus, notwithstanding that the majority of the proceeds of the public offering had been reaped by the THL Defendants and the Bennett Co-Conspirators (as opposed to Refco itself) through the sale of their stock in Refco. Thus, the sale of stock resulted in Refco incurring liabilities to investors who had purchased stock based on unreliable financial statements. These liabilities would not have been incurred had the THL Defendants acted in accordance with their fiduciary duties.

### 5.    The Greenshoe

187.    A greenshoe dividend results from the exercise by IPO underwriters of an option to purchase shares beyond their initial allotment. The proceeds from such a sale are paid out in the form of a dividend to certain investors in the company.

188.    THL began focusing on creating and obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October 19, 2004. The planning culminated in a massive payout to THL less than one year later. On August 10, 2005, the Refco Board agreed to pay a dividend to pre-IPO shareholders, including THL. The Board self-servingly determined that after the IPO and the exercise of the Underwriters' Option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permit payment of the dividend to its shareholders — despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

189.    One day later, on August 11, 2005, the Underwriters agreed to exercise their over-allotment option and to purchase 3,975,000 shares of Refco common stock. Accordingly, it was determined that "an aggregate dividend equal to the net proceeds of the $82,203,000 received from the exercise of the Underwriters' Option . . . be paid."

190.    Having successfully met their long-held goal of a lucrative greenshoe, THL executives immediately expressed their pleasure. On August 11, 2005, Schoen sent an email to THL executives and Bennett announcing the "[g]reat news" that the greenshoe would be fully paid. On the same day, Gregory White, a Senior Vice President at THLP, responded in an email that said: "I guess we should change the team name to be the 'Money team.' Congrats!"

191.    On August 18, 2005, Refco paid the THL Entities $41.1 million as a result of the greenshoe dividend.

F.    **Fraud At Refco**

192.    As noted, by the time of the Initial Public Offering, the THL Entities and

THL Directors knew, among other things, the following about Refco:

- Refco's internal accounting function was in disrepair;

- Refco's outside auditor was inadequate for a company of Refco's size and complexity, giving rise to a "restatement risk" were an appropriate auditor brought in;

- Refco merely had taken "stop gap measures" to deal with the auditing shortcomings;

- The Bennett Co-Conspirators and Refco's outside auditors for months had failed to bring to THL's attention what a THL executive later called a "horrendous" Management Letter criticizing Refco's internal controls;

- Refco played "fast and loose [with] compliance issues," and incurred multiple regulatory sanctions involving the improper handling of customer funds;

- The Bennett Co-Conspirators had affirmatively lied to THL;

- Phillip Bennett "just [would] not come clean easily" on the relationship and dealings between Refco and Bennett's holding company, RGHI;

- The Bennett Co-Conspirators refused to respond to THL's questions regarding $105 million in related-party receivables on its books as of February 28, 2003,

- Despite the "Deep Throat" allegations regarding the "sloughing off" of customer losses into a subsidiary, and KPMG's advice to THL that the highest priority should be to gain an understanding of financial transactions between Refco and RGHI, THL never obtained any documents dealing with these transactions; and

- Refco, at the direction of the Bennett Co-Conspirators, engaged in multi-hundred-million-dollar transactions based only on what THL executives described as a "rudimentary" and "disorganized" due diligence process — and in one instance went forward even though a Refco analyst could not explain to THL how such a large transaction could be funded without incurring additional debt.

193.    Had the THL Entities and THL Directors fulfilled their fiduciary duties, they would have learned that the improprieties within Refco were not limited to the list above. In fact, the same Bennett Co-Conspirators that THL knew to be dishonest had carried out a massive and long-running fraudulent scheme.

194.    The massive fraudulent scheme orchestrated at Refco by the Bennett Co-Conspirators, although multi-pronged and spread out over many years, consisted, generally speaking, of three types of illegitimate transactions. The common goal was to improve Refco's *apparent* financial condition.

195.    First, there was extensive inappropriate use of related-party accounts to "slough off" customer losses and other items, just as THL had been warned by "Deep Throat." These amounts would have negatively affected Refco's financial position had they been properly recorded on Refco accounting books and records. To avoid this, and to create a false picture of Refco's financial success, the losses and other items were instead recorded as RGHI's debt to Refco (collectively, the "RGHI Receivable"). Examples of such activity include:

- Losses incurred by Refco as a result of customer defaults and proprietary trading losses that the Bennett Co-Conspirators transferred to RGHI instead of disclosing the existence of these uncollectible sums;

- Operating expenses incurred by Refco but improperly recorded on, or moved to, the books of RGHI, by the Bennett Co-Conspirators, thereby decreasing Refco's expenses and increasing RGHI's debt to Refco; and

- The creation of bogus income for Refco by, *inter alia*, "charging" substantial interest on the debt balances owed by RGHI to Refco.

196.    Second, these related-party receivable balances were kept from public disclosure by means of a "Round-Trip Loan" scheme that had no legitimate business purpose.

197.    Third, the Bennett Co-Conspirators caused Refco to rely for its life and growth upon the fraudulent conversion of billions of dollars of assets that customers of the Refco

52

subsidiary RCM deposited in RCM for safekeeping. Once the Bennett Co-Conspirators had directed Refco employees to sell, or cause to be sold, RCM customers' securities, the proceeds were siphoned out of RCM and "upstreamed" to other Refco subsidiaries.

198.    The Bennett Co-Conspirators' conversion of RCM customers' securities violated federal law. THL became aware of this business practice in connection with its control of Refco. Yet, the THL Defendants did nothing pursuant to its fiduciary obligations, or its obligations under the Management Agreement, to prevent the Bennett Co-Conspirators from misusing RCM customers' assets.

199.    As a direct result of the THL Entities' and THL Directors' breaches of their fiduciary duties, this fraudulent scheme continued unabated, and THL pushed Refco into an IPO that saddled it with hundreds of millions of dollars in obligations it could not fulfill.

### 1.    The RGHI Receivable

#### a.    Trading Losses

200.    One early aspect of the fraudulent scheme involved the improper concealment of hundreds of million dollars in customer and proprietary trading losses in the late 1990's, including hundreds of millions in losses that were incurred during the Asian debt crisis in 1997 and 1998.

201.    Beginning in or around 1997, certain Refco customers to whom Refco had extended credit to purchase securities incurred heavy trading losses in the Asian financial crisis and could not repay the loans extended to them by Refco (the "Asian Losses").

202.    The Bennett Co-Conspirators failed to properly account for the Asian Losses, which appeared on Refco's books as customer receivables. Because the sums from the customers were uncollectible, Refco ought to have written the customer receivables off as bad debts and reduced its operating income accordingly. Instead, the Bennett Co-Conspirators

engaged in financial statement manipulation, periodically and ultimately transferring the amount of uncollectible customer receivables to an RGHI account at Refco, thereby increasing the RGHI Receivable. As a result, a charge to Refco's operating results was avoided and the Refco customer losses were alchemized into an amount due from RGHI, *i.e.*, the RGHI Receivable.

203.    Also in 1997, certain Refco customers in the United States to whom Refco had extended credit — entities associated with Victor Niederhoffer — lost more than $90 million in trades ("Niederhoffer Losses") on the Chicago Mercantile Exchange ("CME"). When rumors at the CME suggested that Refco customers had lost money and that Refco was on the hook, Grant stated to the public that "there is no problem at Refco." This was not true. Rather, when the customer could not meet the margin requirements, the Bennett Co-Conspirators caused Refco to take out an intra-day loan from a financial institution to meet the margin call at the CME and then used funds taken from customers of other Refco entities to repay the loan. The Bennett Co-Conspirators caused Refco to enter into settlement agreements with the Niederhoffer entities pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco.

204.    The Bennett Co-Conspirators also failed to properly account for the Niederhoffer Losses. Like the Asian Losses, the Niederhoffer Losses were uncollectible — indeed the settlement agreements released the Niederhoffer entities from liability — and should have been written off in Refco's operating results as a bad debt expense. Instead, approximately $71 million of the Niederhoffer Losses were "sold" or transferred to an RGHI subsidiary and then further transferred to RGHI's account at Refco. Thus, like the Asian Losses, the uncollectible Niederhoffer Losses were transformed from bad debts into what appeared on Refco's books as the RGHI Receivable.

205.    Refco also suffered substantial losses in excess of $40 million during this period from proprietary trades, *i.e.*, trades carried out on its own behalf, which losses were also improperly concealed rather than being written off.  Like the Niederhoffer Losses, rather than being written off in Refco's operating results, these losses — some of which were associated with the decrease in value of Russian bonds in 1998 — were "sold" or transferred to an RGHI subsidiary.

206.    Rather than recognize and properly record the trading losses on Refco's books, the Bennett Co-Conspirators concocted a scheme to transfer some or all of these losses from Refco to RGHI.  As a result, instead of being written off as bad debt, hundreds of millions of dollars in customer losses and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable from RGHI.  This had the effect of making Refco's financial position look materially stronger than it actually was.

207.    RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Bennett Co-Conspirators' ability to conceal the very losses shifted from Refco's books to RGHI's account.

### b.    Hiding Operating and Other Expenses

208.    In addition to the Asian Losses and other trading losses, the Bennett Co-Conspirators also artificially inflated the appearance of Refco's financial results by inappropriately recording over a hundred million dollars in Refco expenses and other transactions on RGHI's books.  This had the effect of improperly reducing Refco's expenses while at the same time increasing the RGHI Receivable, *i.e.*, increasing RGHI's purported indebtedness to Refco.

209.    The activity making up this aspect of the RGHI Receivable relates to a number of different categories of expenses and charges that should have been recorded by a Refco entity rather than shifted to RGHI to become part of the RGHI Receivable.

210.    One category of improper transactions was expenses that were apparently incurred by Refco but were moved by the Bennett Co-Conspirators from Refco's books to RGHI's books. In many instances, the Bennett Co-Conspirators would cause a Refco entity to make a cash payment for an expense, or credit (reduce) an expense item that was to be transferred to RGHI, and record a resulting receivable from RGHI. At the same time, RGHI would record an expense and a resulting payable to Refco. For example, between 2000 and 2005, tens of millions of dollars in computer expenses were transferred from Refco to RGHI. Further, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco. The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco. On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

### c.    Phantom Income

211.    The Bennett Co-conspirators also artificially inflated the Refco's financial results by creating hundreds of million of dollars of phantom income from RGHI.

212.    The Bennett Co-Conspirators substantially inflated Refco's income by recording significant interest income from RGHI accruing on the fraudulently created receivable balance. This was bogus income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

213.    The Bennett Co-Conspirators also caused Refco to inflate its income as a result of "transactions" with RGHI.  On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Bennett Co-Conspirators of income at Refco.  The description of the transaction on the account statement said only "Transfer" for each item.  This practice served as a significant source of Refco's income and continued after the LBO, while THL was in control of Refco.

### d.    Disclosure of the RGHI Receivable

214.    On October 10, 2005, Refco disclosed that a multi-hundred-million dollar related-party receivable had been inaccurately characterized in the company's public financial statements:

> Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. . . .

215.    Refco also announced that, because this receivable was not shown as a related-party transaction in its financial reports, Refco's financial statements for the previous four years "should no longer be relied upon."

216.    Starting with its pre-LBO diligence, the THL Entities and THL Directors knew that the Bennett Co-Conspirators had thwarted THL's professionals from determining the nature of the balances carried in such related-party accounts.  After the LBO, when the THL Entities owned a controlling interest in Refco, when the THL Directors served on Refco's board, and when the Management Agreement was in force, the THL Entities and THL Directors had the right, the ability and the duty to demand such information from Refco's auditors.  THL

inexplicably never requested documentation regarding related-party accounts during this period of control, despite Refco's auditor's refusal to furnish this information to THL prior to the LBO. In essence, THL buried the red flag.

217.    In addition, the THL Entities and THL Directors had access to all of Refco's books and records, including documents related to Refco's related-party transactions with RGHI. Had the THL Entities and THL Directors exercised their right to review such documents, they easily could have uncovered the fraud at Refco. By choosing not to demand such information, the THL Entities and THL Directors breached their fiduciary duties to the company.

### 2.    The Cover-up: Round-Trip Loans

218.    The multi-hundred million dollar RGHI Receivable was a related-party obligation that was required to be disclosed in Refco's financial statements. To cover-up the magnitude and the related-party nature of the RGHI Receivable at key reporting periods, the Bennett Co-Conspirators came up with a remarkably simple scheme. The scheme involved implementing a series of transactions at the end of each fiscal year (and also, starting in 2005, at the end of fiscal quarters) that were designed to reduce temporarily the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed to Refco by unrelated third parties (the "Round-Trip Loans"). The transactions were reversed just days after the end of the reporting period and the RGHI Receivable was reinstated.

219.    Starting as early as February 1998, toward the end of each relevant reporting period, the Bennett Co-Conspirators would cause RCM, or another one of the Refco entities, to extend "loans" of up to $720 million at a fixed rate of interest to a third-party unrelated to Refco, Bennett or RGHI. The "loan" would appear as a credit in the third-party's account at Refco. The third-party would then "loan" the same amount to RGHI charging an

interest rate that was between 15 and 100 basis points higher than the third-party was being charged on the "loan" from Refco. The "loan" to RGHI would enable it to appear to pay down – by recording a reduction of its obligation – a significant portion of the debt RGHI owed to one or more of the Refco entities. For many of the Round-Trip Loans, the Bennett Co-Conspirators would also cause RGL to issue a guarantee to the third-party lenders for repayment of their "loan" to RGHI.

220.    A few days following the close of the reporting period, the parties would then unwind the entire transaction. The third party would receive a fee for Refco's temporary use of the third parties' legal entity. The fee or risk-free profit was equal to the interest the third-party "charged" on the "loan" to RGHI less the interest the third-party was "charged" on its "loan" from RCM. Indeed, although characterized as "loans" in the transaction documents, most of these transactions occurred on paper only; for the majority of the transactions, except for payment of interest to the third-parties, the "loans" were conducted on a book basis only and no actual transfer of funds occurred.

221.    The effect of the Round Trip Loans was to substitute at the end of each reporting period, for bookkeeping purposes only, a multi-hundred million dollar obligation owed by RGHI to one or more of the Refco entities (which obligation was required to be disclosed) into an obligation owed by an entity purportedly unrelated to Refco (which could be hidden in customer receivables). The Round-Trip Loans were a sham, generating risk-free profit for the third-party participating in these transactions. The Round-Trip Loans served no legitimate business purpose. Rather, they were conducted solely to reduce temporarily the amount of the RGHI Receivable at the end of a reporting period.

222.    There were approximately 30 Round-Trip Loans from 1998 through 2005, always at the end of a financial reporting period, and never at any other time (with one exception). The Round-Trip Loans caused the amount of the RGHI Receivable to be understated by hundreds of millions of dollars at each relevant reporting period and were always unwound a few days into the new reporting period.

223.    The Bennett Co-Conspirators conducted the Round-Trip loans both pre- and post-LBO. The post-LBO loans occurred while the THL Entities were controlling shareholder, while the THL Directors were on the Board of New Refco, and after THL had determined that Refco's accounting function was inadequate. They happened on THL's watch.

### 3.    Fraudulent Conversion Of Customer Assets At RCM

224.    Apart from the fraudulent activity concealed in third-party accounts, the Bennett Co-Conspirators engaged in a longstanding fraudulent conversion of customer assets held at RCM.

225.    RCM, Refco's purported offshore entity, was in the business of effecting securities and foreign exchange transactions for the accounts of customers. RCM held itself out to be a custodian for its customers' securities and cash. In reliance on RCM's supposed practices, customers opened accounts at RCM and entrusted property that allowed them to purchase and/or sell securities and currency that were held for them by RCM.

226.    In reality, however, RCM's actual business was starkly different; the Bennett Co-Conspirators saw to it that RCM did not "hold" or act as custodian of its customers' securities and cash. Rather, the Bennett Co-Conspirators would fraudulently convert customer assets held in the custody of RCM and use the resulting proceeds to sustain Refco's business operations and acquisitions. Without the RCM customers' knowledge, authorization or consent, on an almost daily basis, Refco employees were directed to sell, or cause to be sold, RCM

customers' securities through hypothecations or pursuant to agreements to repurchase ("repos"). The proceeds of the repos were then siphoned out of RCM, and transferred to RCC. RCC, in turn, used the funds for the benefit of other entities resulting in "loans" to other Refco entities, which entities could not repay those "loans."

227.    The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the THL Defendants. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did.

228.    Not surprisingly, given the size of the funds generated for Refco through the unauthorized sale of customer securities, the THL Defendants were well aware that RCM customer funds were not being protected and segregated in accordance with the relevant U.S. regulatory requirements. While Refco board papers in the relevant period monitor segregation and net capital requirements for other Refco entities, significantly those same Refco board papers make clear that no such segregation requirements were observed in relation to RCM.

229.    The Bennett Co-Conspirators also kept careful track of the intercompany transactions and of the customer assets that were held at RCM at any given time. Refco's treasury operations were managed by the treasury department of Refco Global Finance. This department generated regular reports for Refco management showing the amount of customer

assets that could be stolen from RCM customers. The THL Entities and THL Directors —
including Jaeckel, who was the Treasurer of New Refco — had access to such reports throughout
the relevant period. Additionally, upon information and belief, the THL Entities and THL
Directors in fact accessed the reports during the relevant period. On information and belief, it
was by examining reports such as these that Refco management and the THL Defendants
ascertained that Refco was experiencing severe liquidity problems and thus decided to impose a
moratorium on RCM customer withdrawals in October 2005.

230.    The stolen RCM customer assets were used for a wide variety of funding
purposes by various Refco affiliates. For example, the Bennett Co-Conspirators used RCM
customer assets to make payroll payments and to fund the daily operations of other Refco
entities.

231.    Moreover, while THL was in control of Refco, the Bennett Co-
Conspirators used RCM customer assets to fund business acquisitions and other significant
Refco transactions. For example, in 2005 the Bennett Co-Conspirators used the proceeds from
the conversion of customer securities to loan $154.2 million from RCC to Suffolk, LLC, the
controlling shareholder of PlusFunds, to finance Suffolk's buyout of PlusFunds. The Bennett
Co-Conspirators also caused RCC to make a $50 million payment at this time to two principals
of PlusFunds.

232.    Additionally, while THL was in control of Refco, the Bennett Co-
Conspirators used assets converted from RCM customer accounts to fund Refco's purchase of
Cargill Investor Services. Having completed an LBO which removed "excess" cash from
Refco's books, and having closely monitored the company's finances in preparation of the
upcoming IPO, the THL Entities and THL Directors knew the amount of cash available to

finance the Cargill acquisition. The THL Entities and THL Directors must have known — or at a minimum, strongly suspected and avoided confirming — the illegitimate origin of the approximately $209 million used to finance the Cargill acquisition.

233.    The THL Entities and THL Directors had unfettered access to, and were made aware of, material information concerning RCM and the intercompany transfers of RCM customer assets. For example, the THL Entities and THL Directors, through Jaeckel, received presentations on the results of Grant Thornton's audit of Refco's 2005 financial statements. In addition, documents produced by THLP in connection with the Debtors' bankruptcy proceedings demonstrate that the THL Entities and THL Directors were aware of RCM's practice of "repoing" securities that were supposed to be held in customer accounts and knew that RCM customer securities were being sold to raise cash for RCM and its affiliates.

234.    Given the THL Entities' and the THL Directors' easy access, the sheer size and number of the transfers made in furtherance of the fraudulent scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Entities and the THL Directors would not have known about the use of the RCM customer funds over the course of the sixteen months it controlled Refco prior to the bankruptcy. Had they merely had an understanding of how Refco's businesses were regularly funded, the THL Entities and the THL Directors would have learned the full scope of the RCM fraud.

## G.    Refco's Insolvency

235.    RGL and New Refco were insolvent starting no later than the LBO. Additionally, as of the Reincorporation, Refco Inc. was insolvent.

236.    Additionally, each of these entities possessed unreasonably small capital — including RGL, which was left with unreasonably small capital as a result of the LBO.

237.    Given that Refco was insolvent and in the zone of insolvency beginning no later than the LBO, the THL Entities and the THL Directors owed fiduciary duties to Refco's creditors, as well as to Refco and its stockholders. After the LBO, and after the THL Entities and THL Directors became majority owner and directors of Refco, numerous improper transactions caused Refco's insolvency to deepen.

238.    First, Refco entered into the ill-advised approximately $209 million Cargill acquisition. As noted, THL executives voiced grave concerns over the lack of due diligence on this transaction, and over the wisdom of the financial terms of the transaction — but nevertheless signed off on the acquisition, so as not to "rock the boat" soon before their IPO.

239.    Second, the THL Entities and THL Directors knew of the Suffolk Loans that financed Suffolk's buyout of PlusFunds. Again, they failed to properly consider whether these loans were in the best interests of Refco. Had they inquired into the validity of these loans, they would have learned that the Suffolk Loans were a sham and that Refco received little or no consideration in return for its loans.

240.    Third, the THL Entities and THL Directors improperly caused Refco to go public in August 2005. The IPO saddled Refco with hundreds of millions of dollars in obligations while THL and the other selling shareholders reaped substantial gains. By entering into an IPO based on a prospectus riddled with misstatements, Refco incurred liabilities under the securities laws to stock purchasers of $670.5 million. Similarly, THL caused Refco to register its bonds under Form S-4, thus causing Refco to incur hundreds of millions of dollars in

64

additional liabilities. Had THL taken the necessary steps to remedy Refco's internal problems

prior to the IPO and the bond registration, Refco would not have incurred these losses.

241.    The THL Defendants violated their fiduciary duties by allowing Refco to

enter into these transactions and thus plunge Refco deeper into insolvency.

**H.    Payments to the THL Defendants**

242.    From on or around August 5, 2004 — when the THL Defendants were

fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made the following

payments to one or more of the THL Entities:

- Approximately $31.6 million for the Initial Management Fee and a semi-annual installment of the Annual Management Fee on August 5, 2004;

- $1.5 million as a semi-annual installment of the Annual Management Fee on March 4, 2005;

- Approximately $41.1 million as a "greenshoe" dividend on August 18, 2005;

- Approximately $12.9 million for the Management Agreement Buyout Fee on August 25, 2005;[8]

- Approximately $8.4 million to cover tax obligations owed by the THL Entities; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

243.    From on or around August 5, 2004 — when the THL Entities and THL

Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made

the following payments for the benefit of one or more of the THL Entities:

---

[8]    Pursuant to the terms of the Management Agreement, New Refco and RGL were required to pay a buyout fee to THL immediately upon an IPO. This "cash lump-sum termination fee" was calculated as the "net present value of the fees that that would have been payable . . . for a period of five (5) years from the date of such termination calculated using the Fee paid for the fiscal year ended prior to such termination and a discount rate equal to the ten-year treasury rate on the date of such termination . . . ."

- Approximately $9.6 million for professional fees incurred in the LBO on or around August 5, 2004; and

- Approximately $3.5 million for professional fees incurred in the IPO.

244.  From on or around August 5, 2004 — when the THL Entities and THL Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made approximately $38 million in payments to cover tax obligations owed by owners of Refco. Approximately $8.4 million of these payments were made to the THL Entities; the remainder went to other owners.

245.  The IPO was consummated on August 11, 2005.  At that time, THL and its affiliates sold approximately 7.86 million shares of Refco common stock, and received net proceeds of approximately $162.5 million.

246.  In total, therefore, the THL Defendants received the following approximate transfers and benefits, all of which are recoverable as fraudulent conveyances and/or subject to disgorgement, and which total approximately $275 million:

- $46 million under the Management Agreement;

- $162.5 million in IPO proceeds;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- $3.9 million in "side letter" payments.

## I.    Post-Bankruptcy Events

247.  As noted, on October 10, 2005, less then two months after the IPO, Refco disclosed a related-party receivable of approximately $430 million held at Refco.  The disclosure

precipitated a crisis of confidence among Refco's customers and shareholders. Within one week, Refco and various of its subsidiaries filed for bankruptcy.

248.    Notwithstanding THL's failure to uncover the fraud during its intimate involvement with and management of Refco, federal authorities stepped in and promptly identified massive wrongdoing at Refco. On October 11, 2005, the day after the public disclosure of the related-party receivable, Bennett was arrested and indicted by the United States Attorney for the Southern District of New York ("USAO"). Bennett was charged with fraud for engaging in fraudulent related-party transactions.

249.    On October 24, 2006, the USAO issued a superseding indictment against Bennett, adding Trosten as a defendant, relating to the fraudulent related-party transactions.

250.    Finally, on January 16, 2007, the USAO issued a superseding indictment, adding Grant as a defendant.

## COUNT I
### Recovery of Fraudulent Transfers
### Against the THL Entities
### (11 U.S.C. §§ 544(b), 550(a)(1), and (2); 548(a)(1)(B)(ii)(I), (II), and (IV);
### NY DCL § 270 et seq.)

251.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

252.   Refco Inc., New Refco, and RGL made the following transfers (the "Fraudulent Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|---|---|---|---|---|
| 08/05/2004 | RGL | Managers V | Transaction Fee plus one-half of Annual Management Fee | $31.6 |
| 08/05/2004 | Refco Finance Holdings | THL's professionals | Professionals' Fees | $9.6 |
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | $1.5 |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | $41.1 |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | $12.9 |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | $3.9 |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | $3.5 |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | $8.4 |

253.   Each of these Fraudulent Transfers constituted transfers of interests in property of Refco Inc., New Refco, or RGL.  The Fraudulent Transfers totaled approximately $112.5 million.

254.    Each of the Fraudulent Transfers was made for no consideration; was without fair consideration; or was made for less than a reasonably equivalent value.

255.    At the times of each of the Fraudulent Transfers, the payor (RGL, New Refco, or Refco Inc.) had at least one creditor with an unsecured claim for liabilities.

256.    Each of the Fraudulent Transfers was made (a) when the transferor was insolvent; (b) so as to render the transferor insolvent; or (c) so as to leave the transferor with unreasonably small capital.

## COUNT II
### Recovery of Preferential Transfers
### Against the THL Entities
### (11 U.S.C. §§ 547(b); 550(a)(1), and (2))

257.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

258.    Refco Inc. and RGL made the following transfers (the "Preferential Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|------|-------|-------|-------------|---------------------------|
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | **$1.5** |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | **$41.1** |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | **$12.9** |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | **$3.9** |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | **$3.5** |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | **$8.4** |

259. Each of these Preferential Transfers constituted transfers of interests in property of Refco Inc. or RGL. The Preferential Transfers totaled approximately $71.3 million.

260. Each of the Preferential Transfers was made within one year of the filing of the Debtors' bankruptcy petitions on October 17, 2005.

261. Each of the Preferential Transfers was made while the THL Defendants were insiders of Refco.

262. Each of the Preferential Transfers was made to or for the benefit of one of the THL Entities for or on account of an antecedent debt owed by Refco Inc. or RGL before the transfers was made.

263. Each of the Preferential Transfers was made while Refco Inc. and RGL were insolvent.

264. Each of the Preferential Transfers enabled one of the THL Entities to receive more than they would have received if (a) the case were administered under chapter 7 of the United States Bankruptcy Code; (b) the transfer had not been made; and (c) the transferee received payment to the extent provided by the Bankruptcy Code.

## COUNT III
### Breach Of Fiduciary Duty
### Against the THL Entities
### For Compensatory Damages

265. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

266. The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

267.    The THL Entities owed fiduciary duties to RGL because the THL Entities owned a majority interest in New Refco while New Refco was the operative parent company of Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation provided that "[New Refco] shall have complete and absolute control of the affairs and business of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

268.    The THL Entities owed fiduciary duties to Refco Inc. because, following the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc. and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco Inc. Additionally, the THL Entities exercised control over the board and the business affairs of Refco Inc.

269.    These duties required the THL Entities at all times to act faithfully on behalf of the Company and to conduct themselves in a manner they reasonably believed to be in the best interests of the Company.

270.    The THL Entities breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these transactions, the THL Entities received a monetary benefit at the expense of the Refco entities.

271.    The THL Entities had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Entities breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

272.    As a direct and proximate result of the THL Entities' acts and omissions, Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities;

71

Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Entities are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

**COUNT IV**
**Breach Of Fiduciary Duty**
**Against the THL Entities**
**For Restitution**

273.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

274.    The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

275.    The THL Entities owed fiduciary duties to RGL because the THL Entities owned a majority interest in New Refco while New Refco was the operative parent company of Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation provided that "[New Refco] shall have complete and absolute control of the affairs and business of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

276.    The THL Entities owed fiduciary duties to Refco Inc. because, following the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc. and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco Inc. Additionally, the THL Entities exercised control over the board and the business affairs of Refco Inc.

277.    These duties required the THL Entities at all times to act faithfully on behalf of the Company and to conduct themselves in a manner it reasonably believed to be in the best interests of the Company.

278.    The THL Entities breached their fiduciary duties when they engaged in acts of self-dealing.  As a result of these transactions, the THL Entities received a monetary benefit at the expense of the Refco entities.

279.    The THL Entities had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco.  The THL Entities breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

280.    The THL Entities breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which the THL Entities derived an improper benefit at the expense of the Company while causing the Company to incur, among other things, approximately $670.5 million in obligations to shareholders.

281.    As a direct and proximate result of the THL Entities' acts and omissions, the THL Entities were enriched, including enrichment from transfers from the Company.  The THL Entities must disgorge all proceeds so derived, in an amount not less than $275 million.

73

## COUNT V
### Breach of Fiduciary Duty
### Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen
### For Compensatory Damages

282.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

283.    The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

284.    The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

285.    In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

286.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

287.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing.  As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities.  The THL Directors chose to put the interests of THL above the interests of the Refco entities.

288.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco.  The THL Directors breached their

74

fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

289.    As a direct and proximate result of the THL Directors' acts and omissions, Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities; Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Directors are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

## COUNT VI
### Breach of Fiduciary Duty
### Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen
### For Restitution

290.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

291.    The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

292.    The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

293.    In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

75

294.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

295.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities. The THL Directors chose to put the interests of THL above the interests of the Refco entities.

296.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Directors breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

297.    The THL Directors breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which they derived an improper benefit at the expense of the Company while causing the Company to incur $670.5 million in obligations to shareholders.

298.    As a direct and proximate result of the THL Directors' acts and omissions, the THL Directors were enriched, including enrichment from transfers from the Company. The THL Directors must disgorge all proceeds so derived, in an amount not less than $275 million.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**Against All Defendants**

299.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

300.    The THL Defendants were enriched by the following transfers in excess of $275 million:

- Approximately $162.5 million in proceeds that the THL Defendants received by causing Refco to go public.

- Approximately $46 million pursuant to the Management Agreement;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

301.    When the THL Defendants received the monies described herein, they were enriched at the Company's expense by receiving something of value that belonged to the Company.

302.    The enrichment violates equity and good conscience.  Among other things, as a result of their failure to act appropriately as majority owner and directors of Refco, the THL Defendants must disgorge these monies as it would be inequitable and unjust to allow them to retain these funds.

## COUNT VIII
**Illegal Dividend**
**Against the THL Entities and THL Directors**
**(DGCL §§ 170 - 174)**

303.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

304.    The THL Entities and the THL Directors approved and directed the payment of at least approximately $120.2 million in dividends and distributions by New Refco and Refco Inc., including a greenshoe dividend of approximately $82.2 million as well as approximately $38 million in payments to cover tax obligations owed by owners of Refco.

305.    At all relevant times, New Refco and Refco Inc. were insolvent.  Because these entities' liabilities exceeded their assets, the dividends and distributions approved by and paid to the THL Entities and the THL Directors were illegal under Delaware law.  The THL Entities and THL Directors are each liable for illegal dividends and distributions declared and paid while they were fiduciaries.

## COUNT IX
**Forfeiture of Compensation**
**Against the THL Entities and THL Directors**

306.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

307.    The THL Entities and THL Directors are required to forfeit all compensation received after the first date of their breaches of fiduciary duties, including after the first instance of a breach of their duty of loyalty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and grant the following relief:

78

(a) Entering judgment in favor of the Trust for the benefit of the Trust beneficiaries and against the THL Entities and the THL Directors in this action;

(b) Avoiding and setting aside the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II**;

(c) Directing each respective transferee of the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II** to deliver to the Trust for the benefit of the Trust beneficiaries the property transferred or pay the value of such property, in an amount not less than $112.5 million plus prejudgment interest;

(d) Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Counts III and V** against the THL Entities and THL Directors, jointly and severally, for all damages sustained by RGL, New Refco, and Refco Inc. as a result of the THL Entities' and THL Directors' breaches of their fiduciary duties, in an amount to be proven at trial, plus prejudgment interest;

(e) Awarding restitution in favor of the Trust for the benefit of the Trust beneficiaries on **Counts IV and VI** against the THL Entities and THL Directors, jointly and severally, for all proceeds derived by the THL Defendants following the date of the first breach of fiduciary duty, plus prejudgment interest;

(f) Directing disgorgement, restitution, and damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VII** against the THL Defendants, jointly and severally, in an amount to be determined at trial, but not less than $275 million, plus prejudgment interest;

(g) Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VIII** against the THL Entities and THL Directors, jointly and

79

severally, in an amount to be determined at trial, but not less than $120.2 million, plus prejudgment interest;

(h)     Directing forfeiture of all compensation received by the THL Entities and THL Directors after the first date of a breach of one of their fiduciary duties, and awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count IX** against the THL Entities and THL Directors, jointly and severally, in an amount to be determined at trial, but not less than $112.5 million, plus prejudgment interest;

(i)     Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action; and

(j)     Granting Plaintiff such other and further relief as the Court considers appropriate.

## JURY DEMAND

308.    Plaintiff demands a trial by jury on all issues triable by a jury.


Dated:  New York, NY
        August 8, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

*Kylie Davidson*

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000

*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*

81