Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARC S. KIRSCHNER,
as Trustee of the Refco Litigation Trust,

        Plaintiff,

    - against -

THOMAS H. LEE PARTNERS, L.P.;
THOMAS H. LEE ADVISORS, LLC; THL
MANAGERS V, LLC; THL EQUITY
ADVISORS V, LLC; THOMAS H. LEE
EQUITY FUND V, L.P.; THOMAS H. LEE
PARALLEL FUND V, L.P.; THOMAS H.
LEE EQUITY (CAYMAN) FUND V, L.P.;
THOMAS H. LEE INVESTORS LIMITED
PARTNERSHIP; 1997 THOMAS H. LEE
NOMINEE TRUST; THOMAS H. LEE;
DAVID V. HARKINS; SCOTT L. JAECKEL;
and SCOTT A. SCHOEN,

        Defendants.

Corrected Copy

No. 07 Civ. 7074 (GEL)

**COMPLAINT**

**JURY TRIAL DEMANDED**



## COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee" or "Plaintiff"), as Court-approved Trustee for the Refco Litigation Trust (the "Trust"),[1] brings this action based on information and belief against the following defendants:

- Defendants Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors, LLC, THL Managers V, LLC, THL Equity Advisors V, LLC, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust; and

- Thomas H. Lee ("Lee"), David Harkins ("Harkins"), Scott Jaeckel ("Jaeckel"), and Scott Schoen ("Schoen") (collectively, the "THL Directors").

These defendants collectively are referred to herein as "THL" or the "THL Defendants."

Such information and belief is based on the investigation of the Trustee and his counsel and the review of, among other things, (a) filings of Refco Inc. (collectively, with its direct and indirect subsidiaries, "Refco" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) filings, documents, and testimony obtained in connection with Refco's chapter 11 case, including but not limited to documents and testimony obtained in connection with investigations conducted pursuant to Bankruptcy Rule 2004; (c) interviews with current and former employees of Refco; (d) the final report of the Court-appointed Independent Examiner in the bankruptcy cases, and interviews of persons conducted in connection with the preparation of that report; (e) indictments filed in a criminal case against several former Refco executives; and (f) other relevant public documents. Plaintiff believes that

---

[1]    The Trust is the duly authorized representative to commence all claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, as approved by the United States Bankruptcy Court for the Southern District of New York on December 15, 2006 (the "Plan").

substantial evidentiary support exists for the allegations set forth herein and that after a reasonable opportunity for discovery in this action significant additional evidence will be uncovered.

## STATEMENT OF THE CASE

1.    Refco's collapse and resulting bankruptcy in October 2005 was one of the worst financial disasters ever to befall the securities industry, leaving Refco's creditors and customers owed billions of dollars. Only two months earlier, in August 2005, under the majority ownership and control of the THL Defendants, Refco had completed a seemingly successful initial public offering (the "IPO"). Through that offering, the THL Defendants pocketed over $162.5 million through their own sales of Refco stock to the public, while at the same time exposing Refco to hundreds of millions of dollars in liabilities to the purchasers of Refco shares who bought shares in reliance on fraudulent financial statements and other misleading representations.

2.    From outward appearances, the THL Defendants were the toast of the financial community, having made a huge score by buying control of Refco in August 2004, purportedly using their much-touted financial acumen and experience to ready Refco for a successful IPO, and then reaping substantial profits from that IPO only twelve months later.

3.    As the THL Defendants knew, but Refco's customers and creditors did not, appearances were deceiving. Through their control and ownership of Refco, the THL Defendants had become aware of severe problems with Refco, its management, and its accounting. By the time of the IPO, the THL Defendants knew that certain top executives and managers at Refco were dishonest, and that Refco had unreliable financial statements and a disturbing lack of internal and external accounting controls.

2

4.      As Refco's majority shareholder, with responsibilities pursuant to a lucrative Management Agreement between a THL entity and Refco (the "Management Agreement"), as well as the power to control Refco through board dominance and other means discussed below, THL owed fiduciary duties to Refco. Likewise, while they served on Refco's board, the THL Directors owed similar fiduciary duties to the company. Those fiduciary duties required the THL Defendants to act in Refco's best interest and not just their own interests.

5.      The story of THL's misconduct is one of greed and a failure of integrity. To date, THL has sought to portray itself as a victim that was deceived and defrauded by certain members of Refco's management. However, the THL Defendants have hidden from public view their extensive knowledge of the serious problems at Refco during the period that the THL Defendants were in control.

6.      By the time of the IPO, the THL Defendants were well aware that Refco's existing management was dishonest and had lied to THL and others at the time of the THL Defendants' investment in Refco. They learned that certain members of Refco's management had deceived the THL Defendants about management's own historical compensation. And even more significantly, they learned that certain members of Refco's management had withheld from the THL Defendants a highly critical "management letter" that Refco's outside auditor, Grant Thornton LLP ("Grant Thornton"), had provided to Refco management.

7.      After assuming control of Refco, through the receipt of that letter and other means, the THL Defendants learned that Refco's financial function was in shambles, that its internal accounting and external auditing functions were ineffective, and that Refco was in no condition to be a public company. In private emails, a number of the THL Defendants openly discussed that Refco would be better off hiring a Big Four accounting firm to replace Grant

3

Thornton, which the THL Defendants recognized was not providing the type of auditing services that could be provided by a Big Four firm.

8.    One of the THL Defendants acknowledged in an email that, were Refco to fix its systems and switch to a Big Four firm, Refco might well require a restatement of its financial statements as part of a re-audit. In other words, prior to taking Refco public the THL Defendants openly discussed the fact that Refco's financial statements could well be materially false and in need of correction, but they forged ahead anyway.

9.    Rather than fix the problems at Refco, the THL Defendants made a conscious choice to bury those problems. Instead of doing things correctly and in accordance with Refco's best interests, the THL Defendants operated Refco with the singular goal of getting a payday for themselves as quickly as possible. Notwithstanding the THL Defendants' fiduciary duties to Refco, the THL Defendants focused all of their energies and resources on accomplishing an IPO to benefit themselves, and in the process, did nothing to fix the many problems that should have been apparent to the THL Defendants based on their control of Refco.

10.    To date, THL has been able to obtain the $162.5 million in proceeds from its Refco stock sales, along with another approximately $113 million that the THL Defendants siphoned out of Refco. THL obtained those $275 million in proceeds even though THL's own breaches of fiduciary duties to Refco resulted in Refco's incurrence of hundreds of millions of dollars in additional liabilities.

11.    The motive for the THL Defendants' actions was entirely selfish. Aside from the pursuit of cash, the THL Defendants were readying themselves to raise a new multi-billion dollar private equity fund with which to grow their business. The THL Defendants' ability to mark their Refco investment to market at a significant profit through a seemingly

4

successful IPO was a critical ingredient in the THL Defendants' plan to create a favorable track record for marketing purposes.

12.    As fiduciaries, the THL Defendants had a duty to put Refco's interests ahead of their own.  Faced with their need for a substantial payday, however, the THL Defendants chose to pursue their own interests and line their own pockets.

13.    In this action, Plaintiff seeks to recover the damages the THL Defendants caused Plaintiff to suffer as a result of their multiple breaches of fiduciary duties.  In addition to compensatory damages, Plaintiff also seeks disgorgement by the THL Defendants of the $162.5 million in proceeds that they received by causing Refco to go public in August 2005.  And Plaintiff seeks to recover fraudulent transfers totaling approximately $113 million in payments made by Refco entities to the THL Defendants.

## JURISDICTION AND VENUE

14.    On October 17, 2005, the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code").  The Debtors' Plan was confirmed on December 15, 2006 by the United States Bankruptcy Court for the Southern District of New York.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  Many of the acts and transactions alleged herein occurred in substantial part in this District.  Additionally, Thomas H. Lee Partners, L.P., as well as many of its subsidiaries, and each of the THL Directors, filed proofs of claim in this District related to their involvement with Refco.[2]  By doing so, THL submitted itself to the jurisdiction of this Court.

---

[2]    The entities and persons filing proofs of claim include Thomas H. Lee Partners, L.P., THL Equity Advisors V, LLC, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership,

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, among other things, Plaintiff was appointed as Trustee in this District; Refco is, and was, headquartered in this District; and many of the acts and transactions alleged herein occurred in substantial part in this District.

## PARTIES

### A.    Plaintiff

17.    <u>Trustee.</u>  Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Trust, which was established in connection with the Plan.  The Trustee is the duly authorized representative to commence all claims and causes of action formerly owned by the Debtors. Plaintiff brings this action on behalf of, among other Refco entities, Refco Group Ltd., LLC; New Refco Group Ltd., LLC; and Refco Inc.

### B.    Certain Refco Entities

18.    <u>Refco Group Ltd., LLC.</u>  Refco Group Ltd., LLC ("RGL") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

19.    <u>New Refco Group Ltd., LLC.</u>  New Refco Group Ltd., LLC ("New Refco") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  New Refco filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

20.    <u>Refco Inc.</u>  Refco Inc., the corporate parent of both RGL and Refco Capital Markets Ltd., was organized under the laws of Delaware, with its principal place of

---

the 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. Refco Inc. filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding

company that, through its subsidiaries, provided securities brokerage, execution and clearing

services for exchange-trade derivatives, and prime brokerage services in the fixed income and

foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005

Initial Public Offering ("IPO"), and was the issuer of the stock sold pursuant to the IPO.

   21. Refco Capital LLC. Refco Capital LLC ("RCC"), a wholly owned

subsidiary of RGL, was organized under the law of Delaware, with its principal place of business

at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.

RCC filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17,

2005.

   22. Refco Global Finance Ltd. Refco Global Finance Ltd. ("RGF"), a wholly

owned subsidiary of RGL, was organized under the law of Delaware, with its principal place of

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. RGF filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005.

   23. Refco Capital Markets Ltd. Refco Capital Markets Ltd. ("RCM") was a

company organized and existed under the laws of Bermuda. At all relevant times, RCM had its

principal place of business at 200 Liberty Street, Tower A, New York, New York, 10281. RCM

filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

RCM was a securities broker and foreign exchange broker and one of the three principal

operating subsidiaries of Refco.

24.    Refco Securities, LLC.  Refco Securities, LLC ("RSL"), a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.

25.    Refco LLC.  Refco LLC, a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281. Refco LLC was a registered Futures Commission Merchant.

26.    Set out below is an organizational chart of Refco demonstrating the relationships of the relevant Refco entities:



C.    **Defendants**

27.    Thomas H. Lee Partners, L.P.  Thomas H. Lee Partners, L.P. ("THLP"), a Delaware limited partnership, is a private equity investment firm headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management.  THLP's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

28.    THLP describes itself as "one of the oldest and most successful private equity investment firms in the United States." Since its founding in 1974, THLP has represented itself as a preeminent and highly sophisticated growth buyout firm. THLP has invested approximately $12 billion of equity capital in more than 100 businesses with an aggregate purchase price of more than $100 billion. THLP holds itself out to the financial community as extraordinarily sophisticated in business and financial matters. The firm currently manages approximately $20 billion of committed capital. Notable transactions sponsored by THLP include Dunkin Brands, Nielsen, Michael Foods, Houghton Mifflin Company, Fisher Scientific, Experian, TransWestern, Snapple Beverage, and ProSiebenSat1 Media.

29.    In June 2004, THLP and its affiliates purchased a controlling 57% equity stake in Refco for approximately $507 million. As a result, THLP held a majority stake in Refco and had de facto control over its operations. As detailed below, in addition to having voting control over Refco, THLP and related THL entities had a variety of contractual rights that provided them with additional control over, and access to information about, Refco's affairs. The THL entities involved with Refco include:

- THL Equity Advisors V, LLC ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THLP with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts of which at all times THLP was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts owned and controlled by Equity Advisors V and Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee

Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THLP;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

30.     THLP, THL Advisors, Managers V, Equity Advisors V, Fund V Entities, Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are collectively referred to herein as the "THL Entities." As discussed in more detail below, the THL Entities always acted in concert. They owned a majority stake in Refco from the date of THL's leveraged buyout of Refco (the "LBO") until Refco's IPO. Additionally, from the date of the LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and exercised discretion over its affairs.

31.     THL held their interests in Refco through the Fund V Entities.

32.     Thomas H. Lee. Thomas H. Lee ("Lee") was at all relevant times subsequent to the LBO a director of Refco. Lee founded the Thomas H. Lee Company, the predecessor of THLP, in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that entity after October 2005. As a director of Refco and as Chairman and CEO of THLP, Lee was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.

33.     David V. Harkins. David V. Harkins ("Harkins") was at all relevant times subsequent to the LBO a director of Refco. Harkins also served on Refco's nominating and governance committee. Harkins is Vice Chairman and Managing Director of Private Equity

10

Funds of THLP, and has also served as President of THLP. As a director of Refco and as Chairman and a top executive at THLP, Harkins was actively involved in the decision to invest in Refco and THLP's subsequent monitoring of its investment.

34.     Scott L. Jaeckel. Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the LBO a director of Refco. Jaeckel also served as treasurer of New Refco, treasurer of Refco Finance Holdings, LLC, and treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of May 2004. Jaeckel is a Managing Director of THLP. Jaeckel previously served as Vice President of THLP from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A from Harvard University and his extensive experience in corporate finance includes previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THLP, Jaeckel was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

35.     Scott A. Schoen. Scott A. Schoen ("Schoen") was at all relevant times after the LBO a director of Refco. Schoen served as president of New Refco; president of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of May 2004; and sole director of Refco Finance, Inc. Schoen also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THLP in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THLP from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and, prior to joining THL, was in the private finance department of Goldman, Sachs & Co. As a director and officer of Refco and a top executive at THLP, Schoen was actively

11

involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.

**D.    The THL Entities' Control Over Refco**

36.    As noted, from the date of the LBO in August 2004 until Refco's IPO in August 2005, the THL Entities and their affiliates owned a majority stake (approximately 57%) of Refco and exercised control over Refco. From the date of the IPO until Refco's bankruptcy filing, the THL Entities and their affiliates owned approximately 42.7% of Refco and continued to exercise control over the company. The THL Entities controlled RGL and New Refco as of the LBO and through the date of their bankruptcy filings, and they controlled Refco Inc. as of the date of Refco's reincorporation (discussed below) at the latest and through the date of its bankruptcy filing.

37.    The THL Directors owed fiduciary duties to RGL and New Refco at least as of August 5, 2004, the date of the LBO, when they were made directors of New Refco and when RGL's corporate documents were amended so as to give New Refco (and the THL Directors) complete control over all of RGL's actions. The THL Directors owed fiduciary duties to Refco Inc. as of August 1, 2005, at the latest, when they were installed on its board.

38.    The basis for and evidence of the THL Entities' control over RGL, New Refco, and Refco Inc., at the times set forth above includes the following:

- The THL Entities owned a majority or a controlling interest in Refco during these periods, and the THL Entities at all times acted as one with respect to their interests;

- In addition to voting control, the THL Entities had various contractual rights providing them with additional control over, and access to information about, Refco's affairs — including, but not limited to, the Management Agreement;

- The THL Entities had the right to appoint 4 of 8 directors of New Refco, as well as a joint right with another shareholder to appoint a fifth director;

12

- The THL Entities had the right to appoint 3 of 8 directors of Refco Inc., as well as a joint right with another shareholder to appoint a fourth director;

- The THL Entities exercised these rights by installing their own executives on New Refco's and Refco Inc.'s boards and by ensuring that the THL Directors would and did vote as one block in the THL Entities' interests;

- The THL Entities had the right to "reasonable representation" on the key committees of New Refco's boards, including its audit committee, nominating and governance committee, and compensation committee, and it designated certain of the THL Directors to sit on these committees and take part in their review of information and decision making on behalf of the THL Entities;

- Members of the THL Entities had entered into a Management Agreement with New Refco in August 2004, which agreement specifically obligated Managers V to know and understand Refco's business so that it and the THL Entities could provide management and advisory services to Refco in connection with Refco's business operations and the execution of its "strategic plan";

- The Offering Memorandum for Refco's bonds, issued as part of the LBO, indicated that the THL Entities would "have the ability to control all aspects of [Refco's] business" as a result of the LBO;

- Refco characterized itself as a "controlled company" under New York Stock Exchange Rules following Refco's IPO due to the substantial stock holdings of the THL Entities and Refco's other major shareholder;

- In addition to the involvement of the THL Directors in Refco's management, THL also made other employees of THL Entities who were not directors available to work on Refco's oversight, and certain THL executives became officers of New Refco:  Schoen, Jaeckel, and George Taylor became President, Treasurer, and Secretary, respectively;

- The Securityholders Agreement entered into between certain THL Entities and New Refco effectively conferred on the THL Entities veto power over a wide range of corporate activities, including the right to merge or sell any of Refco's assets or to effect a public offering — both through a requirement of gaining the vote of 65% of New Refco's outstanding shares to take a number of important actions, and through a requirement of board approval for a wide range of corporate activities; and

- The THL Entities had and exercised the authority on behalf of Refco to sign material documents and SEC filings.

13

39.    As a result of the foregoing, the THL Entities were able to and did exercise control over the business affairs of RGL, New Refco, and Refco Inc.  In recognition of this fact, Federal District Court Judge Gerard Lynch recently denied the THL Entities' motion to dismiss claims alleging control person liability under section 15 of the Securities Act and section 20 of the Securities and Exchange Act.[3]

## FACTUAL BACKGROUND

A.    **Refco**

1.    **Refco's Business**

40.    RGL was a holding company whose direct and indirect subsidiaries were, among other things, providers of execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets.  In 2004, the Refco businesses were the largest provider of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States.  Refco serviced more than 200,000 accounts from over twenty locations in over ten countries.

41.    On or around August 5, 2004, when THL consummated its Refco LBO, New Refco became the successor parent holding company of the Refco business.

42.    Refco Inc. was formed in connection with Refco's August 2005 IPO, after which 42.7% of Refco Inc.'s stock was owned by the THL Entities and its affiliates; 33.8% was owned directly and indirectly by Phillip Bennett ("Bennett"), then Refco's President and CEO; 2.7% was owned by Refco's management and other related persons; and 20.8% was owned by public investors.

---

[3]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 41, 82, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

43.     Bennett was President, CEO, and Chairman of RGL from 1998 and later also served in those roles for New Refco and Refco Inc. Bennett was forced to take a leave of absence from Refco on October 10, 2005, the day that Refco announced the existence of a previously undisclosed multi-hundred-million-dollar related-party receivable on Refco's books.

44.     Tone Grant ("Grant") was CEO of RGL until 1998, when Bennett succeeded him. Grant also co-owned a majority of RGL together with Bennett until August 2004.

45.     Robert Trosten ("Trosten") was Executive Vice President and CFO of RGL from 2001 until his resignation in October 2004.

46.     On October 17, 2005, Refco and a number of its wholly owned subsidiaries were forced into bankruptcy and eventual dissolution as a direct and foreseeable result of a massive, financial fraud perpetrated over the course of at least eight years by Bennett with the aid and assistance of various co-conspirators, including former Refco owners (Grant and Thomas Dittmer), former Refco executives (Santo Maggio and Trosten), and others (collectively, the "Bennett Co-Conspirators"). Bennett, Grant, and Trosten have been indicted and currently await trial on related criminal charges.

**B.      Leveraged Buyout**

**1.      THL Undertakes Due Diligence**

47.     THL was contacted by Credit Suisse First Boston ("CSFB") in October 2003 regarding an investment opportunity in Refco. At this early stage, THL already viewed Refco as a candidate for a THL-led IPO. THL analyzed Refco to determine whether it could make a substantial investment in Refco and then quickly turn around and sell Refco or its equity to a third party or the public.

48.     THL expressed its interest in purchasing Refco, and received a detailed "Confidential Information Memorandum" prepared by CSFB. By mid-November 2003, THL was in talks with CSFB regarding THL's intent to submit an indication of its interest to acquire Refco.

49.     In connection with its leveraged buyout of Refco, THL undertook due diligence. THL was tantalized by the prospect of a successful IPO of Refco that would result in significant profits to THL and its affiliates. Although THL's diligence put it on notice of a number of issues requiring additional investigation prior to any IPO, THL did not conduct the type of follow-up that in many cases would have revealed significant problems at Refco.

50.     THL hired outside professionals to assist in its due diligence as it prepared to acquire Refco. These professionals included Weil, Gotshal & Manges LLP ("Weil"), THL's main outside legal counsel, to conduct legal due diligence; KPMG, to review Refco's financial statements; and McKinsey & Co., which analyzed financial market structures and trends.

51.     After the consummation of the LBO, Refco (not THL) paid the $9.6 million in professional fees generated by these due diligence efforts. Had THL determined not to go forward with the LBO, it would have been required to pay those professional fees with its own funds.

### 2.    Due Diligence Put THL On Notice That Refco Had Management Problems

52.     If THL had undertaken a thorough and complete review of Refco's operations, it would, undoubtedly, have been on notice of the true state of Refco's problematic financial situation. As Federal District Court Judge Gerard Lynch recently stated in a related

proceeding, the problems at Refco were "glaringly suggestive of fraud . . . . [T]here was certainly a monster under the bed . . . ."[4]

### a.   Management Thwarts THL's Knowledge Of Management's Misconduct

53.    Throughout its diligence, THL knew that its professionals repeatedly were stonewalled when they tried to obtain key information from the Bennett Co-Conspirators.

54.    In March 2004, KPMG reported to THL on at least three separate occasions regarding roadblocks in KPMG's diligence effort thrown up by the Bennett Co-Conspirators. KPMG reported the following to THL:

- The Bennett Co-Conspirators had not provided KPMG with key financial information, including information regarding the nature of receivables owed to Refco;

- Rob Trosten, RGL's CFO, was unwilling to provide data underlying certain of Refco's financial figures; and

- KPMG attempted to engage some of the Bennett Co-Conspirators in an in-depth discussion regarding the company's financial information, but those persons restricted the conversation to anecdotal, high-level information.

55.    Initially, THL grew so frustrated with the Bennett Co-Conspirators that it called off its due diligence. A THL memo dated March 29, 2004 made the point clearly: "we have been disappointed by management's ability to answer diligence questions and respond to data requests." On March 24, 2004, THL's Jaeckel emailed KPMG: "please do not spend time & $ on Refco until further notice – we are struggling on diligence."

56.    Nevertheless, THL determined to move ahead with its acquisition, with full knowledge that it could not expect cooperation or candor from the Bennett Co-Conspirators.

---

[4]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 57, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

**b.    THL's Ignorance Of Related-Party Receivables**

57.    THL also failed to insist upon competent documentation of related-party receivable balances at Refco during its due diligence.

58.    On April 16, 2004 — barely three weeks after it called off its due diligence before restarting — THL sent a letter confirming its proposal to purchase Refco and discussing the structure for a "Potential Future Initial Public Offering" for Refco, (the "Proposal Letter").

59.    The Proposal Letter shows THL's knowledge of related-party receivables held by Refco Group Holdings, Inc. ("RGHI") and BAWAG[5] at Refco and the significance of those receivables to Refco's future.  The following were given as preconditions to THL's purchase of Refco:

> [A]ny existing shareholder loans will be terminated prior to Closing and funded with cash otherwise payable to the Sellers [RGHI and BAWAG Overseas], and all existing agreements, contracts or arrangements between the Company and the Sellers or their affiliates will be terminated . . . .  [T]he Company may distribute the $120 million amount that was accrued for distribution as of February 29, 2004, provided, however, that no more than $12 million of such distribution will be in cash and the remainder will be made solely through the reduction of amounts payable to the Company from Sellers [i.e., related-party receivables held by RGHI].

60.    On May 17, 2004, KPMG issued a draft report to THL summarizing its due diligence findings.  In the section titled "Receivables: risk concentration," the report stated as follows: "Loans at February 28, 2003 included $105 million of receivables from members, affiliated companies and related parties."  Reflecting KPMG's limited access to information, its

---

[5]    BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse AG ("BAWAG") was at this time the owner of a reported 10% stake in Refco through its subsidiary BAWAG Overseas Inc.

report provided no analysis of the makeup of this $105 million or any explanation of how the receivable grew so large.

61.     Had THL followed up regarding related-party receivables, it would have uncovered the fraud within Refco and would not have allowed Refco to incur hundreds of millions of dollars in additional liabilities it could not afford.

### c.     THL's Knowledge Of Regulatory And Legal Problems

62.     Refco had a highly publicized history of serious regulatory and legal problems, including repeated fines imposed by the Commodity Futures Trading Commission ("CFTC"), among other regulators. Refco paid millions of dollars to the CFTC as penalties for Refco's improper pooling of and misuse of customer funds.

63.     This checkered past was well known within THL prior to the LBO. In a March 12, 2004 email, Jaeckel informed THL executives that Refco was a company that played "fast and loose [with] compliance issues." Likewise, in a May 31, 2004 email, THL's Schoen commented on Refco's history in an email to THL colleagues and a Weil attorney by saying "the old operation [Refco] was in fact fined heavily for activities such as *mixing with client funds* and parceling winnings out selectively between Refco and clients . . . ."

64.     Another internal THL email in March 2004 informed Schoen that Lee had spoken to Arthur Levitt, former head of the SEC, regarding THL's impending acquisition of Refco. The email stated: "Arthur [Levitt] said it (Refco) had been known as a 'pump and dump' operation."

65.     THL knew that disciplinary actions brought by Refco's regulators ensnared even the most senior Refco executives, including one of the Bennett Co-Conspirators. For example, the SEC investigated Refco and Santo Maggio ("Maggio"), President and CEO of

19

RSL, in connection with an investigation into inappropriate short selling of stock in the Sedona Corporation.

66.    In July 2005, RGL publicly announced that one of Refco's top executives, Maggio, was near a settlement with the SEC which would result in his 1-year suspension from any supervisory duties as a result of his role in the Sedona manipulation. RGL also noted the likelihood of a "substantial civil penalty," for which it had set aside $5 million.

67.    THL also knew that Refco had a history of nondisclosure of uncollectible losses incurred by its customers. One such instance came to light in litigation related to Eastern Trading Company ("Eastern"), a client of what was then Refco Inc. (and later Refco LLC). In the late 1990s, Eastern experienced large trading losses that resulted in a shortfall of $28 million in its account at Refco. During Refco's lawsuit to recover this sum, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit said: "for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco [Inc.] did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate [RCC] . . . ."[6]

68.    THL did little or nothing to investigate the circumstances relating to Refco's concealment of the debit in its customers' account or the affiliate loan that was used to effect the concealment. As discussed below, the Bennett Co-Conspirators' concealment of customer losses continued during THL's period of majority ownership of Refco and it was the public disclosure of such concealment that precipitated Refco's bankruptcy.

---

[6]    *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000).

69. These and other well known legal and regulatory problems put THL on notice of Refco's checkered past. Once it owned Refco, however, THL failed to ensure that Refco had remedied the deficiencies that caused its serious and widespread previous violations.

**d.    THL Ignores Professionals' Requests For Key Information**

70. THL's due diligence professionals repeatedly warned THL that they were not receiving the information necessary to conduct competent due diligence. THL repeatedly ignored many of those requests.

71. On May 10, 2004, Ram Menon of KPMG emailed Jaeckel, George Taylor ("Taylor"), a Vice President at THLP, and Max Strasburg ("Strasburg"), an analyst at THLP, alerting them to additional due diligence difficulties. Menon's email attached a document summarizing KPMG's discussion with Mark Ramler of Grant Thornton, Refco's outside auditor. This document indicated that Grant Thornton had not provided KPMG with working papers regarding "credit risk loss reserves," among other things.

72. KPMG also informed THL of the Bennett Co-Conspirators' questionable tax treatment of the liquidation of the former Refco, Inc. into its successor Refco LLC. KPMG stated: "We have requested the [relevant documents] in case they describe the basis for management's opinion that no gain was recognized as a result of the conversion. . . . We have not received this information."

73. KPMG further informed THL that Grant Thornton "did not provide us with access to their audit planning memoranda, work programs, test work papers, schedule of audit adjustments and audit conclusion memoranda. . . . [Grant Thornton's] audit conclusions on the fair value or [sic] [Refco's] proprietary investments were not also made available."

### e.    THL Never Obtains Documentation Regarding RGHI

74.    THL knew that the Bennett Co-Conspirators refused to provide key corporate documents regarding the relationship between Refco and Bennett's holding company, RGHI.  THL's due diligence professionals repeatedly stressed the need for such documents.

75.    A document titled "Open Diligence Issues" dated February 26, 2004 and prepared by Weil listed RGHI's organizational documents as an "open item."  The document also listed this troubling "Open Question": "Relationship of P. Bennett and T. Grant to entities owning Refco Group Ltd., LLC."

76.    Similarly, a May 13, 2004 Weil memo titled "Outstanding Legal Due Diligence Items" stated that Weil still needed to obtain "Voting agreements, stockholders agreements or any other material agreements relating to the relationships between RGHI, Refco Group Holdings LLC, BAWAG Overseas, Inc. and Refco Group Ltd., LLC."

77.    Notwithstanding these open issues, and the myriad unanswered questions, THL pushed forward without ever receiving these key materials regarding the relationship between Refco and its owners.

### f.    THL Learns Of Facts Hidden By Certain Members Of Refco's Management

78.    As noted, THL was fully aware that it could not expect candor from the Bennett Co-Conspirators.  This proved especially true late in THL's due diligence process, when it learned that the Bennett Co-Conspirators had repeatedly failed to be forthright with THL.

79.    Shortly before the LBO, THL learned that a Refco executive had attempted to hide from THL a significant legal obligation that Refco may have owed to Edward McElwreath, who demanded a commission for introducing Refco to THL.  By letters dated May 6, 2004, McElwreath's attorney made his demand known to Bennett and to THL's Schoen.  The

letter to THL stated that Peter McCarthy, Executive Vice President of RSL, had suggested that McElwreath wait until the close of the THL LBO to make his demand, in order to "keep the contract's existence from [Thomas H. Lee Partners]." This surprising and worrisome disclosure did not deter THL from going forward.

80.     THL also was aware that the Bennett Co-Conspirators had failed to share key information regarding a litigation between Tradewinds Financial and RSL. On or around June 17, 2004, just six weeks before the LBO, a jury in New York returned a verdict in favor of Tradewinds and against Refco. Tradewinds had sued Refco for $45 million. Although THL had been generally aware of a litigation involving Tradewinds and Refco, THL was not told by the Bennett Co-Conspirators that the matter either was on the verge of trial or that the trial had been lost.

81.     After THL and/or Weil raised their concern about the Bennett Co-Conspirators' failure to voluntarily disclose the current status of the Tradewinds litigation, Schoen discussed this topic with Bennett. On June 19, 2004, Schoen sent an email to THL executives and Jay Tabor, an attorney at Weil, stating:

> Phil [Bennett] and I spoke for about an hour. He obviously went to great lengths to try to reassure me that there was no deliberate attempt on Dennis [Klejna's (Refco's General Counsel)] part to mislead us. I focused on the need to have the kind of open communication and transparency that we need as partners, and that he and we need as Directors on an ongoing basis. I referred to the discussion on the SEC matter [Sedona] as a similar experience, and he understood exactly what I was talking about. While I do not have satisfaction as to how this miscommunication/misunderstanding occurred, we have at least raised the bar on disclosure. Phil also understands that this cuts at our credibility with the lenders . . . .

82.     Although Schoen recognized that the THL Directors required "open communication and transparency" in order to fulfill their duties, the THL Directors knew they were not receiving this from the Bennett Co-Conspirators — and yet they went forward with the

LBO and thereafter took action as directors based on insufficient information, as discussed below.  Likewise, the THL Entities knew of this lack of transparency and yet directed certain of Refco's acts as controlling shareholder without receiving necessary information.

> **g.    THL Learns Of "Deep Throat" And Allegations Of Internal Fraud**

83.    Toward the end of its diligence process, THL learned of a Refco insider (called "Deep Throat" by KPMG) who reported that in the 1990s Refco was "sloughing off" trading losses into a Refco subsidiary.

84.    KPMG compiled a list of additional diligence items for THL to investigate Deep Throat's report. KPMG's John Berndsen sent this list to Schoen at THL on May 28, 2004. The highest-priority diligence item was to obtain RGHI's financial statements and recent tax returns, tie them to Refco's books, and "[i]solate and investigate all items not flowing through from [Refco]." As discussed below, had THL accepted KPMG's advice and obtained and analyzed the relevant RGHI documents, THL likely would have uncovered the fraud being perpetrated by the Bennett Co-Conspirators.  THL did not do so.

85.    Another high-priority item identified by KPMG was to "[o]btain details and understand the nature of inter-company financing arrangements, both on- and off-balance sheet." These intercompany financing arrangements were crucial to understand the workings of the Bennett Co-Conspirators' receivables scheme.  Again, THL rejected KPMG's advice.

86.    Instead of conducting the recommended due diligence, THL merely discussed the "Deep Throat" issues with Bennett.  On the question of "application of proceeds in the Sub S [RGHI], historical distributions, and handling of taxes," Schoen wrote in an email: "I would not say that [Bennett] has yet committed to actually show us tax returns or Sub S [RGHI] underlying organizational and ownership documents, but the issue is on the table and we will

24

have the opportunity to press on until we develop comfort." In connection with THL's request

for a meeting with THL and Ernst & Young, LLP — which had served as tax advisor to the

Refco entities, but resigned from handling Refco's tax returns in 2003 after (among other things)

Refco refused to make what Ernst & Young deemed to be appropriate disclosures regarding the

amount of RGHI's receivable balances — Bennett refused to permit THL's request for a

meeting. THL chose not to press the issue.

       87.     On June 2, 2004, Jaeckel sent an email to other THL executives to

summarize his meeting with Bennett regarding "Deep Throat." According to Jaeckel, Bennett

stated that in the 1990s, customers of Refco had incurred losses, and these losses were run

through certain unconsolidated overseas affiliates of Refco in order to offset their foreign tax

charges. Specifically, Bennett represented to THL that "both historically and going forward

[RGHI] has had and will have no brokerage accounts with any [Refco] entities;" these words,

wholly false, were accepted by THL, without any corroboration, as adequate assurance that there

were no trading losses being hidden by the Bennett Co-Conspirators. Even minimal follow-up

on this representation would have exposed evidence of the fraud at Refco. THL never obtained

appropriate documentation or other evidence from anyone at Refco other than Bennett.

       88.     On June 2, 2004, Schoen sent an email to other THL executives

summarizing this same meeting with Bennett. Schoen stated:

> Phil [Bennett] met with me and Scott Jaeckel to discuss tax liabilities and
> payments by the S Corp [RGHI]. I also pressed him that we really needed at least
> the Readers'[ ]Digest version of who is getting the proceeds from the deal, in
> particular how much is he putting in his pocket versus his rollover. He agreed
> that we need to be taken through all of it, but deferred the entire discussion until
> tomorrow morning. He says he needs to close the loop with Tone Grant before
> opening up these details. We will have to see where this discussion goes
> tomorrow.

89.     On June 3, 2004, David Harkins of THL responded to Schoen's email regarding Bennett's refusal to disclose who was getting the proceeds of the deal. Harkins wrote: "Good luck. *He just will not come clean easily on this one.*"

### 3.     THL Buys 57% Stake In Refco For $507 Million

90.     Had THL pressed for information with respect to any of the leads provided by Deep Throat, rather then failing to do so as set forth above, THL almost certainly would have uncovered the fraud.

91.     However, despite the unanswered questions and risks associated with an acquisition of Refco, THL, one of the world's most sophisticated leveraged buyout firms, forged ahead. As a result, the THL Entities entered into an agreement with various Refco entities, by which the THL Entities and their affiliates agreed to purchase 57% of RGL, a company purportedly valued at $2.25 billion.

92.     To facilitate and fund the LBO, THL created new entities including New Refco and Refco Finance Holdings LLC ("Refco Finance Holdings"). As part of the transactions, THL arranged for $1.4 billion in debt financing at Refco Finance Holdings. Refco Finance borrowed $800 million pursuant to a senior secured credit facility, and $600 million from the issuance by Refco Finance Holdings of unsecured subordinated notes. As part of the same series of transactions, Refco Finance Holdings merged with and into RGL with RGL as the surviving entity.

93.     RGL then purportedly distributed $500 million, supposedly representing excess cash held on RGL's books, to New Refco, which in turn purportedly distributed those funds to RGHI. As Refco and THL agreed, RGL also distributed certain businesses valued at over $237 million, referred to as the Asset Management Entities, to New Refco, which in turn

26

distributed those businesses to RGHI. These distributions to RGHI, and its sole owner, Bennett, had been endorsed by THL prior to the LBO.

94.    Subsequently, RGHI, and the THL Entities contributed their ownership interests in RGL to New Refco in exchange for the following consideration:

- Bennett, sole owner of RGHI, monetized a portion of his ownership in RGL in the amount of $875 million, and exchanged the remainder of his interest in RGL, with a stated value of $382.5 million, for an approximate 43% interest in New Refco.

- The THL Entities and their affiliates received an aggregate of 280.8 Class A Common Units of New Refco, which amounted to approximately 57% ownership interest.

95.    As a result of these transactions, New Refco owned 100% of RGL and became its sole member.

### 4.    THL Directors Join Refco's Board

96.    As part of the LBO, the THL Entities gained significant control over Refco, notably including the power to appoint board members. The THL Entities designated four THL executives to New Refco's board. In addition, certain THL executives became officers of New Refco: Schoen, Jaeckel, and Taylor became President, Treasurer, and Secretary, respectively.

97.    As a result of their positions as Board members and officers of New Refco, the THL Directors formally assumed fiduciary duties to New Refco.

98.    The THL Directors derived their control from their ownership position in Refco, as well as the Amended and Restated Limited Liability Company Agreement (the "New Refco LLC Agreement"). The New Refco LLC Agreement stated that "The business and affairs of the Company shall be managed and controlled by or under the direction of a Board of Managers . . . . The initial Board of Managers shall be comprised of the individuals set forth on

Schedule D." Schedule D listed the following Managers: David V. Harkins (THL); Scott L.

Jaeckel (THL); Thomas H. Lee (THL); Scott A. Schoen (THL); Phillip R. Bennett; Robert C.

Trosten; and Phillip Silverman.

99.     The New Refco LLC Agreement included a section titled "Duties" that

stated: "The Managers, in the performance of their duties, shall owe to the Company and the

Members duties of loyalty and due care of the type owed by the directors of a corporation to such

corporation and its stockholders under the laws of the State of Delaware."

100.     The THL Directors also owed fiduciary duties to RGL. A Fifth Amended

and Restated Limited Liability Company Agreement of RGL (the "RGL LLC Agreement") was

entered into by New Refco (the sole member of RGL) on August 5, 2004. The RGL LLC

Agreement included a section titled "Management" that stated:

> The business and affairs of the Company [RGL] shall be managed by the Member
> [New Refco]. . . . Member shall have complete and absolute control of the affairs
> and business of the Company, and shall possess all powers necessary, convenient
> or appropriate to carrying out the purposes and business of the Company,
> including, without limitation, doing all things and taking all actions necessary to
> carrying out the terms and provisions of this Agreement.

### 5.     THL's Lucrative Management Agreement

101.     As part of the LBO, Managers V agreed that it would serve in an oversight

and managerial capacity for Refco in return for tens of millions of dollars in fees. This

Management Agreement was entered into on August 5, 2004 by New Refco (the "Company" for

purposes of the Management Agreement), RGL, and Managers V (the "Sponsor").

102.     The Management Agreement was entered into *after* the THL Entities and

their affiliates had made their $507 million investment in the LBO, for which they received a

controlling 57% ownership share of New Refco.

103.     The preamble to the Management Agreement reads in part as follows:

WHEREAS, the Sponsor has staff specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services.

WHEREAS, the Company will require the Sponsor's special skills and management advisory services in connection with its business operations and execution of its strategic plan.

WHEREAS, the Sponsor is willing to provide such skills and services to the Company.

104.    The Management Agreement provided that Managers V would provide advisory services to Refco under the following circumstances:

The Sponsor hereby agrees that if . . . [New Refco or RGL] reasonably and specifically requests that the Sponsor provide the services set forth below and the Sponsor agrees to provide such services, the Sponsor or one of its affiliates will provide the following services to the Company and its subsidiaries:

(a)    advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to the Company's or any of its subsidiaries' finances or relationships with banks or other financial institutions; or

(b)    advice with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of the Company and , and [sic] other senior management matters related to the business, administration and policies of the Company and its subsidiaries.

105.    New Refco and RGL agreed to pay Managers V's fees "[i]n exchange for the Sponsor's arrangement of the equity financing and agreement to provide the services set forth" in the Management Agreement.

106.    The first fee to be paid by New Refco and RGL to Managers V was a lump sum payment of $30 million (the "Initial Management Fee").  The second fee was a recurring management fee (the "Annual Management Fee") payable semi-annually and was to be

the *greater* of (a) \$2.5 million per year or (b) 1% of Refco's EBITDA.[7]  (Indeed, on August 5, 2004 — on the same day as the Management Agreement was signed — Refco paid approximately \$31.627 million to Managers V for the Initial Management Fee and a semi-annual installment of the Annual Management Fee.)

107.   The Management Agreement was to continue in effect until one of three events took place:

- termination by Managers V;

- automatic termination on the date that Managers V and its affiliates no longer owned at least 25% of the equity of New Refco; or

- termination by Managers V upon the consummation of an initial public offering by New Refco or any successor entity.

108.   If the Management Agreement were terminated upon an IPO (as was foreseen all along), New Refco and RGL were to pay Managers V a buyout fee (the "Management Agreement Buyout Fee").  The Management Agreement Buyout Fee was to be equal to the net present value of the fees payable for *five years* from the termination of the Management Agreement.

109.   The Management Agreement was signed by Bennett on behalf of New Refco and RGL.  Signing on behalf of Managers V were other members of the THL Entities — THLP (as its Managing Member) and Equity Advisors V (as its General Partner) — and Schoen (as Managing Director of Managers V).

110.   As controlling shareholders, the THL Entities were each an interested party in the Management Agreement transaction.  The THL Entities entered into the

---

[7]   "EBITDA" was defined in the Securityholders Agreement between the parties to the Management Agreement as consolidated earnings for a given fiscal year of New Refco and its subsidiaries before interest, taxes, depreciation, and amortization.

Management Agreement with Refco, whose Board of Directors consisted of senior THL executives. At the same time, these senior THL executives exercised control over THL, Equity Advisors V, and Managers V. As a result, the THL Directors were conflicted with respect to each party's different obligations. In fact, the THL Directors' motive was to minimize the requests that Refco made of Managers V, so that that entity could get its money without providing any services in return.

111.    Had they fulfilled their duties to Refco, the THL Directors would not have permitted funds to be paid to the THL Entities pursuant to the Management Agreement. Alternately, they would have caused Refco to make a request to the THL Entities for services under the Management Agreement, so that Refco's processes, controls, and overall financial situation could have been better understood and improved. If nothing else, the deficiencies, resistance, and concealment they encountered in the due diligence process should have caused the THL Directors to liberally utilize the services of a sophisticated entity such as Managers V. They did not do so, and, upon information and belief, THL Managers V never performed any services in return for its lucrative Management Agreement.

**D.    THL's Awareness Of And Failure To Remedy Deficiencies At Refco Post-LBO**

112.    After the leveraged buyout, the THL Entities became Refco's majority owner and the THL Entities and THL Directors assumed direct oversight and management of Refco. Moreover, after the leveraged buyout, the THL Entities and THL Directors had unfettered access to all of Refco's information. The THL Defendants could obtain, and indeed had fiduciary obligations to obtain, answers to questions that had been raised but not answered in the course of their due diligence. Moreover, the THL Defendants had the ability, power, and

obligation, to remedy the problems at Refco caused by the Bennett Co-Conspirators. They did not do so.

113. After THL was on Refco's board and at the helm, THL learned that Refco's accounting and auditing function, both internal and external, was a disaster. THL executives knew and discussed the fact that Refco's accounting function was inadequate for a company seeking to go public, and that Refco would be better off hiring a "Big Four" accounting firm.

114. As fiduciaries, directors, and officers, the THL Entities and THL Directors had a duty to put Refco's interests ahead of their own. Moreover, to justify the tens of millions of dollars they reaped in the Management Agreement, the THL Entities and THL Directors should have, at a minimum, insisted on correcting the problems that they knew to be afflicting Refco. Rather, for the THL Defendants, the choice was simple and had nothing to do with fiduciary duties. Taking Refco public would greatly benefit THL. So THL pushed ahead, without regard for the adverse consequences to Refco. On October 19, 2004, just ten weeks after the LBO, THL held a key IPO planning meeting with its professionals, and set the gears in motion for the IPO.

115. Aside from the financial gain to be made from a sale of Refco stock, the THL Entities and the THL Directors knew that a successful IPO was critical to the THL Entities and the THL Directors because they were making preparations to market a new private equity fund, for which THL hoped to raise approximately $7.5 billion from institutional investors. In an email exchange with an investor in March 2005, even as a THL executive was discussing THL's current investments such as Refco, the executive was soliciting interest in "our new fund – Fund VI and hopefully Q1 2006."

116.    Indeed, after the fact, THL's chief executive acknowledged that Refco's bankruptcy had made it more difficult to raise money for THL's Fund VI. Scott Sperling of THL called Refco a "disappointment" and said the publicity was "very unpleasant," causing a delay in fund-raising of six months.

117.    By pushing what they knew was an unprepared company into an IPO, the THL Entities and THL Directors breached their duties by causing Refco to incur hundreds of millions of dollars in obligations so that THL could enjoy a quick profit and favorable publicity.

### 1.    THL's Failure To Ensure A Proper Accounting Function

118.    Not long after the LBO, THL realized that Refco should replace Grant Thornton. The THL Entities and THL Directors were well aware that Grant Thornton had done a substandard job auditing Refco. Based on, among other things, Grant Thornton's handling of management's opposition to the Management Letter, the THL Defendants knew that Grant Thornton was not sufficiently independent of the Bennett Co-Conspirators to discharge its responsibilities to audit the various financial statements for Refco. In email exchanges, THL executives noted that in order to clean up Refco's accounting and financial statements, Grant Thornton should be replaced with one of the "Big Four" accounting firms.

119.    THL knew, however, that a new auditor would need time to conduct a proper audit, and therefore would require THL to delay Refco's IPO. THL was unwilling to accept such a delay.

120.    THL executives also knew and discussed the fact that, besides the question of delay, there was a "restatement risk" that came with hiring competent outside auditors. This frank admission by THL executives that Refco's audited financials had a significant likelihood of being materially inaccurate, coupled with the decision not to hire competent auditors so as not

to interfere with THL's self-serving drive to the IPO, constituted a breach of the THL Entities'

and THL Defendants' fiduciary duties to Refco.

      121.   THL's conflict was clear. In an October 6, 2004 email to persons at THL

and KPMG, Jaeckel highlighted two possible courses of action with respect to Refco's outside

auditors. Jaeckel expressed concern about the "restatement risk" as well as a possible delay in

THL's planned sale of its equity stake in Refco:

> Auditors. I think we narrowed this down to 2 main options. Option A – file [the
> IPO] as soon as possible so we are on the road in January. *We will have to stay
> with GT under option A*. . . . Frank [Casal of KPMG] cautions that *we run
> 'restatement risk' by switching auditors* (we run this risk in either option but it is
> magnified when you have public equity). He said the big four take a very hard
> and long look at the books of companies audited by second tier firms. Option B –
> replace current auditors for fiscal 2005 audit. Big four are currently swamped
> with year end and SOX work. . . . Likely to mean that *we wouldn't be selling
> equity until summer*.

      122.   THL faced a stark choice: improve the dysfunctional audit situation and

remedy the misstated and fraudulent financial statements but delay the IPO, or push ahead with

the IPO notwithstanding serious audit shortcomings. THL and the THL Directors, to the

detriment of Refco, chose the latter. They decided to retain Grant Thornton as outside auditor

even though it took ten months from Jaeckel's email to consummate the IPO — more than

enough time to change auditors and long enough for existing problems to fester and worsen

while Refco was without the safeguard of a capable auditor. The real reason for THL's decision

was its recognition that bringing in a new, objective auditor might reveal problems lurking in

Refco's financial statements with disastrous financial and reputational consequences to the THL

Defendants, including the postponement or cancellation of the IPO on which the THL

Defendants were counting.

      123.   In addition, THL executives repeatedly (and justifiably) expressed concern

over Refco's internal accounting staff:

- On March 28, 2005, Jaeckel wrote an internal THL email in which he said that "[t]he staff departures [of two senior Refco accounting personnel] are troubling – *[I]'m getting increasingly worried about our audit.*"

- On March 30, 2005, Strasburg sent an internal THL email regarding an "Auditor call" with Mark Ramler from Grant Thornton. Strasburg said: "Ramler pulled no punches — essentially calling [Refco's] finance staff ex[cept] Gerry [Sherer] 'lazy.'"

- On April 1, 2005, Taylor sent an internal THL email in which he concurred that "Gerry [Sherer] is clearly a one man band in the short run."

124.    Notwithstanding their well grounded concerns, the THL Entities and THL Directors did not remedy these internal accounting deficiencies. To fix the problems at Refco would again have placed THL's much-desired IPO at risk. This was another breach of the THL Entities' and THL Directors' fiduciary duties to Refco.

## 2.    THL Learns Of Grant Thornton's Management Letter

125.    Subsequent events only added to THL's concerns about the deficiencies in Refco's accounting systems.

126.    During the push toward an IPO, THL learned that Refco executives had lied to THL about the existence of a "horrendous" letter to Refco's management from Refco's outside auditors (the "Management Letter"). This letter, which came to light in March 2005, discussed significant accounting deficiencies at Refco. The Management Letter had been prepared by Grant Thornton in connection with its audit of Refco's financial statements for the fiscal year ending February 29, 2004, but was not provided to THL by the Bennett Co-Conspirators.

127.    THL's Jaeckel learned of the Management Letter on or about March 31, 2005, at which point he forwarded a copy of the Management Letter internally within THL, and asked: "What does this letter say? I don't recall ever hearing about this letter. you guys?"

128.   THL's Taylor responded with another internal THL email: "I have never seen the [Management] letter before the email and *it is as horrendous as it sounds*."

129.   On April 1, 2005, Jaeckel wrote an internal THL email expressing his anger that the Bennett Co-Conspirators, with the assistance of Refco's outside auditors, had not provided the Management Letter to THL:

> when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. *if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both*[.]

130.   On April 1, 2005, Strasburg sent an internal THL email explaining that at or about the time that Grant Thornton had provided the Management Letter to Refco management, that management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's then Chief Financial Officer] received it when he first got there [date] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

131.   On April 6, 2005, Jaeckel sent an internal THL email discussing how the Management Letter had not been provided to THL:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

132.   The Management Letter listed nine broad and important "Internal Control Deficiencies" at Refco, each of which put THL on further notice of irregularities within Refco:

36

(1)    IT Environment;

(2)    Consolidation Process;

(3)    Formalized Reporting and Closing Process;

(4)    Internal Audit Function;

(5)    Fixed Asset Subsidiary Ledger;

(6)    Accounting Procedures and Policies;

(7)    Accounting Function;

(8)    Refco Capital Markets Ltd. Custody Reconciliations; and

(9)    Audit Coordination.

133.    Grant Thornton's comment regarding a "Refco Capital Markets Ltd. Custody Reconciliations" deficiency read: "The Company could not produce any custody reconciliations at or around year end for EQ." As discussed below, only through the fraudulent "upstreaming" by the Bennett Co-Conspirators of customer funds in accounts held at RCM was Refco able to fund its operations. Had the THL Defendants asked for RCM's custody reconciliations (which were essential to understand how Refco functioned), they would have seen that Refco's business model, as directed by the Bennett Co-Conspirators, was rooted in fraud and unsustainable.

134.    Grant Thornton's comment regarding Refco's "Internal Audit Function" deficiency stated that "it has become essential to establish an internal audit function [at Refco]."

135.    Had the THL Defendants acted appropriately in light of this information, they would have ensured that the internal audit function was staffed and operating properly. A proper internal audit function would have revealed, before the IPO, to the THL Entities and THL

Directors, the various accounting improprieties and frauds conducted by the Bennett Co-Conspirators within Refco (discussed below).

136.    Grant Thornton's comment regarding Refco's "Accounting Function" deficiency read in relevant part:

> *At present, the accounting function does not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer.* Although the Company has taken stop gap measures in engaging PWC to fill these gaps, it is not a solution. The Company needs to hire qualified people with the necessary skills and expertise . . . .

137.    Once again, THL was made fully aware that Refco was unprepared for an IPO. The THL Entities and THL Directors breached their fiduciary duties by nevertheless pushing Refco into going public too quickly and without sufficient care — all to meet THL's own timetable.

138.    Despite learning that it was lied to about Refco's accounting function, and then learning that the function was a mess, the THL Entities and THL Directors failed to ensure the appropriate remedies were taken, and in so doing breached their fiduciary duties to Refco. Indeed, the Prospectus disclosed deficiencies within Refco's accounting function — proof that the THL Entities and THL Directors had failed to ensure that Refco was prepared to go public.

### 3.    THL Becomes Aware of the Profit-Sharing Agreement

139.    Subsequent to the LBO, THL confirmed the dishonesty of the Bennett Co-Conspirators. One stark example is THL's discovery that before and after the LBO multiple Refco executives withheld information from the THL Defendants and others regarding an important and lucrative compensation scheme.

140.    In or around 2001, eight Refco executives purportedly entered into an arrangement with RGL, pursuant to which they would receive substantial payments from RGL in the event that RGL was sold to a third party for more than $900 million (the "Equity-Like

Arrangement"). By January 1, 2002, the Equity-Like Arrangement had been restructured in an effort to provide favorable tax treatment to the participants. Under the revised scheme, the participants purportedly obtained profit participation interests in RGL pursuant to which they would share in RGL's net annual income equal to their respective equity-like interest in RGL (the "Profit-Sharing Agreement" or "PSA").

141.    This arrangement purportedly was implemented by amending the RGL partnership agreement on January 1, 2002 to allow for profits-only members, who were entitled to share in the annual net profits of RGL but were not entitled to vote.

142.    In June 2004, on the brink of the consummation of the LBO, Refco agreed to redeem the purported equity-like interests by paying the executives a portion of the proceeds derived from a sale of Refco in amounts ranging from $2 to $25 million. The participants did not disclose to THL their purported equity-like interest in RGL, nor that they were to receive substantial redemption payments upon the LBO.

143.    In the pre-LBO due diligence period, Weil, at THL's behest, had asked Refco to provide its "employment arrangements or arrangements with key employees." Weil sent questionnaires to Refco executives asking them to disclose information concerning their respective backgrounds and regarding Refco's executive compensation structure. The questionnaires specifically asked the Refco executives whether they had any personal financial interest in the LBO. None of the eight participating directors or officers disclosed their participation in the PSA. Thus, none of the eight participating directors or officers disclosed that they would gain substantially from a high-priced sale of Refco.