144.    The failure of these directors and officers to make such disclosure was a deliberate effort on their part to deceive THL and others about the financial benefits that those directors and officers would receive upon a sale of Refco.

145.    Immediately after the closing of the LBO, THL began preparing for the IPO. Weil, again at THL's behest, sent identical questionnaires to Refco executives again asking whether they had any personal financial interest in the contemplated transaction.

146.    This time around, two of the members of the management team determined to come clean with THL. Having already been paid millions of dollars, these executives had less to lose by telling the truth. In March 2005, Refco executive Joseph Murphy learned that William Sexton, another Refco executive, planned to disclose his participation in the PSA. Accordingly, Murphy contacted Weil to determine whether he too had to reveal his participation in the PSA. Murphy then revealed that his profit participation interest had been acquired at the LBO for $13.7 million, $9.5 million of which had been paid to him at the time of the LBO, with the remaining $4.2 million to be paid to him at the IPO. Consistent with Murphy's understanding that Sexton was going to disclose his PSA interest, Sexton in fact disclosed on his questionnaire that Refco had agreed to acquire his "outstanding profits participation interest" for a total of $9 million, $6 million of which had been paid to him at the time of the LBO, with the remaining $3 million to be paid to him at the IPO.

147.    Following this partial and belated airing of the truth, Refco subsequently informed Weil that two other executives also participated in the PSA. THL therefore had knowledge that on August 5, 2004, upon consummation of the LBO, the PSA interests held by these four individuals had been partially redeemed for a total of approximately $26 million, using RGL funds routed through RGHI. THL also knew that the remaining redemption

payments for the PSA interests were to be accelerated upon consummation of the IPO. As a result, THL knew that certain of Refco's directors and officers — particularly Bennett, the 100% owner of RGHI — had yet another reason to take Refco public at a high price.

148.    THL and Weil knew that certain of Refco's executives had taken affirmative steps to conceal their equity-like interests in Refco. Nevertheless, THL did not inquire further about the PSA or its concealment. Neither THL nor Weil obtained a copy of the underlying documentation of the PSA even after they learned of this key agreement. Had they done so, instead of turning a blind eye, THL would have learned that four additional Refco executives participated in the PSA. Bennett was one of them. He made over $25 million on the LBO solely from the redemption of his PSA interest.

149.    Faced with blatant evidence that certain of the Bennett Co-Conspirators had conspired to engage in fraudulent conduct by failing to disclose the existence of their Profit-Sharing Agreements, the THL Defendants were on plain notice that at least a substantial part of Refco's management was not fit to be leading a public company. Rather than take steps to deal with that issue, the THL Defendants chose to ignore it and move forward with the IPO that was vital to THL's future financial and reputational success. Moreover, the THL Defendants opted to keep hidden from Refco's various constituencies the fraudulent conduct and character of these Refco executives in order to ensure that the THL Defendants were able to follow through on their plan to go forward with the IPO.

### 4.    THL's Knowledge Of Acquisitions Without Proper Diligence

150.    On June 14, 2005, a Refco employee emailed the Refco board of directors to request a conference call to discuss Project Key, the code name for Refco's acquisition of Cargill Investor Services.

151.    In response to the request for a board conference call, Jaeckel sent an

internal THL email:

> Phil [Bennett] has not called me back. I hope the analysis is sufficiently deep/detailed for a discussion. Since they have never accepted our/Max [Strasburg]'s help I'm not sure who is modeling the deal and pro forma company.

152.    The same day, Taylor sent another internal THL email discussing his

concerns with Project Key:

> Jake [Jaeckel] and I caught up with Gerry [Sherer] regarding his request for a Board meeting Thursday (now confirmed for 4:00pm) to discuss Project Key (Cargill). Phil and Gerry plan to present the financials for Key and discuss with the Board whether it is an interesting acquisition candidate. When pressed, *Gerry did not sound as if he had a presentation prepared that laid out the pros and cons of the deal* . . . . As it stands, *what will be presented to the Board will be a relatively rudimentary set of financials that are not integrated into Refco's financial results.* We offered to help model the combination by sending Max down to assist in pulling the necessary data together (an offer we've made several times in the past), but did not get much of a response.

153.    On June 15, 2005, Schoen responded to this email with another internal

THL email expressing similar concerns:

> I had a 30 minute conversation with Phil [Bennett] on the same subject. . . . I gave him a pretty good push on the value we could offer in diligence and modeling, the importance of doing thorough due diligence and building a financial plan in a levered, soon to be public company as compared to their intuitive historical style, and my desire to see them present a 10-20 slide deck to the board that walks through summary financials, pro formas, accretion/dilution, lays out the key executional plan including individual responsibilities, deliverables and measurement metrics, and balances key opportunities and risks. *He fully acknowledged the need to engage with us in such a process, and then explained that these were unusual circumstances and basically blew me off.* He did it with respect, but nonetheless seemed to just be giving lip service to this approach.

154.    On June 16, 2005, Strasburg sent an internal THL email about Refco's

strategy for Project Key.  He expressed concern over how this acquisition would be funded: "No

consideration is given to debt costs and *Scott Love [from Refco] thinks they are funding this

without borrowing.  Not sure how.*"

155.    Jaeckel replied with an internal THL email: "They r [*sic*] paying 300mm for this? *I wouldn't do that* – we have to trade at 10x ebitda for this to be accretive?"

156.    Strasburg replied with another internal THL email: "$215 upfront. Earnout is additional $67 to $192. *Love could not explain to me how it works.*"

157.    On June 16, 2005, Jaeckel sent an internal THL email expressing concern over how much Refco intended to pay for Project Key:

> I have not been able to view the Refco package [regarding Project Key] but have traded a couple quick emails w/ Max [Strasburg]. If I'm reading them correctly Refco would ultimately pay about 300mm for Key, which is over 9x ebitda. *If I'm correct in those assumptions I would not do this deal.* There is not enough upside in this deal to justify the capital and risk in my view. We only paid 8–8.5x ebitda for all of Refco. In our wildest dreams Refco would trade publicly in the 10-12x ebitda range (which at this point is at least as much hope as reality). In addition the company needs to do a very careful net income comparison to see if this [is] accretive after intangible amort[ization]. . . . *Hopefully I've got my facts wrong and this deal is more exciting.*

158.    Schoen replied with an internal THL email:

> We have a big task and desperately need our whole team on this, plus Weil and Grant Thornton. Phil says he must sign a definitive agreement by Tuesday or it is gone forever. I am really upset that with two months of begging to be involved, we are now at this point, but we have to get organized ASAP.

159.    On June 18, 2005, after receiving copies of documents for the Project Key purchase, Jaeckel sent an internal THL email referencing these documents: "Since the biz [business] is unfamiliar to us I'm not sure if we get a lot out of a page flip."

160.    On June 20, 2005, the THL Directors all approved a board resolution granting Refco executives the authority to finish the Cargill transaction — notwithstanding their strong misgivings (expressed as recently as two days earlier) about the procedure used for the deal and their knowledge that the acquisition was being rushed. In so doing, the THL Entities and the THL Directors breached their fiduciary duties to the company. Their top priority was

43

to complete the IPO, and, indeed, the IPO occurred just prior to the closing of the Cargill acquisition. The THL Defendants abdicated their responsibilities as controlling stockholder and directors because their sole interest was to move forward with the IPO. In their singleminded effort to accomplish an IPO payday for themselves as rapidly as possible, which would require the cooperation of Refco's management, the THL Defendants opted not to make waves with that management team, or otherwise take steps to protect Refco from going forward with an acquisition that the THL Defendants recognized was based on flawed and insufficient analysis.

161.    On June 20, 2005, after receiving an email from Sherer at Refco regarding yet another potential acquisition, Jaeckel sent Sherer an email recommending a number of due diligence steps that he considered appropriate. These included the use of outside professionals, which had not been part of the Project Key acquisition.

162.    Jaeckel then forwarded the email he had written to Sherer to Schoen, Taylor, and Strasburg at THL, making clear that he sought to avoid a repeat of Project Key: "Fyi – I didn't want lack of response to be seen as approval of *another disorganized effort*." This and other emails made clear that the THL Defendants were aware that they had approved the Cargill acquisition based on inadequate due diligence.

163.    Schoen responded to this internal THL email:

> A good plan. *Let's discuss this morning how we can try to force the same result in process re Cargill, albeit after the fact since we will be signing a binding agreement first!* We can at least lay out our specific requirements and give them a sample from [redacted] to show the level of work, planning and information that we require, and that absolutely must be done as a public equity filer.

164.    On June 22, 2005, Schoen sent Bennett a letter reading in part as follows:

> As promised, enclosed is a presentation one of our portfolio companies, [redacted], presented to its Board of Directors prior to obtaining a Board resolution to complete an approximately $400 million acquisition of [redacted]. This is an excellent example of the level of disclosure and diligence work we would normally expect for a substantial acquisition. *I recognize that the Cargill*

*process had real limitations we had to live with to be successful.* Hopefully, we can now do the work and prepare materials of comparable breadth and depth for our Board meeting.

165.    The decision to go forward with the Cargill transaction resulted in injuries to Refco because it overpaid for the assets that it acquired. The Cargill acquisition was not the only major transaction approved by the THL Entities and the THL Directors in violation of their fiduciary duties. Another example is a series of transactions with the Suffolk entities.

166.    In March 2005, RGL, through its subsidiary, RCC, issued a series of loans totaling $204.2 million (the "Suffolk Loans") to Suffolk, LLC, the controlling shareholder of PlusFunds Group, Inc., and related entities.

167.    The first loan, a line of credit of $154.2 million, was issued to Suffolk to be used to purchase the minority shares of PlusFunds. The second loan, a total loan of $50 million, was issued to certain principals of PlusFunds. These loans were secured by shares of PlusFunds.

168.    The Suffolk Loans were nothing more than a sham. In actuality, Bennett and certain other Bennett Co-Conspirators had intended that Suffolk would default on the Suffolk Loans and Refco would thereby foreclose on and acquire the majority interest in PlusFunds — at a price far higher than market rate.

169.    The Bennett Co-Conspirators overpaid for PlusFunds. At the time of the loan, PlusFunds' total net revenue was approximately $26 million. Nevertheless, the Bennett Co-Conspirators valued PlusFunds at $250 million, an amount well in excess than its total net revenues. In any event, there was insufficient justification for a $204.2 million loan against illiquid, privately-held stock.

170.    At the time of the Suffolk Loans, the THL Entities and THL Directors exercised control over the Refco parent entities. The THL Entities and THL Directors knew that

45

Refco entered into the Suffolk Loans. Despite this knowledge, THL failed to ensure adequate controls over acquisitions, and did not attempt to reverse or remedy this loan of $204 million to a company with little or no collateral. The THL Entities' and THL Directors' lack of diligence caused Refco to spend over $200 million, which Refco did not have, to acquire a company that had been wildly overvalued.

### E.    IPO

171.    After conducting continuous due diligence pre- and post-LBO, the THL Entities and THL Directors knew of myriad problems at Refco which were reasons not to go through with the IPO. These problems included the following:

- Various indicia of fraud, including repeated dishonesty by the Bennett Co-Conspirators;

- Disastrous internal and external auditing which had received only "stop gap measures";

- The fact that the IPO would expose Refco to SEC and other reporting requirements for which the company plainly was unprepared;

- Financial statements that could well be in need of restatement;

- Refco was in the middle of a multi-hundred-million-dollar acquisition of Cargill which the Company could not afford, and which required the integration of business components on multiple continents; and

- Refco was highly leveraged, and only a portion of the IPO proceeds would be used to pay down debt.

172.    The THL Entities, THL Directors, and THL executives serving as officers of Refco — each a fiduciary of Refco — each had a duty to fix those deficiencies. Instead, as they had done prior to their acquisition of Refco, the THL Defendants made a conscious choice to disregard the problems and to proceed with its singular goal of getting a lucrative payday as quickly as possible.

1.      **The Reincorporation**

173.    In preparation for the impending IPO, Refco underwent a reincorporation (the "Reincorporation"), whereby Refco Inc. became the new holding company through which ownership in RGL was held.  As a result, Refco Inc. became the ultimate parent of the Refco entities; New Refco became inoperative except as a subsidiary of Refco Inc. and parent of RGL; and RGL continued to be the main holding company for the Refco businesses.

174.    As part of the Reincorporation, the THL Entities and their affiliates exchanged their 283.24 Class A Common Units of New Refco for 63,122,588 shares of common stock of Refco Inc and thus became majority owner of Refco Inc.

175.    As of August 1, 2005, the following people were directors of Refco Inc.:

- THL Directors:  David V. Harkins; Scott L. Jaeckel; Thomas H. Lee; and Scott A. Schoen;

- Refco Insider:  Phillip R. Bennett; and

- Independents:  Leo R. Breitman; Nathan Gantcher; Ronald L. O'Kelley.

THL therefore had significant control over the board of Refco Inc.

2.      **The Prospectus**

176.    Prior to the IPO, Refco Inc., as Refco's new parent company, filed a final prospectus (the "Prospectus") with the SEC.  The Prospectus described the stock sale as follows:

| | |
|---|---|
| Common stock offered by [Refco] | 12,500,000 shares. |
| Common stock offered by the selling stockholders | 14,000,000 shares. |
| Total offering | 26,500,000 shares. |
| Common stock to be outstanding after this offering | 127,500,000 shares. |

The offering amount of 26,500,000 shares did not include the overallotment of 3,975,000 shares available for purchase by the underwriters (the proceeds of which constituted the greenshoe dividend, discussed below).

47

177.    The Prospectus also included a "Report of Independent Registered Public Accounting Firm" from Grant Thornton, Refco's outside auditors, as well as the audited financials of New Refco, which were audited by Grant Thornton.

178.    As discussed above, THL knew that it would have been prudent to replace Grant Thornton, but — in its haste to cash out in the IPO — it consummated the IPO using Grant Thornton's audit opinion, notwithstanding that THL recognized that a re-audit by a Big Four firm could have required a restatement of Refco's financial statements.

### 3.    Roadshow

179.    THL embarked on a two-week IPO roadshow to market Refco to public investors.  A roadshow is a presentation by an issuer of securities to potential buyers that is intended to create interest in the securities and hence raise the price of the stock sold by the issuer.

180.    During its roadshow, THL touted the financial viability of Refco — despite its knowledge of Refco's troubled state.  In its roadshow presentation, THL claimed that Refco had "strong financial performance" and that it had solid risk management with "no proprietary trading" in order to ensure that Refco would not suffer sustained losses in the future. This was false.  In truth, Refco had suffered grave losses in the past that it had fraudulently masked and its financial model was beset with significant problems.

181.    Moreover, THL misleadingly touted its own involvement at Refco in an effort to overcome the public's poor perception of Refco's business practices.  The roadshow presentation stated that the "[Refco] [m]anagement team, in partnership with THL is poised to deliver the next stage of growth."  Investors were led to believe that THL was ensuring that many of the problems that plagued Refco were being fixed.  This too was false.  THL never informed the investors of the truth — that THL had failed to remedy Refco's troubled state.

### 4.    Stock Sales in the IPO

182.    After the roadshow, on August 11, 2005, just one year after the LBO, THL led Refco though an initial public offering of its stock.  At that time, THL and its affiliates sold approximately 8.625 million shares of Refco common stock, with a total sale price of approximately $178.4 million.  After selling this portion of their collective ownership, THL and its affiliates retained approximately 42.7% of ownership of Refco.

183.    Bennett sold 5.375 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $118.25 million.

184.    Refco's proceeds from the IPO totaled approximately $254 million, most of which was used to retire $210 million of the debt taken out to facilitate the LBO, plus a debt prepayment penalty of $18.9 million.

185.    THL and Bennett agreed among themselves to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt with which THL and Bennett had saddled Refco in connection with the LBO.  Again, the THL Defendants put their own interests ahead of Refco's.

186.    When the fraud was disclosed, Refco was saddled with hundreds of millions of dollars in liabilities to all of the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus, notwithstanding that the majority of the proceeds of the public offering had been reaped by the THL Defendants and the Bennett Co-Conspirators (as opposed to Refco itself) through the sale of their stock in Refco.  Thus, the sale of stock resulted in Refco incurring liabilities to investors who had purchased stock based on unreliable financial statements.  These liabilities would not have been incurred had the THL Defendants acted in accordance with their fiduciary duties.

### 5.    The Greenshoe

187.    A greenshoe dividend results from the exercise by IPO underwriters of an option to purchase shares beyond their initial allotment. The proceeds from such a sale are paid out in the form of a dividend to certain investors in the company.

188.    THL began focusing on creating and obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October 19, 2004. The planning culminated in a massive payout to THL less than one year later. On August 10, 2005, the Refco Board agreed to pay a dividend to pre-IPO shareholders, including THL. The Board self-servingly determined that after the IPO and the exercise of the Underwriters' Option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permit payment of the dividend to its shareholders — despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

189.    One day later, on August 11, 2005, the Underwriters agreed to exercise their over-allotment option and to purchase 3,975,000 shares of Refco common stock. Accordingly, it was determined that "an aggregate dividend equal to the net proceeds of the $82,203,000 received from the exercise of the Underwriters' Option . . . be paid."

190.    Having successfully met their long-held goal of a lucrative greenshoe, THL executives immediately expressed their pleasure. On August 11, 2005, Schoen sent an email to THL executives and Bennett announcing the "[g]reat news" that the greenshoe would be fully paid. On the same day, Gregory White, a Senior Vice President at THLP, responded in an email that said: "I guess we should change the team name to be the 'Money team.' Congrats!"

191.    On August 18, 2005, Refco paid the THL Entities $41.1 million as a result of the greenshoe dividend.

### F.    Fraud At Refco

192.    As noted, by the time of the Initial Public Offering, the THL Entities and THL Directors knew, among other things, the following about Refco:

- Refco's internal accounting function was in disrepair;

- Refco's outside auditor was inadequate for a company of Refco's size and complexity, giving rise to a "restatement risk" were an appropriate auditor brought in;

- Refco merely had taken "stop gap measures" to deal with the auditing shortcomings;

- The Bennett Co-Conspirators and Refco's outside auditors for months had failed to bring to THL's attention what a THL executive later called a "horrendous" Management Letter criticizing Refco's internal controls;

- Refco played "fast and loose [with] compliance issues," and incurred multiple regulatory sanctions involving the improper handling of customer funds;

- The Bennett Co-Conspirators had affirmatively lied to THL;

- Phillip Bennett "just [would] not come clean easily" on the relationship and dealings between Refco and Bennett's holding company, RGHI;

- The Bennett Co-Conspirators refused to respond to THL's questions regarding $105 million in related-party receivables on its books as of February 28, 2003,

- Despite the "Deep Throat" allegations regarding the "sloughing off" of customer losses into a subsidiary, and KPMG's advice to THL that the highest priority should be to gain an understanding of financial transactions between Refco and RGHI, THL never obtained any documents dealing with these transactions; and

- Refco, at the direction of the Bennett Co-Conspirators, engaged in multi-hundred-million-dollar transactions based only on what THL executives described as a "rudimentary" and "disorganized" due diligence process — and in one instance went forward even though a Refco analyst could not explain to THL how such a large transaction could be funded without incurring additional debt.

193.    Had the THL Entities and THL Directors fulfilled their fiduciary duties, they would have learned that the improprieties within Refco were not limited to the list above. In fact, the same Bennett Co-Conspirators that THL knew to be dishonest had carried out a massive and long-running fraudulent scheme.

194.    The massive fraudulent scheme orchestrated at Refco by the Bennett Co-Conspirators, although multi-pronged and spread out over many years, consisted, generally speaking, of three types of illegitimate transactions. The common goal was to improve Refco's *apparent* financial condition.

195.    First, there was extensive inappropriate use of related-party accounts to "slough off" customer losses and other items, just as THL had been warned by "Deep Throat." These amounts would have negatively affected Refco's financial position had they been properly recorded on Refco accounting books and records. To avoid this, and to create a false picture of Refco's financial success, the losses and other items were instead recorded as RGHI's debt to Refco (collectively, the "RGHI Receivable"). Examples of such activity include:

- Losses incurred by Refco as a result of customer defaults and proprietary trading losses that the Bennett Co-Conspirators transferred to RGHI instead of disclosing the existence of these uncollectible sums;

- Operating expenses incurred by Refco but improperly recorded on, or moved to, the books of RGHI, by the Bennett Co-Conspirators, thereby decreasing Refco's expenses and increasing RGHI's debt to Refco; and

- The creation of bogus income for Refco by, *inter alia*, "charging" substantial interest on the debt balances owed by RGHI to Refco.

196.    Second, these related-party receivable balances were kept from public disclosure by means of a "Round-Trip Loan" scheme that had no legitimate business purpose.

197.    Third, the Bennett Co-Conspirators caused Refco to rely for its life and growth upon the fraudulent conversion of billions of dollars of assets that customers of the Refco

52

subsidiary RCM deposited in RCM for safekeeping.  Once the Bennett Co-Conspirators had

directed Refco employees to sell, or cause to be sold, RCM customers' securities, the proceeds

were siphoned out of RCM and "upstreamed" to other Refco subsidiaries.

198.    The Bennett Co-Conspirators' conversion of RCM customers' securities

violated federal law.  THL became aware of this business practice in connection with its control

of Refco.  Yet, the THL Defendants did nothing pursuant to its fiduciary obligations, or its

obligations under the Management Agreement, to prevent the Bennett Co-Conspirators from

misusing RCM customers' assets.

199.    As a direct result of the THL Entities' and THL Directors' breaches of

their fiduciary duties, this fraudulent scheme continued unabated, and THL pushed Refco into an

IPO that saddled it with hundreds of millions of dollars in obligations it could not fulfill.

## 1.    The RGHI Receivable

### a.    Trading Losses

200.    One early aspect of the fraudulent scheme involved the improper

concealment of hundreds of million dollars in customer and proprietary trading losses in the late

1990's, including hundreds of millions in losses that were incurred during the Asian debt crisis in

1997 and 1998.

201.    Beginning in or around 1997, certain Refco customers to whom Refco had

extended credit to purchase securities incurred heavy trading losses in the Asian financial crisis

and could not repay the loans extended to them by Refco (the "<u>Asian Losses</u>").

202.    The Bennett Co-Conspirators failed to properly account for the Asian

Losses, which appeared on Refco's books as customer receivables.  Because the sums from the

customers were uncollectible, Refco ought to have written the customer receivables off as bad

debts and reduced its operating income accordingly.  Instead, the Bennett Co-Conspirators

engaged in financial statement manipulation, periodically and ultimately transferring the amount of uncollectible customer receivables to an RGHI account at Refco, thereby increasing the RGHI Receivable. As a result, a charge to Refco's operating results was avoided and the Refco customer losses were alchemized into an amount due from RGHI, *i.e.*, the RGHI Receivable.

203.    Also in 1997, certain Refco customers in the United States to whom Refco had extended credit — entities associated with Victor Niederhoffer — lost more than $90 million in trades ("Niederhoffer Losses") on the Chicago Mercantile Exchange ("CME"). When rumors at the CME suggested that Refco customers had lost money and that Refco was on the hook, Grant stated to the public that "there is no problem at Refco." This was not true. Rather, when the customer could not meet the margin requirements, the Bennett Co-Conspirators caused Refco to take out an intra-day loan from a financial institution to meet the margin call at the CME and then used funds taken from customers of other Refco entities to repay the loan. The Bennett Co-Conspirators caused Refco to enter into settlement agreements with the Niederhoffer entities pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco.

204.    The Bennett Co-Conspirators also failed to properly account for the Niederhoffer Losses. Like the Asian Losses, the Niederhoffer Losses were uncollectible — indeed the settlement agreements released the Niederhoffer entities from liability — and should have been written off in Refco's operating results as a bad debt expense. Instead, approximately $71 million of the Niederhoffer Losses were "sold" or transferred to an RGHI subsidiary and then further transferred to RGHI's account at Refco. Thus, like the Asian Losses, the uncollectible Niederhoffer Losses were transformed from bad debts into what appeared on Refco's books as the RGHI Receivable.

54

205.    Refco also suffered substantial losses in excess of $40 million during this period from proprietary trades, *i.e.*, trades carried out on its own behalf, which losses were also improperly concealed rather than being written off. Like the Niederhoffer Losses, rather than being written off in Refco's operating results, these losses — some of which were associated with the decrease in value of Russian bonds in 1998 — were "sold" or transferred to an RGHI subsidiary.

206.    Rather than recognize and properly record the trading losses on Refco's books, the Bennett Co-Conspirators concocted a scheme to transfer some or all of these losses from Refco to RGHI. As a result, instead of being written off as bad debt, hundreds of millions of dollars in customer losses and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable from RGHI. This had the effect of making Refco's financial position look materially stronger than it actually was.

207.    RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Bennett Co-Conspirators' ability to conceal the very losses shifted from Refco's books to RGHI's account.

### b.    Hiding Operating and Other Expenses

208.    In addition to the Asian Losses and other trading losses, the Bennett Co-Conspirators also artificially inflated the appearance of Refco's financial results by inappropriately recording over a hundred million dollars in Refco expenses and other transactions on RGHI's books. This had the effect of improperly reducing Refco's expenses while at the same time increasing the RGHI Receivable, *i.e.*, increasing RGHI's purported indebtedness to Refco.

209.    The activity making up this aspect of the RGHI Receivable relates to a number of different categories of expenses and charges that should have been recorded by a Refco entity rather than shifted to RGHI to become part of the RGHI Receivable.

210.    One category of improper transactions was expenses that were apparently incurred by Refco but were moved by the Bennett Co-Conspirators from Refco's books to RGHI's books.  In many instances, the Bennett Co-Conspirators would cause a Refco entity to make a cash payment for an expense, or credit (reduce) an expense item that was to be transferred to RGHI, and record a resulting receivable from RGHI.  At the same time, RGHI would record an expense and a resulting payable to Refco.  For example, between 2000 and 2005, tens of millions of dollars in computer expenses were transferred from Refco to RGHI. Further, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco.  The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco.  On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

### c.    Phantom Income

211.    The Bennett Co-conspirators also artificially inflated the Refco's financial results by creating hundreds of million of dollars of phantom income from RGHI.

212.    The Bennett Co-Conspirators substantially inflated Refco's income by recording significant interest income from RGHI accruing on the fraudulently created receivable balance.  This was bogus income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable.  For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

213.    The Bennett Co-Conspirators also caused Refco to inflate its income as a result of "transactions" with RGHI. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Bennett Co-Conspirators of income at Refco. The description of the transaction on the account statement said only "Transfer" for each item. This practice served as a significant source of Refco's income and continued after the LBO, while THL was in control of Refco.

### d.    Disclosure of the RGHI Receivable

214.    On October 10, 2005, Refco disclosed that a multi-hundred-million dollar related-party receivable had been inaccurately characterized in the company's public financial statements:

> Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. . . .

215.    Refco also announced that, because this receivable was not shown as a related-party transaction in its financial reports, Refco's financial statements for the previous four years "should no longer be relied upon."

216.    Starting with its pre-LBO diligence, the THL Entities and THL Directors knew that the Bennett Co-Conspirators had thwarted THL's professionals from determining the nature of the balances carried in such related-party accounts. After the LBO, when the THL Entities owned a controlling interest in Refco, when the THL Directors served on Refco's board, and when the Management Agreement was in force, the THL Entities and THL Directors had the right, the ability and the duty to demand such information from Refco's auditors. THL

inexplicably never requested documentation regarding related-party accounts during this period

of control, despite Refco's auditor's refusal to furnish this information to THL prior to the LBO.

In essence, THL buried the red flag.

218.    In addition, the THL Entities and THL Directors had access to all of

Refco's books and records, including documents related to Refco's related-party transactions

with RGHI. Had the THL Entities and THL Directors exercised their right to review such

documents, they easily could have uncovered the fraud at Refco. By choosing not to demand

such information, the THL Entities and THL Directors breached their fiduciary duties to the

company.

### 2.    The Cover-up: Round-Trip Loans

218.    The multi-hundred million dollar RGHI Receivable was a related-party

obligation that was required to be disclosed in Refco's financial statements. To cover-up the

magnitude and the related-party nature of the RGHI Receivable at key reporting periods, the

Bennett Co-Conspirators came up with a remarkably simple scheme. The scheme involved

implementing a series of transactions at the end of each fiscal year (and also, starting in 2005, at

the end of fiscal quarters) that were designed to reduce temporarily the RGHI Receivable and

replace it on Refco's books with a receivable purportedly owed to Refco by unrelated third

parties (the "Round-Trip Loans"). The transactions were reversed just days after the end of the

reporting period and the RGHI Receivable was reinstated.

219.    Starting as early as February 1998, toward the end of each relevant

reporting period, the Bennett Co-Conspirators would cause RCM, or another one of the Refco

entities, to extend "loans" of up to $720 million at a fixed rate of interest to a third-party

unrelated to Refco, Bennett or RGHI. The "loan" would appear as a credit in the third-party's

account at Refco. The third-party would then "loan" the same amount to RGHI charging an

interest rate that was between 15 and 100 basis points higher than the third-party was being charged on the "loan" from Refco. The "loan" to RGHI would enable it to appear to pay down – by recording a reduction of its obligation – a significant portion of the debt RGHI owed to one or more of the Refco entities. For many of the Round-Trip Loans, the Bennett Co-Conspirators would also cause RGL to issue a guarantee to the third-party lenders for repayment of their "loan" to RGHI.

220.    A few days following the close of the reporting period, the parties would then unwind the entire transaction. The third party would receive a fee for Refco's temporary use of the third parties' legal entity. The fee or risk-free profit was equal to the interest the third-party "charged" on the "loan" to RGHI less the interest the third-party was "charged" on its "loan" from RCM. Indeed, although characterized as "loans" in the transaction documents, most of these transactions occurred on paper only; for the majority of the transactions, except for payment of interest to the third-parties, the "loans" were conducted on a book basis only and no actual transfer of funds occurred.

221.    The effect of the Round Trip Loans was to substitute at the end of each reporting period, for bookkeeping purposes only, a multi-hundred million dollar obligation owed by RGHI to one or more of the Refco entities (which obligation was required to be disclosed) into an obligation owed by an entity purportedly unrelated to Refco (which could be hidden in customer receivables). The Round-Trip Loans were a sham, generating risk-free profit for the third-party participating in these transactions. The Round-Trip Loans served no legitimate business purpose. Rather, they were conducted solely to reduce temporarily the amount of the RGHI Receivable at the end of a reporting period.

222.    There were approximately 30 Round-Trip Loans from 1998 through 2005, always at the end of a financial reporting period, and never at any other time (with one exception). The Round-Trip Loans caused the amount of the RGHI Receivable to be understated by hundreds of millions of dollars at each relevant reporting period and were always unwound a few days into the new reporting period.

223.    The Bennett Co-Conspirators conducted the Round-Trip loans both pre- and post-LBO. The post-LBO loans occurred while the THL Entities were controlling shareholder, while the THL Directors were on the Board of New Refco, and after THL had determined that Refco's accounting function was inadequate. They happened on THL's watch.

### 3.    Fraudulent Conversion Of Customer Assets At RCM

224.    Apart from the fraudulent activity concealed in third-party accounts, the Bennett Co-Conspirators engaged in a longstanding fraudulent conversion of customer assets held at RCM.

225.    RCM, Refco's purported offshore entity, was in the business of effecting securities and foreign exchange transactions for the accounts of customers. RCM held itself out to be a custodian for its customers' securities and cash. In reliance on RCM's supposed practices, customers opened accounts at RCM and entrusted property that allowed them to purchase and/or sell securities and currency that were held for them by RCM.

226.    In reality, however, RCM's actual business was starkly different; the Bennett Co-Conspirators saw to it that RCM did not "hold" or act as custodian of its customers' securities and cash. Rather, the Bennett Co-Conspirators would fraudulently convert customer assets held in the custody of RCM and use the resulting proceeds to sustain Refco's business operations and acquisitions. Without the RCM customers' knowledge, authorization or consent, on an almost daily basis, Refco employees were directed to sell, or cause to be sold, RCM

customers' securities through hypothecations or pursuant to agreements to repurchase ("repos"). The proceeds of the repos were then siphoned out of RCM, and transferred to RCC. RCC, in turn, used the funds for the benefit of other entities resulting in "loans" to other Refco entities, which entities could not repay those "loans."

227.    The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the THL Defendants. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did.

228.    Not surprisingly, given the size of the funds generated for Refco through the unauthorized sale of customer securities, the THL Defendants were well aware that RCM customer funds were not being protected and segregated in accordance with the relevant U.S. regulatory requirements. While Refco board papers in the relevant period monitor segregation and net capital requirements for other Refco entities, significantly those same Refco board papers make clear that no such segregation requirements were observed in relation to RCM.

229.    The Bennett Co-Conspirators also kept careful track of the intercompany transactions and of the customer assets that were held at RCM at any given time. Refco's treasury operations were managed by the treasury department of Refco Global Finance. This department generated regular reports for Refco management showing the amount of customer

assets that could be stolen from RCM customers. The THL Entities and THL Directors —

including Jaeckel, who was the Treasurer of New Refco — had access to such reports throughout

the relevant period. Additionally, upon information and belief, the THL Entities and THL

Directors in fact accessed the reports during the relevant period. On information and belief, it

was by examining reports such as these that Refco management and the THL Defendants

ascertained that Refco was experiencing severe liquidity problems and thus decided to impose a

moratorium on RCM customer withdrawals in October 2005.

230.    The stolen RCM customer assets were used for a wide variety of funding

purposes by various Refco affiliates. For example, the Bennett Co-Conspirators used RCM

customer assets to make payroll payments and to fund the daily operations of other Refco

entities.

231.    Moreover, while THL was in control of Refco, the Bennett Co-

Conspirators used RCM customer assets to fund business acquisitions and other significant

Refco transactions. For example, in 2005 the Bennett Co-Conspirators used the proceeds from

the conversion of customer securities to loan $154.2 million from RCC to Suffolk, LLC, the

controlling shareholder of PlusFunds, to finance Suffolk's buyout of PlusFunds. The Bennett

Co-Conspirators also caused RCC to make a $50 million payment at this time to two principals

of PlusFunds.

232.    Additionally, while THL was in control of Refco, the Bennett Co-

Conspirators used assets converted from RCM customer accounts to fund Refco's purchase of

Cargill Investor Services. Having completed an LBO which removed "excess" cash from

Refco's books, and having closely monitored the company's finances in preparation of the

upcoming IPO, the THL Entities and THL Directors knew the amount of cash available to

finance the Cargill acquisition. The THL Entities and THL Directors must have known — or at a minimum, strongly suspected and avoided confirming — the illegitimate origin of the approximately $209 million used to finance the Cargill acquisition.

233.    The THL Entities and THL Directors had unfettered access to, and were made aware of, material information concerning RCM and the intercompany transfers of RCM customer assets. For example, the THL Entities and THL Directors, through Jaeckel, received presentations on the results of Grant Thornton's audit of Refco's 2005 financial statements. In addition, documents produced by THLP in connection with the Debtors' bankruptcy proceedings demonstrate that the THL Entities and THL Directors were aware of RCM's practice of "repoing" securities that were supposed to be held in customer accounts and knew that RCM customer securities were being sold to raise cash for RCM and its affiliates.

234.    Given the THL Entities' and the THL Directors' easy access, the sheer size and number of the transfers made in furtherance of the fraudulent scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Entities and the THL Directors would not have known about the use of the RCM customer funds over the course of the sixteen months it controlled Refco prior to the bankruptcy. Had they merely had an understanding of how Refco's businesses were regularly funded, the THL Entities and the THL Directors would have learned the full scope of the RCM fraud.

**G.    Refco's Insolvency**

235.    RGL and New Refco were insolvent starting no later than the LBO. Additionally, as of the Reincorporation, Refco Inc. was insolvent.

236.    Additionally, each of these entities possessed unreasonably small capital — including RGL, which was left with unreasonably small capital as a result of the LBO.

237.    Given that Refco was insolvent and in the zone of insolvency beginning no later than the LBO, the THL Entities and the THL Directors owed fiduciary duties to Refco's creditors, as well as to Refco and its stockholders. After the LBO, and after the THL Entities and THL Directors became majority owner and directors of Refco, numerous improper transactions caused Refco's insolvency to deepen.

238.    First, Refco entered into the ill-advised approximately $209 million Cargill acquisition. As noted, THL executives voiced grave concerns over the lack of due diligence on this transaction, and over the wisdom of the financial terms of the transaction — but nevertheless signed off on the acquisition, so as not to "rock the boat" soon before their IPO.

239.    Second, the THL Entities and THL Directors knew of the Suffolk Loans that financed Suffolk's buyout of PlusFunds. Again, they failed to properly consider whether these loans were in the best interests of Refco. Had they inquired into the validity of these loans, they would have learned that the Suffolk Loans were a sham and that Refco received little or no consideration in return for its loans.

240.    Third, the THL Entities and THL Directors improperly caused Refco to go public in August 2005. The IPO saddled Refco with hundreds of millions of dollars in obligations while THL and the other selling shareholders reaped substantial gains. By entering into an IPO based on a prospectus riddled with misstatements, Refco incurred liabilities under the securities laws to stock purchasers of $670.5 million. Similarly, THL caused Refco to register its bonds under Form S-4, thus causing Refco to incur hundreds of millions of dollars in

additional liabilities. Had THL taken the necessary steps to remedy Refco's internal problems prior to the IPO and the bond registration, Refco would not have incurred these losses.

241. The THL Defendants violated their fiduciary duties by allowing Refco to enter into these transactions and thus plunge Refco deeper into insolvency.

## H.    Payments to the THL Defendants

242. From on or around August 5, 2004 — when the THL Defendants were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made the following payments to one or more of the THL Entities:

- Approximately $31.6 million for the Initial Management Fee and a semi-annual installment of the Annual Management Fee on August 5, 2004;

- $1.5 million as a semi-annual installment of the Annual Management Fee on March 4, 2005;

- Approximately $41.1 million as a "greenshoe" dividend on August 18, 2005;

- Approximately $12.9 million for the Management Agreement Buyout Fee on August 25, 2005;[8]

- Approximately $8.4 million to cover tax obligations owed by the THL Entities; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

243. From on or around August 5, 2004 — when the THL Entities and THL Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made the following payments for the benefit of one or more of the THL Entities:

---

[8]    Pursuant to the terms of the Management Agreement, New Refco and RGL were required to pay a buyout fee to THL immediately upon an IPO. This "cash lump-sum termination fee" was calculated as the "net present value of the fees that that would have been payable . . . for a period of five (5) years from the date of such termination calculated using the Fee paid for the fiscal year ended prior to such termination and a discount rate equal to the ten-year treasury rate on the date of such termination . . . ."

- Approximately $9.6 million for professional fees incurred in the LBO on or around August 5, 2004; and

- Approximately $3.5 million for professional fees incurred in the IPO.

244.    From on or around August 5, 2004 — when the THL Entities and THL Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made approximately $38 million in payments to cover tax obligations owed by owners of Refco. Approximately $8.4 million of these payments were made to the THL Entities; the remainder went to other owners.

245.    The IPO was consummated on August 11, 2005.  At that time, THL and its affiliates sold approximately 7.86 million shares of Refco common stock, and received net proceeds of approximately $162.5 million.

246.    In total, therefore, the THL Defendants received the following approximate transfers and benefits, all of which are recoverable as fraudulent conveyances and/or subject to disgorgement, and which total approximately $275 million:

- $46 million under the Management Agreement;

- $162.5 million in IPO proceeds;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- $3.9 million in "side letter" payments.

## I.    Post-Bankruptcy Events

247.    As noted, on October 10, 2005, less then two months after the IPO, Refco disclosed a related-party receivable of approximately $430 million held at Refco.  The disclosure

precipitated a crisis of confidence among Refco's customers and shareholders. Within one week, Refco and various of its subsidiaries filed for bankruptcy.

248.    Notwithstanding THL's failure to uncover the fraud during its intimate involvement with and management of Refco, federal authorities stepped in and promptly identified massive wrongdoing at Refco. On October 11, 2005, the day after the public disclosure of the related-party receivable, Bennett was arrested and indicted by the United States Attorney for the Southern District of New York ("USAO"). Bennett was charged with fraud for engaging in fraudulent related-party transactions.

249.    On October 24, 2006, the USAO issued a superseding indictment against Bennett, adding Trosten as a defendant, relating to the fraudulent related-party transactions.

250.    Finally, on January 16, 2007, the USAO issued a superseding indictment, adding Grant as a defendant.

**COUNT I**
**Recovery of Fraudulent Transfers**
**Against the THL Entities**
**(11 U.S.C. §§ 544(b), 550(a)(1), and (2); 548(a)(1)(B)(ii)(I), (II), and (IV);**
**NY DCL § 270 et seq.)**

251.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

252.    Refco Inc., New Refco, and RGL made the following transfers (the "Fraudulent Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|------|-------|-------|-------------|---------------------------|
| 08/05/2004 | RGL | Managers V | Transaction Fee plus one-half of Annual Management Fee | $31.6 |
| 08/05/2004 | Refco Finance Holdings | THL's professionals | Professionals' Fees | $9.6 |
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | $1.5 |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | $41.1 |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | $12.9 |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | $3.9 |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | $3.5 |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | $8.4 |

253.    Each of these Fraudulent Transfers constituted transfers of interests in property of Refco Inc., New Refco, or RGL. The Fraudulent Transfers totaled approximately $112.5 million.

254. Each of the Fraudulent Transfers was made for no consideration; was without fair consideration; or was made for less than a reasonably equivalent value.

255. At the times of each of the Fraudulent Transfers, the payor (RGL, New Refco, or Refco Inc.) had at least one creditor with an unsecured claim for liabilities.

256. Each of the Fraudulent Transfers was made (a) when the transferor was insolvent; (b) so as to render the transferor insolvent; or (c) so as to leave the transferor with unreasonably small capital.

**COUNT II**
**Recovery of Preferential Transfers**
**Against the THL Entities**
**(11 U.S.C. §§ 547(b); 550(a)(1), and (2))**

257. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

258. Refco Inc. and RGL made the following transfers (the "Preferential Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|---|---|---|---|---|
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | $1.5 |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | $41.1 |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | $12.9 |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | $3.9 |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | $3.5 |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | $8.4 |

259.    Each of these Preferential Transfers constituted transfers of interests in property of Refco Inc. or RGL.  The Preferential Transfers totaled approximately $71.3 million.

260.    Each of the Preferential Transfers was made within one year of the filing of the Debtors' bankruptcy petitions on October 17, 2005.

261.    Each of the Preferential Transfers was made while the THL Defendants were insiders of Refco.

262.    Each of the Preferential Transfers was made to or for the benefit of one of the THL Entities for or on account of an antecedent debt owed by Refco Inc. or RGL before the transfers was made.

263.    Each of the Preferential Transfers was made while Refco Inc. and RGL were insolvent.

264.    Each of the Preferential Transfers enabled one of the THL Entities to receive more than they would have received if (a) the case were administered under chapter 7 of the United States Bankruptcy Code; (b) the transfer had not been made; and (c) the transferee received payment to the extent provided by the Bankruptcy Code.

### COUNT III
**Breach Of Fiduciary Duty**
**Against the THL Entities**
**For Compensatory Damages**

265.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

266.    The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

70

267.    The THL Entities owed fiduciary duties to RGL because the THL Entities

owned a majority interest in New Refco while New Refco was the operative parent company of

Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation

provided that "[New Refco] shall have complete and absolute control of the affairs and business

of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

268.    The THL Entities owed fiduciary duties to Refco Inc. because, following

the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc.

and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco

Inc. Additionally, the THL Entities exercised control over the board and the business affairs of

Refco Inc.

269.    These duties required the THL Entities at all times to act faithfully on

behalf of the Company and to conduct themselves in a manner they reasonably believed to be in

the best interests of the Company.

270.    The THL Entities breached their fiduciary duties when they engaged in

acts of self-dealing. As a result of these transactions, the THL Entities received a monetary

benefit at the expense of the Refco entities.

271.    The THL Entities had a duty to inform themselves of Refco's financial

state prior to making business decisions on behalf of Refco. The THL Entities breached their

fiduciary duties because based on, among other things, their due diligence they knew, should

have known, and should have informed themselves of Refco's true financial state upon assuming

a managing role in Refco.

272.    As a direct and proximate result of the THL Entities' acts and omissions,

Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities;

71

Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Entities are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

**COUNT IV**
**Breach Of Fiduciary Duty**
**Against the THL Entities**
**For Restitution**

273.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

274.    The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

275.    The THL Entities owed fiduciary duties to RGL because the THL Entities owned a majority interest in New Refco while New Refco was the operative parent company of Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation provided that "[New Refco] shall have complete and absolute control of the affairs and business of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

276.    The THL Entities owed fiduciary duties to Refco Inc. because, following the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc. and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco Inc. Additionally, the THL Entities exercised control over the board and the business affairs of Refco Inc.

277.    These duties required the THL Entities at all times to act faithfully on behalf of the Company and to conduct themselves in a manner it reasonably believed to be in the best interests of the Company.

278.    The THL Entities breached their fiduciary duties when they engaged in acts of self-dealing.  As a result of these transactions, the THL Entities received a monetary benefit at the expense of the Refco entities.

279.    The THL Entities had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco.  The THL Entities breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

280.    The THL Entities breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which the THL Entities derived an improper benefit at the expense of the Company while causing the Company to incur, among other things, approximately $670.5 million in obligations to shareholders.

281.    As a direct and proximate result of the THL Entities' acts and omissions, the THL Entities were enriched, including enrichment from transfers from the Company.  The THL Entities must disgorge all proceeds so derived, in an amount not less than $275 million.

## COUNT V
### Breach of Fiduciary Duty
### Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen
### For Compensatory Damages

282.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

283.    The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

284.    The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

285.    In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

286.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

287.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities. The THL Directors chose to put the interests of THL above the interests of the Refco entities.

288.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Directors breached their

74

fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

289.    As a direct and proximate result of the THL Directors' acts and omissions, Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities; Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Directors are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

## COUNT VI
### Breach of Fiduciary Duty
### Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen
### For Restitution

290.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

291.    The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

292.    The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

293.    In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

75

294.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

295.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities. The THL Directors chose to put the interests of THL above the interests of the Refco entities.

296.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Directors breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

297.    The THL Directors breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which they derived an improper benefit at the expense of the Company while causing the Company to incur $670.5 million in obligations to shareholders.

298.    As a direct and proximate result of the THL Directors' acts and omissions, the THL Directors were enriched, including enrichment from transfers from the Company. The THL Directors must disgorge all proceeds so derived, in an amount not less than $275 million.

## COUNT VII
### Unjust Enrichment
### Against All Defendants

299.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

300.     The THL Defendants were enriched by the following transfers in excess of $275 million:

- Approximately $162.5 million in proceeds that the THL Defendants received by causing Refco to go public.

- Approximately $46 million pursuant to the Management Agreement;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

301.     When the THL Defendants received the monies described herein, they were enriched at the Company's expense by receiving something of value that belonged to the Company.

302.     The enrichment violates equity and good conscience.  Among other things, as a result of their failure to act appropriately as majority owner and directors of Refco, the THL Defendants must disgorge these monies as it would be inequitable and unjust to allow them to retain these funds.

## COUNT VIII
### Illegal Dividend
### Against the THL Entities and THL Directors
### (DGCL §§ 170 - 174)

303.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

304.    The THL Entities and the THL Directors approved and directed the payment of at least approximately $120.2 million in dividends and distributions by New Refco and Refco Inc., including a greenshoe dividend of approximately $82.2 million as well as approximately $38 million in payments to cover tax obligations owed by owners of Refco.

305.    At all relevant times, New Refco and Refco Inc. were insolvent.  Because these entities' liabilities exceeded their assets, the dividends and distributions approved by and paid to the THL Entities and the THL Directors were illegal under Delaware law.  The THL Entities and THL Directors are each liable for illegal dividends and distributions declared and paid while they were fiduciaries.

## COUNT IX
### Forfeiture of Compensation
### Against the THL Entities and THL Directors

306.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

307.    The THL Entities and THL Directors are required to forfeit all compensation received after the first date of their breaches of fiduciary duties, including after the first instance of a breach of their duty of loyalty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and grant the following relief:

(a)    Entering judgment in favor of the Trust for the benefit of the Trust beneficiaries and against the THL Entities and the THL Directors in this action;

(b)    Avoiding and setting aside the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II**;

(c)    Directing each respective transferee of the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II** to deliver to the Trust for the benefit of the Trust beneficiaries the property transferred or pay the value of such property, in an amount not less than $112.5 million plus prejudgment interest;

(d)    Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Counts III and V** against the THL Entities and THL Directors, jointly and severally, for all damages sustained by RGL, New Refco, and Refco Inc. as a result of the THL Entities' and THL Directors' breaches of their fiduciary duties, in an amount to be proven at trial, plus prejudgment interest;

(e)    Awarding restitution in favor of the Trust for the benefit of the Trust beneficiaries on **Counts IV and VI** against the THL Entities and THL Directors, jointly and severally, for all proceeds derived by the THL Defendants following the date of the first breach of fiduciary duty, plus prejudgment interest;

(f)    Directing disgorgement, restitution, and damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VII** against the THL Defendants, jointly and severally, in an amount to be determined at trial, but not less than $275 million, plus prejudgment interest;

(g)    Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VIII** against the THL Entities and THL Directors, jointly and

79

severally, in an amount to be determined at trial, but not less than $120.2 million, plus prejudgment interest;

(h)    Directing forfeiture of all compensation received by the THL Entities and THL Directors after the first date of a breach of one of their fiduciary duties, and awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count IX** against the THL Entities and THL Directors, jointly and severally, in an amount to be determined at trial, but not less than $112.5 million, plus prejudgment interest;

(i)    Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action; and

(j)    Granting Plaintiff such other and further relief as the Court considers appropriate.

## JURY DEMAND

308.    Plaintiff demands a trial by jury on all issues triable by a jury.


Dated: New York, NY
           November 20, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

_Kylie Davidson_

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000

*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*

81